FIRST CIRCUIT UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Jeffrey L Taylor, *Pro Se* )
    *Plaintiff* )
  )
  )
verses )  Attachment to Affidavit
  )  Supplemental Motion to Vacate
Ally Fowler )
    *Defendant* )
  )

**An Attachment in support of the content of Affidavit on Motion for Dismissal of an action pursuant on statute laws 42 U.S.C.S. 11361 and following.**

    The necessity for expansion into the area on which the outline of several key features were advanced for the argument on the violations of rules of the public housing makes this a standout item in the defense of public spaces used by the Plaintiff, at the residence in use by the Plaintiff. The cause of action has been maintained to address an aspect of hostility of the defendant, and especially of the party of the defendant, which has been inadequately described. For the initial purposes of the civil action the testimonial Plaintiff has provided has been one that is of personal involvement and as well as reportorial. This testimony may rely on interpretation of events, verbally paraphrase as well as be descriptive of actions initiated by the defendant and the defendant party. Please note, that at however variant the standards on the reportage, this is self-defense of the Plaintiff. A solo voice makes no amends for the standards of the burden of proof allowable in the system of jurisprudence, addressing grievances caused by more than one person. Doing this on a lone stance, of solo testimony, may be incomplete, as a standard of acceptance for procedure in law: The Plaintiff alone cannot address the distributed problems perpetrated; as an individual, the Plaintiff acts in response to a series of provocations initiated by the Defendant of this action. The plaintiff's role has been multiplied over being subjected to acts caused by the defendant, and sometimes to the great inconvenience of using the response necessary to counter the actions.

That the writing instrument Plaintiff owns has been affected in a manner that makes the performance of the MS Millennium Edition operating system unreliable in failsafe conditions is a severe cause of concern; and it introduces alterations in ways in which this project can be completed. It is just the sort of thing that delineates the course of the composition of written material to redirect the procedure in which it will take final form. Plaintiff depends on instrumentality of the computer for work in order to work with the written

word.  Environments in which the plaintiff works have not been free from such control of the personal performance.  As long as the Plaintiff cannot rely on the performance of the operating systems and the software applications to the plaintiff's satisfaction, there will occur the parallax view of whether the items in the record accurately reflect and intended origination.

Of the original submissions in the course of the complaint is the note of caution of the condition of the Plaintiff's software; there is the operating system's notation of the defect that has caused the software that runs a gaming experience to malfunction.  This is a vitiation and a likely signal that the operating system has been compromised, as far as the Plaintiff is concerned. The purchase of the computer product was made in June 2001 from a vendor who has helped maintain the computer's operation system, on a service agreement plan.  The operating system has been re-installed on a single occasion.  The OEM disks have been kept offsite, and have been unavailable for as much as 12 months: at the same time when Plaintiff has been concerned of a system crash that would disable the computer indefinitely.  However, certain glitches in performance have not brought the operating system to this stage.  The game that is used as evidence of intrusion into the system, of Plaintiff's stand alone Home Computer, has been opened on the order of about a dozen times in the lifetime of the system's creation.  Half of those events of the use of the game have been in the period just after May to June 2004. (Files will normally corrupt — a naturally occurring fault expected to be encountered in software design and creation).  There is another scenario of the introduction of programming errors, and this is the possibility of the alteration of the programming to affect the performance of the program material — a specific action made explicitly on purpose in a piece of operational software for gaming to rewrite programming.  The Plaintiff believes a fault may be introduced, which has the intention of disrupting the gaming software.  The fault may easily be remedied, but has not yet been implemented.

The fault model is a reproducible one.  In other words, the plaintiff is part of an environment which is reliant upon the monitoring of suspects, and it is secondary to believe that the activities of these intrusions is not always un-intentional.  But it is just as likely that the effect is a little environmental degradation, or that there is evidence that is left behind on fishing expeditions, the remainder or litter effects that betray the presence of the intrusion.  The evidence the Plaintiff is asking the reviewer to recognize is that these interruptions in normal service of a performance tool (program WildTangent BlasterBall) may mean that it is broken in the wake of an operation that has trespassed on the property, on which the Plaintiff resides, into the computer which the plaintiff bought and owns.  The dis-functionality could just as well be conditioned to disable itself after x number of runs, and may have been set to do this at another time then again remote.  The fix on the javascript disablement could be remedied by reloading the game softwares. However, the Plaintiff has been unable to do this simple remedy because the Plaintiff has put OEM software in a remote site, at a safety deposit box. Currently, the plaintiff has access to the lock box.

The other evidence that Plaintiff proffers that non-system errors have been introduced into the software, some system software, and some of plaintiff's

data files, is from how well the data files are holding up under normal usages, and whether the data files are accessible, and what the Plaintiff has put into the files that contain data. The expensive extreme of having a failsafe operating system is not the intent of computer ownership, as most any desktop environment is sufficient for day to day use. Having a computer system do what it is intended to do makes life a little easier, however, in plaintiff's computers there are now showing small evidences of something resident of other ARTIFACTS. It perhaps will indicate the involvement of another entity, and that the intrusion of this entity's activities may be revealed in functional flaws the owner encounters in normal operation. The Millennium operating system software was without password protection for more than a year. The day after this move to upgrade was in place, the plaintiff noticed changes in the environment of his living quarters. The same intrusions to the rooming house spaces at #216 Massachusetts Avenue were observed. The plaintiff's primary computer has not been operating any smoother, but was instead having crashes in periods more often than others (the plaintiff is still a novice for computer operations, but differences are uncharacteristic of healthy system performance). In other ways small changes were apparent. The daily checklist of things done before leaving the residence was maintained is one. For example, the "on" light of the speaker set was being found in the "ON" position, when plaintiff has kept the amplifier switch in the off mode. Sometimes up to three incidents in a week were being observed that the speaker power on button was being left in the On position, when the PLAINTIFF left the room for the day and had made double sure that the power on button for the speakers had been turned off. There is no possible way for this power on switch to be electronically powered up. The only method in which this can be accomplished is for the button to be depressed manually, and that to actuate the button it would mean that a check-pressure would also be required so that the click-on hold would persist. By pressing the power-on button and holding it there, it would ensure that the power-on feature of the JBL Platinum computer speakers would remain on. Plaintiff asserts the only way for the speaker button to be turned on and to be left on until when the plaintiff returned for the day was by another person using the apartment room. Plaintiff will not be able to declare whether the computer system was operationally on at the times of intrusion.

There are software changes observed that indicate another entity operating in the Plaintiff's equipment, but similarly as with the speaker ON-button problem, the plaintiff is not prepared to claim that direct intrusion into the property of the plaintiff has transpired. What we have is that Plaintiff has created data files and has placed these files within the data system management of the hard drive. Some files are not being found at a later time. The malwares themselves have not been discovered by the plaintiff, and it is also completely within the realm of computer activities that malwares have been introduced into the plaintiff's computing systems innocuously through plaintiff's own working habits, even though plaintiff has observed certain rules in diskette usages in order to prevent the most blatant of trespassing acts. At certain times it may appear "safe" to the judgment of the plaintiff to transfer a file, or edit a file in the drive marked for <a:>. There are other times that plaintiff has been aware of the operation of the A: drive as being suspicious, and problematic, and the plaintiff has also relied upon a resident AntiVirus

software to check file systems and electronic files from time to time, and especially upon occasions where problems occur. The chief problem of malwares the plaintiff has observed has been file content that has been corrupted, and that has been corrupted as the plaintiff works on the content (returning to a data file corrupted can mean its contents have disappeared). The malwares have shown up in the plaintiff's open source software used in the Linux operating systems, as well as in plaintiff's MS operating systems for Windows 2000 Professional, Millennium Edition. Are malwares, and "heterogenic" softwares being purposely introduced into the content of plaintiff's computer boxes? When system malwares become a concern to the plaintiff, and how they may have been introduced, it is when certain files that the Plaintiff creates become problematic and corrupt. A corrupted file content appears to disintegrate when it is under attack, leaving a crumple of a binary residual. Examples include notes that have been transcribed, important reference letters, and content of data elsewise that end up a liability. Plaintiff can recall no examples of files other than his own where contents or its purpose have been degraded, such as program material software, or applications softwares, with the single exception of the BlasterBall WildTangent software which has stopped functioning midstream after about a dozen openings (but it is unknown at the present time whether re-programming has transpired to cause its breakage, or whether reloading the software for this program will cause the existence of the gaming to be an immutable source of program wares). Files (numbers: a handful of items) that undergo this special kind of corruption are targets of disruption and so the programming that has a way of honing an attack on such a file/ownership.

For the purposes of this composition and testimony, the plaintiff makes no assertion to establish that files and data are being tagged, pirated or purposely being corrupted, until a thorough check on the recovery of lost files can be made. Plaintiff only asserts that intruders have been, and are, actively engaged in accessing work products the Plaintiff makes, and, the computers in the residence. The plaintiff cannot verify the substance of this assertion, and only can assert there are trespasser's violations of the internal spaces of the hard drive, but that the time differential is the only thing that prevents elucidating the claims — and, that there are sufficient artifacts present to belie the tangibility of intrusions in the home computer systems contained in plaintiff's personal room and spaces. Time differential is the condition where the facts can only be established and plaintiff aware of the presence of other people in the personal spaces by evidence that specifically ties another presence in those spaces at other times than when plaintiff is NOT in the same place.

The plaintiff makes no assertion either that the DEFENDANT named in this action is personally responsible for the changes observed in room characteristics. AN ASSERTION can be advanced that places the defendant at the periphery of actions hostile to plaintiff's peace. That because the defendant has become involved in territorial disputes in the residents' spaces at the Cambridge Family YMCA, it is just another sort of artifact that is in play relative to the state of the Plaintiff's relation with adverse parties. Plaintiff believes that DEFENDANT is involved because the defendant's employment role in the Residence means that the defendant is prompted to act for the service contracting that is

maintained by the owner of the building. As a service provider to special populations of people, the defendant's party is required to have a person on the site, as required by a any contractual inclusion to provide *adequate* supervision on the residence's residents. The facility is required by terms of its having funding to perform as a services provider applicant, as to have overnight supervision, as well as a resident overseer for the weekends. The requirement is mandated in statute law that prescribes and regulates the content of the service provisions of the business relations, no different than those provisions of services than would be found in those from a property management perspective. The defendant is acting to preserve territory that is marked for inclusion of use of program participants of treatment programs that are operated, on the building site, by the defendant's employer. The Plaintiff at this time does not establish a given fact, but it reasons that residents in s program need around the clock supervision, and a person on whom the building owners could rely.

At first notices to the property managers of words of concern over fights on the fourth floor necessary and shower rooms, there were the several express concerns of the hour at which time of day these conflicts were occurring. The PLAINTIFF alleges that the defendant's party has relied on time of day to separate any duties into which the defendant may be at risk to be liable for harm. When the defendant was not on duty, or can be assigned to other duty-time, is a likely time that the defendant would behave in ways to not aggravate other residents outside of his employ. That the defendant belongs to an employer who is engaged in managing problem behaviors of their "patient" residents, means that the residents whom the Defendant is familiar with under defendant's supervision have been in some way diagnosed with officially and medically recognized problems related to alcohol use, illicit drug use, and, or, other truancy or deviance.

Plaintiff asserts that it is of interest to employers who are service providers of special populations of captive persons that their service people and supervisory staff are thoughtfully appraised of the problems carried by the charges. Among the characteristics of such wide appraisals are psychiatric DSM diagnosis. The plaintiff asserts that gambling, and other destructive habits are prime targets for supervisory watches. The plaintiff asserts that drug-use typology involves diagnosing people with substance abuses, and that among the substances to abuse are drinks that contain coffee. Caffeine consumption is one of the qualifying marks of substance abuses: to habitually consume a drink with caffeine may preternaturally make the imbiber subject to being diagnosed with substance abuse, as likely as diagnosis for a conditioned user of narcotics. Other addictive behaviors are of interest to the employers of service providers. The plaintiff asserts that playing of computer games would fall into the specialities of psychological and psychiatric assessments, and that employers of service providers would be highly interested in learning of activities of patients who present dysfunctional symptoms such as using computers that have games loaded into them, and would be willing to intrude into others' property to collect information on habits. The plaintiff also states, as computers are marvelous tools in which to design activities for the assistance in diagnosing and assessing people that display disassociative problems, service providers will contract and employ programmers and other

experts in computer adaptations to harvest data on problems that relate to behavior of addictions.

The plaintiff is not the only person to use the fourth floor shower room, and the fourth floor necessary room, who does not normally have an activity, or reside on other floors. The second floor currently has a shower stall into which wheel chair users can be rolled. The residence of the Cambridge Family YMCA has four floors in which shower stalls are available for use. The second floor lacks a handicap: its disablement is related to building upkeep. Currently, any user of the shower stall there will cause water to drip in the main lobby. The shower there has been tagged and roped off as unusable (but these barriers are occasionally, and regularly torn off). In current funding, a concern to consider whether sources are available, and does the fourth floor service provider pay for utility upkeep, building upgrading, fourth floor clean-up?

The Plaintiff makes no claims as to the adverse quality of the defendant's attitude toward the plaintiff, prior to October 2003. The DEFENDANT however never took a notice of the plaintiff at the time the defendant lived on the second floor in apartment number 212. From November of the year of 2000 thereafter to the next year the plaintiff would pass the defendant on the hallways of the second floor. In these occasions when the defendant resided on the second floor, the attitude of the defendant was not hostile, but at the same time it was not indifferent either. The defendant, when seen by the plaintiff then, would generally pass through the hall, and pass without eye-contact. When the defendant has said to the plaintiff that he, the plaintiff, does not belong on the fourth floor bathroom to wash his face, or brush his teeth, the PLAINTIFF can imagine that the defendant should behave the same way to the disabled resident of the second floor. This individual in a wheel chair now has no place in which to shower regularly [for many months the shower stall has been closed]. Additionally, the attitude of the Defendant toward the Plaintiff is not reasonable in light of the incidents that when the Plaintiff has been outside of the residential unit all together:

> Outside the limits of the residence hall, the larger philosophical problem is presented in defendant's behavior as to intentionally cause distress. On the First of January 2004, the plaintiff had returned to the YMCA from outside, and was paused at the entrance to the residence, by the guard who was not at his station at the time. The defendant has directly come into the YMCA a minute or two after the plaintiff, at a late morning hour. As another resident departed, the access to the residence was permitted. The guard was not present. In the lobby the defendant was beginning an attack (though it was an affront, it was not threatening to move something or to take anything that belonged to the plaintiff). "You've been asking around, you've been asking a lot of questions," he declares, "going around my back." *Plaintiff admits asking the front desk supervisor of the name of the resident in number 413, as well as the property manager. Plaintiff also called other residential day staff of the fourth floor. They who answered would not volunteer information.* At the door at the time resident #435 passes to leave the residence, the defendant moved rudely by to go to the elevator. The security guard was not at the front desk. "Why don't you just come and ask me?" the defendant prompts. Plaintiff believes the mentality of the attitude is unfriendly; the attitude is in ways uncooperative in living arrangements, and is a

> reflection that those who believe that facilities users are intruders if they come from other floors (fourth floor laundry room, microwave, sink, kitchen tables, vending machines are for use of all residents, but, not a dedicated shower room?). Don't beat around the bush, "you beat around the bush," he persists. But Plaintiff said to the defendant that defendant can be a hard nose, and defendant is being a hard nose.

The defendant has never been seen by the plaintiff to address any other member of the resident community at the YMCA in such direct and offensive ways the defendant has treated the plaintiff, particularly in the time period between December of 2003 and August of 2004. The defendant's attitude toward the plaintiff on other periods prior to this time have been indistinguishable. The plaintiff asserts that a change of behavior has been notable since about the time of the memorandum/letter of mid-October 2003 was given to the residents and that the defendant's behavior is now characteristically one of combating one of the program participants, under which is the defendant's charge. The PLAINTIFF does not participate in a drug or drug rehabilitation program, that the plaintiff is aware. The manner in which the defendant has addressed the plaintiff would be similar to any other under class person with which the defendant has a grievance, and wished to assert authority. The PLAINTIFF recognizes the barrier as one in which the defendant belongs as any other resident, on the plane of one resident to any other resident of the building (which now has a personal problem, but chooses provocation. So the DEFENDANT therefore has considered the plaintiff must be a part of treatment as though any other client of the employer of the defendant's current occupation). On an afternoon in January 2004 the following incident has changed many things:

> The plaintiff used the central bathroom mirror and shelf on this day. 22 JAN 2004 is not much different at noon with respect to the normal business there, except the Plaintiff was alone at the time the defendant entered the area. The defendant enters the fourth floor necessary room to begin an attack, and has announced it, "now, that we are alone," he begins a barrage that he is secure to be abrasive. Half way through shaving, and a bit of teeth cleaning, plaintiff was stopped, and put into the physically defensive posture to defend bodily attack.
> "Move your stuff," the Defendant calls to the first order of business. The Defendant comes into the bathroom and becomes confrontational, and provocative, "You really gointa use all that space? Get your [****ing] things off from that [second] shelf," he demands. One of two shelf spaces in use, there are four others that are unoccupied. At a sink next to the one the Plaintiff uses, the defendant calls a challenge for territory. He begins to set up, grumbling more. The plaintiff's other things are resting on the shelf, where there isn't room enough on the middle shelf. The defendant insists on aggravation to what could be considered the personal agenda items, ". . . going around dressed like a girl, *all the time*" as though to strike a nerve of innuendo someone else has motivated the Defendant with (there have been other residents who display this behavior overtly, one was such a resident there recently). He is disturbed. "Move your things, you punk, move them or I will move them for you," he begins to get abrasive. "I am gointa count to three and then move them," he proposes, and begins a fast countdown "One." "Two." Then plaintiff begins to say something immediately, as to plaintiff moving the razor and sundries, and collect the

toothbrush etc from the other shelf. Before plaintiff could get the tooth paste and teeth cleaners, the defendant had charged real close to vent some more breath onto the plaintiff's face and onto plaintiff's personal spaces: "Get your [****ing] things aout oh here. I am goiing to take your face and put it in the urinal. You want me to do that, you punk." "I'll do that, I'll put your head in the urinal." The Defendant has persisted on the challenges, and has 70 pounds easily over the plaintiff's weight and volume, "I'll do that, I'll put your face in that urinal [along the wall]," backing the plaintiff into the door. And having succeeded in motivating the plaintiff, he continues "don't use that shower." In weeks prior, there was a noticeable inflection of four letter words, and that in this day, have been dropped on the repeat of the attacks: "don't use that shower," the defendant warns, "don't use that shower!" The plaintiff was unshowered at departure of the fourth floor.

Some thing of the harassment in the methods employed that is reminiscent of the Roe v. Wade Supreme Court decision made years ago is present in the anguish that the Defendant has put into use. And it continues to influence a wishful desire to resolve to the satisfactions that can be better eased into the realm of a more graceful manner. In spite of the education differential, for the defendant, the workplace may be considered as a part of the job to maintain, as part of a sponsored monopoly in the layout of the floors of the residence.

Whether a diagnosis of offender, or of addictive behaviors, the attitude would characterize a will to control it: it's the specialties of the employer of the services provider, an entity resident on the fourth floor. It appears that the method and timing of the interferences have been tied to the plaintiff's personal scheduling, and present a problem of a uniqueness in which behaviors of a stalker are identified. The DEFENDANT after all is the representative of the employment of a service provider, and has chosen provocation, perhaps needlessly, and designed with other intentions (the input of physician's specialties are harkened, by the facts that, like the capillary disruptions experienced in the left eye in the beginning of December 2003, the attacks are distributed. For general example, after the first and second meeting with employer representative at the Canal Street temp agency, this person had become ill and missed work [reference outline of events in Affidavit].

The employer of the Defendant would have us believe that the defendant has chosen this action as his own, and that the defendant operates to "protect" the place of the defendant's employment as a rogue, in that they do not govern his activities with any precision. The employer, North Charles, Inc., had not expected that plaintiff would contact them, according to the property manager's comment, for verifying information about the Defendant – choosing to delay a name verification via electronic mail. It was more than a week of business days that lapsed by the time the defendant's employer verified a name, and then, only a last name. Both email prompts to that employer, made by the Plaintiff, have been copied and sent hard copy to the Community Dispute Settlement center of Cambridge in required procedure to establish an alteration exists with the defendant. The CDSC allegedly found no indication of the

defendant's willingness to participate in a settlement strategy to address a conflict at about April 20, 2004. and April 27 Plaintiff canceled, and requested a return of email copies that were sent to the CDSC (there were no returns of communications, or copies thereof as of yet to this date).

What the plaintiff has learned of public housing and the residents inside is that is poses hard questions of zero tolerance to drug usage, and violence. A person living and seeking, residence in public housing is subjected to community standards that may be based on other delineations. The experiences the plaintiff has gleaned has meant that these are standards made for other people, and that those certifications, pledges, and other forms of agreements with respect to public safety that the threat of violence is a cause of breaching of the contractual roles of living in "community" where conflicts can arise from time to time. Plaintiff is at a loss to explain, in the mission of public housing assistance, particularly with respect to the McKinney Vento Homeless Assistance Act, and amendments, why such detrimental and intimidating behavior is tolerated: If the goal of homeless assistance means to have workers set and cultivated to manage their lives, and to be centered in engaging employment, and other similar positive pursuits, why is the plaintiff having to overcome interference in the right of use in common facilities? Such interference with the personal spaces causes the plaintiff to feel unsecured, and resentful of co-residence with problems; it also means being unduly inconvenienced to prepare even for a day's work, on time, and neat in appearance, as for what a day may require. To hem and haw about things missing from the mail, and about things or non-functional applications software, is not the complete point of the argument of a complaint about a pseudonymous relation to another resident in the boarding house? It belies the fact that the Plaintiff is lodging a complaint of why another resident is assuming a supervisory role in relation to another resident, where no essential relation has a basis to operate.

I, Jeffrey L. Taylor, state and depose for the purposes of this record the preceding content with attestation for truth and accuracy this 13th day October 2004.

*Jeff Taylor*          *[signature]*
                          [signature]