FIRST CIRCUIT UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Jeffrey L Taylor, *Pro Se* ) | CA 04-11802-EFH | |
| *Plaintiff* ) | | |
| ) | | |
| verses ) | Attachment Second to Affidavit | |
| ) | Supplemental Motion to Vacate | |
| Ally Fowler ) | | |
| *Defendant* ) | | |
| ) | | |

## A Second Attachment in support of the content of Affidavit on Motion for Dismissal of an action pursuant on statute laws 42 U.S.C.S. 11361 and following.

The necessity for expansion into the area on the outline for other features are hereby advanced for arguments on violations of rules of public housing continue to constitute a defense of public spaces used by the Plaintiff, at the residence in use by the Plaintiff at the Cambridge Family Young Mens' Christian Association. The cause of action has been maintained to address an aspect of hostility of the defendant, and especially of the party of the defendant, which has been described in venue in state court action; however, additional considerations have come to light that should take a place in their own merit. For the initial purposes of the civil action the testimonial Plaintiff has provided has been one that is of personal involvement and as well as reportorial. At the same time, have involved activities about the single purpose of the defendant's relation to the use of the residence at the YMCA. This testimony may rely on interpretation of events, verbally paraphrase as well as be descriptive of actions initiated by the defendant and of those actions provoked by the defendant's party, now coming into fuller view. Providing this input on a lone stance, of solo testimony, may be incomplete, as a standard of acceptance for procedure in law: The Plaintiff alone cannot address the distributed problems perpetrated as an individual. This document is comprised of text which has been set

and composed on the date of about October 20, 2004 and subsequent to learning of an unfortunate public accident October 21, 2004 has been suspended.

***    ***    ***

October 20, 2004

There is yesterday's notation by Kristen that the newsletter submission was canned by Kevin, Sr. Property Manager with S-C Management Company, Inc., by the reason that it was "too negative," she says. "Your letter has been [banned]," is the way she put the suggestion, not acceptable for newsletter content, although it could involve the detention of any other resident who requires access at the residents' door. The door is under control of front desk staff, either employees on regular attendance with the YMCA usual business for their athletic facility, and it is controlled at off-business hours by security, which has historically been companies contracted by the YMCA management for the purpose of providing coverage in the lobby, and access to the residence, in off-business hours. The newsletter submission is provided by the plaintiff for the consideration of the newsletter, and that should appropriate editing be available, it would be allowable for content of a newsletter for the use of the YMCA residents. The property management office solicits input to create a newsletter for the use of the residents.

Tuesday, In the afternoon, 4:43 and I grind paper for an hour.

I have seen Kristen twice on Monday. In passing twice on the stairway she prompted with concerned input. Also, she has apparently had a discussion with Kevin about the letter and its inclusion on content of the newsletter. Kristen is an activities assistant with the S-C Management company.

This is just the sort of thing that goes into the news, I said to her. "Yeah," enthusiasm in reply. It should be anonymous, and she agrees. This, I said to her, "is the sort of thing that anyone should experience at the front door." This is the text that was submitted for the consideration of the newsletter for an entry possibly to the editor.

TEXT similarly SUBMITTED FOR CONSIDERATION TO THE CAMBRIDGE ymca NEWSLETTER

```
There was a front desk attendant with a telephone handset at his
ear last Friday October 08, who stopped me as I went to the
resident's door to gain access to the upstairs, where the residents
live.  "Come over here," the guy demanded of me.  Since I was not
absolutely not sure the other ten people in the businesses of the
front lobby just after seven o'clock, I asked, and repeated if the
query was for me.  My day cross town and at the other side of the
financial district was ended about five thirty, and I had walked
back to Cambridge, after a meal near Inman Square, and this was the
second trip into the lobby, because I had made a short run upstairs
to retrieve something to take along with me to make a quick return
trip to the store on Massachusetts Avenue.  "Just a minute," the
guy demanded, "Weren't you the one I let into the [athletic
```

```
facility] ? Didn't I let you in and you go downstairs?" What is
this all about I am wondering.  "No, you didn't let me in the
facility," I said, "what are you taking about?" But the front desk
staff was persistent in driving at something to stop me further
from going upstairs.  He was checking me out for something. "I let
you in a couple of hours ago," he was saying.  But he could not be
more incorrect.  "Didn't you, Didn't I let you in, you were inside
the athletic [facility] just a couple of hours ago." "No," I
continued, "What is this all about?"  The front desk person was
still on the phone attempting to talk to me at the same time, and
sort of let me pass and said I was free to go upstairs.  The kind
of business that was on the phone seem not to be too demanding, but
I turned and came back and demanded more information from him, WHEN
he got off the phone.  "What is this about?" But he was looking at
his security screen in the totally other direction, or firestation
panels on the wall, and was not able, because of the other
distractions of the front desk, not to elaborate.  "I thought I
had let you go into the [athletic] area and you were in there just
a couple of hours ago," he said, as I was standing under the two
cameras at the edge of the service window.  "It could not have been
me, as I just come in from a day outside," I informed him.  The
YMCA front desk staff thought he had let me in past the front door
to the gym for some reason, and I think he was trying to say that
he was calling me down for entry into the gym area.  I do not
belong to any membership with the YMCA gym at this time, and his is
mistaken about letting me in the access door to the entrance into
the athletic facilities.

490 words (actual text released).
```

END TEXT part for ymca newsletter consideration [appended to this document true copy]

Kristen accepted the paperless thoughts, by including them in a file I gave to her to download on her machine at the desk. She was also in tears, like Leslie was, at the beginning of the project. So in the middle of the week, at the last talk with her, she was crying saying that she had allergy, "I have an allergy going on right now." And she was crying, as though Kevin had stepped on her real bad. He is more inclined to keep things quiet, as though he is working in every one's best interests. And suppressing the hell out of many other things, things that will never come to the surface, because he has to keep it "respectable."

With respect to the security affairs of the front desk, which operate when the business of the regular part to the athletic facility is closed, a small amount of additional background material is presented today at the forefront for the pleasure of the court to consider.

BEGINNING OF TEXTUAL MATERIAL — other text A
========================================

This is a general notation for the security team at the cambridge y and the management company that is also hired to work with them. the older man, white, has limp walk, is the person who does the overnight guard.

for the second week of July 2003, the duty station attendant has zapped me, jeffrey taylor, with the question of whether i had employment.

the incident happened one day after being out a major portion of the day, and had come through the front doors into the lobby area, and was paused at the reception areas near the front desk, only momentarily, such as adjusting the strap on a knapsack, or with something i was carrying. the guy with the white hair calls to me, and motions me over to the desk. he tossed the question,
"hey! come over here."
"are you working?" for which i did not quite understand his move, i said, "what do you mean?"

for which he said, "do you need a job? i was [asking] if you had a job? Do you have a job?"

the response i made, "no," made him push a bit further: "are you looking for a job?" in the vein of "hey, buddy, if you need a job, I know where you can find a job." -- "you want to know where to get a job?"

no thank you pop. his inquiry into my personal affairs is an affront to me, as this guard at the front desk has been sending me to the locker room at the YMCA gym. the room where there is a lounge of sorts is appended to the locker room, and has rudimentary things like a TV, a water fountain, and a coffee machine. the lounge is the place where the security guard has also sent me more than half-a-dozen times to fetch the Globe paper, when sections are not available at the front desk, leftover from the regular use the YMCA has of the four or five copies it receives from the distributor. the guard sends me to the locker room because he sits at the desk, and discloses the password number to the lock on the lockerroom door at the end of the first floor corridor. at least a half-a-dozen times over the past recent months i have asked at the front desk for sections of the paper that normally is received at the YMCA, and goes unused at the end of the day.

Now on the entrance one day after many weeks of not asking the desk for a copy of the paper, in mid-July, the guard asks if I have a job. This is a strange jerk, especially when his prompting is done in front of an audience, like it was a planned discussion topic, throwing it out to the listeners of his clique of customers coming through the lobby area to the residence.

How goes this now? that I now will seek other sources for the Sunday Globes help wanted from somewhere else. This is rude.

========================================
END OF ADDITIONAL TEXT FILE CONTENT — other text A

BEGINNING OF TEXTUAL MATERIAL — other text B
========================================

CONVERSATION BETWEEN THE Front Desk Staff AND Residents THAT COME THROUGH THE LOBBY. p.m.

August 03, 2003

F D S: the guy's name is michael cavalieri. I don't know why he tells everyone it is not michael. his name is joseph ?_____?/ it is right here. the guy is joseph, the one in two twenty-two.

Resident: oh. thank you.

FSD: yeh. that's right. I don't know what business the guy has here, he doesn't work, doesn't have a job. I mean? What's his ******** business here if he does not have an income.

R: is that right. thank you.

FSD: come back later. if you want a cigarette. here, take this to the store, and then come back.

R2: thank you. who's the one living . . . . ?

FSD: what is he? is he in a program here? let me see, Which program does he belong to?

FSD: Jessica! Jessica! Are you . . . ?

========================================
END OF ADDITIONAL TEXT FILE CONTENT — other text B

      \*\*\*    \*\*\*    \*\*\*

The point at which this document was paused is to observe a period in the incident of the accidental death of Victoria Snelgrove October 21 of this year who was a bystander to police intervention upon the occasion of post ball game rowdiness experienced that evening. What I bring to consideration before the court is the use of chemical control agents, or crowd control methodology to bring this effect in use. Miss Snelgrove suffered injury from an oleoresin pepper spray, from a pellet which

was discharged by police weaponry in the control of mass assemblages of people. The intended effects of those riot control gear are to non-cognitively affect the behavior of what can be at times large groups of people, and in individual cases, like the incident of assault on Rodney King in 1994. These control agents are not the specialty of police functions on special assignments, however. Other forms of these agents are widely available in the use of prevention of sexual assault, just about to any person who could purchase them.

When the plaintiff was bound to research jobs and job availability through the newspapers, plaintiff had relied, on SUNDAYS, to use the Boston Sunday Globe help wanted sections to conduct those searches in the first half of the year two-thousand and three (2003). Many libraries subscribe to the Boston Sunday Globe, however, it should be noted that the availability of the papers on Sundays is another issue all together. Some deliveries do not take place until Monday. Other libraries receive the Sunday paper, but are not able to log them into public use until the business days are open during the regular business week. The plaintiff came to rely on the availability of Sunday papers in the LOBBY of the YMCA in Cambridge, Massachusetts. Often times buyers will make a purchase solely to a section of paper, say the sports, and then discard the rest of the paper. Either the YMCA lobby has been receiving papers as part of the regular distribution of the papers through the YMCA business offices, and have been leaving them there for use of guests and others, or that the donations of anonymous readerships have left their papers for use, as complementary gifts to the lobby users. In the first part of 2003, the Plaintiff has observed stacks of four and five left in their plastic wraps by the distributors who go round very early in the day. These have been reposited on the marble top of the service counter at the front desk of the lobby, if they have not been disassembled for the internal uses of the YMCA, that very day of Sunday. It is only assumed that some of those journals processed by the staff at the front desk end up on the table, for customer use, in the lobby. It is not an established fact. The *PLAINTIFF*, however, has relied on finding papers AT THE TABLE on the lounge part of the inside of the lobby. The plaintiff <u>has</u> relied on the resource to be found there, until things changed, and the papers were later to be found elsewhere, wherever the plaintiff could discover the excess ones by appropriately asking the front desk staff for them. At times, plaintiff would go to find papers in the evening, at which time the

security staff would be on duty. Other times when plaintiff inquired in the early part of 2003, and then later at about mid-point of the year, there were no papers to be found. IT appeared to the Plaintiff that someone had discovered his use of "free" employment sections form the Boston Sunday Globe found at the lobby in the YMCA. Plaintiff had to resort to finding other points where the employment sections would not be missed from assemblages of large amounts of papers collecting from readers who go onto other features. As is stated in one passage above, other texts A, there were times when the PLAINTIFF came to rely upon asking and finding the papers with the front desk staff, and in particular, the security staff appended to the operations at the front desk. Many times papers would at first be found in excess in the front desk work area, a large service area that contains the domain of front desk workers for the YMCA. The papers could be at another desk (three perhaps four desks are in this area), or extras stashed on a chair, or in a corner, there. Other times, the front desk person (security) would know exactly where the extra SunDay papers could be found. And for a matter of months was able to steer the Plaintiff into the interior of the athletic facility, so that the plaintiff himself could retrieve the extra employment sections in the locker rooms. The guard would not retrieve them himself, as it would take the man away from the duty desk. It may also have been an imposition upon the man, who incidentally had a handicap, and could not walk without the disability. The guard would provide the lock code to the Plaintiff, which is a series of three or four numbers punched into the locker room door to release the access mechanism at the door handle. The Plaintiff was manipulated by the security guard to retrieve papers from inside the locker room lounge area. The extra employment sections were to only be found there, the guard believed, and which he was correct on some occasions but not most of the occasions, he directed the Plaintiff to the locker rooms to retrieve.

    The Plaintiff is most concerned of the conduct offered by the security guard, or the security services whom the Management of the YMCA, or the Owners of the YMCA, employ to provide secure facilities for the property at times the Cambridge YMCA is closed for regular business operations. The Plaintiff is most concerned that the effects of chemical control agents may have purposely been used to disaffect the composure of the health of the Plaintiff, as the Plaintiff has had on many occasions to be concerned of health on numerous occasions, to the regular presence of

disruptions of healthy and robust constitution. The plaintiff surmises that these disturbances in the functioning and equilibrium may have been regularly effected by intervention on an ongoing and regular cause as to the results of actions imposed by the owner, owners, or the operator, or operators, of the Cambridge YMCA. The human service providers to the Cambridge family YMCA are also a varied bunch of people. The service providers have wide and authorized access to many part of the YMCA, and especially access to the spaces in which habitation is supplied to the residents of the YMCA, which is under subsidy from block grants administered by locally enforced governmental body at the Housing Authorities. It is the plaintiff belief as well, that actions of the guard are figured prominently in achieving the conditions necessary for those dastardly actions to be implemented upon Plaintiff's person, and upon any other person so selected by authorities who have established themselves as such within the confires of the each of the facilities in the entire building, possibly, the general public as well (i.e., visitors and guests of the residents, or users). That the plaintiff has experierced these controlling actions by dominant parties in the residence, and from the dominant stance by those who are employed in the business end of the building, is highly likely, as it has appeared to the plaintiff that these disabling actions are somewhat coincidental to the episodes of interactions with the party of the defendant. That the Plaintiff is without compensated employment perhaps establishes an overriding criteria to be easily met that Plaintiff himself should be subjected to such treatment. And that because Plaintiff is of a race that differs with some dominant parties, and to some, differs with the swing of some dominant parties, within the establishment may also be a factor that predisposes Plaintiff to being subjected preferentially to such damaging treatment.

August 10, 2002. CFD forces open doors to #210, #209, #216, #212. 11 p.m. Winfred is a service person to install locks, and fix door frames summoned on this evening after the visit to the Cambridge YMCA to extinguish a linen-like fire in room number 209. In the Cambridge YMCA room number 209 is directly across the corridor in the hallway from the unit in which the PLAINTIFF resides at #216. The plaintiff keeps a ventilation control cloth (a towel) on the bottom of the door. Upon the evening of this visit by the fire department to extinguish a presumed flaming burning pile, the fire department did more than enter the presumed place of origination of the

smoldering linen or cloth, which actually arose from the interior of the unit at 209. Plaintiff upon exiting at the general alarm this day had encountered the smoke which was emanating from behind the door to UNIT 209. It was plain to the Plaintiff, even before the sound of the general alarm, the odor and presence of smoke was detectable within the hallway. Plaintiff has also been able to determine that the fire department had forcibly entered units #210, #209, #216, #212 in order that night to discover the presence of a smouldering piece of rag, as in this particular incident was a mop head. A cloth mop head, which was dry, had been smoldering and caused considerable smoke, stinky smoke rapidly throughout the 100+ foot length of the corridor from the backdoor entrance/exit and the elevator lobby at the end where the main traffic of the residents is encountered. The plaintiff actually, however, has only visually examined the doors and frames of the rooms at #216, and of #209. The presence of the locksmith handy upon that evening of service call, otherwise was noted for the doorway at the #210 unit, and not the #212 unit, both of which are on the northwestern side of the corridor, opposite from the plaintiff's residence in #216. The fire department visited only one unit on the southern side of the hallway, a place that was opposite of the room with the smoke. Every room the fire department, other than the plaintiff's's residence was on the other side of the hallway. And #212 is situated at the end of the corridor. And #212 is situated next to the back emergency exit which goes down two or three flights of stairs directly to the outside a hundred feet or so to Green Street. The apartment at #212 was breached by the firemen, who later were present at the scene at the time residents were permitted to return to their rooms when the smoke was somewhat cleared. Danny, the resident of #212, lived there, the second resident after the DEFENDANT left the same room. Resident Number 212 was present at the time three fire fighters were in the hallway. Danny had a complaint about their entering his room #212, and voiced the complaint about having his lock and door breached when they were attending the remains of a smokey smoldering fire, three doors up the hall. At the time when Danny was inside his room, and verbally engaging the firefighters from the Cambridge Fire Department, one of the firemen physically contacted with the head of the resident by his arm at the time he was at the door; the fireman also physically forced Danny into the room. The other two were observant of the actions transpiring at the interior of the room. Although Plaintiff believes the door had closed as a normal course of its inertia, the observers may have interceded, and then to have let the door remain

shut. At a time shortly after the incident with Danny, he was met in the bathroom, and I asked of the exchange, but Danny did not show serious, if any, breach on the skin of the face or upper parts. There was no blood the plaintiff could discern. There were no obvious sore points. But Danny said he was struck. At about 11 p.m. that night, the resident, Jack, of #209 was not about. But the Plaintiff did converse with Jack, shortly to be moved out, later in the week, if not the next day, and Jack said that the mop head behind the door was the direct cause of the smoke. He said as well that is was caused by a cigarette. Plaintiff does not believe Jack was present, but at some time was outside of the building when smoke was apparent. Plaintiff recalls telling the management office staff that he talked with the resident of 209 when Jack was en route on the sidewalk at the interface of the Post Office and the senior center.

What the plaintiff has learned of public housing and the residents inside is that is poses hard questions of zero tolerance to drug usage, and violence. A person living and seeking, residence in public housing is subjected to community standards that may be based on other delineations, living expectations of those who have more formal education, for example. The experiences the plaintiff has gleaned has meant that these are standards made for other people, and that those certifications, pledges, and other forms of agreements with respect to public safety that the threat of violence is a cause of breaching of the contractual roles of living in "community" where conflicts can arise from time to time. Plaintiff is at a loss to explain, in the mission of public housing assistance, particularly with respect to the McKinney Vento Homeless Assistance Act, and amendments, why such detrimental and intimidating behavior is tolerated: If the goal of homeless assistance means to have workers set and cultivated to manage their lives, and to be centered in engaging employment, and other similar positive pursuits, why is the plaintiff having to overcome interference in the right of use in common facilities? The non-violence statement supplied to the housing authority includes a sworn statement that plaintiff does not and will not live with another party who is controlling, or who is abusive to the registrant. Are not the service providers acting in such an abusive manner.

The Plaintiff asserts that because access to rooms are permitted at times the Plaintiff is not at the room to be present upon entry, conditions outside the normal use of the residence are at play. Plaintiff states that he has observed service

providers enter rooms when the residents are not there, and when the residents are there. The plaintiff also asserts that program participants allow such events to occur, but has no factual basis on which to surmise such a relationship, other than to acknowledge, that it is by a consensual agreement that this would allow for transgressions such as this to transpire. At odds with these observations are the prerogatives exercised by the employees of the establishment, those of the YMCA, and the contracted service providers who manage the operations, facilities or rental arrangements inside. The plaintiff has witnessed Jeanne, a supervisory operator at the front desk of the athletic facility of the Cambridge YMCA acting as a party for Jack, the former resident of Unit 209. Plaintiff has observed her returning an athletic shoulder bag, or, rather, putting a sports utility bag, on the inside of the unit 209 after unlocking the door. Plaintiff also states the employee of the YMCA has locked the door and used the rear emergency exit, either to enter or to leave the second floor hallway. The plaintiff also states that in the four years resident there, the front desk supervisor has also been seen at the emergency exit of the south western part of the second floor residential exit way, even though the door has an access control alarm attached to the door at the upper member of the frame, or lentil. Plaintiff acknowledges that Jeanne, or "Jean," sometimes does not open the door, either entering or leaving the second floor from the stairwell, and always enter the code into the device that shuts down the activated siren alarm from the door unit, when the alarm is activated, as it is supposed to do when the door is opened.

To hem and haw about things missing from the mail, and about things or non-functional applications software, is not the complete point of the argument of a complaint about a pseudonymous relation to another resident in the boarding house? It belies the fact that the Plaintiff is lodging a complaint of why another resident is assuming a supervisory role in relation to another resident, where no essential relation has a basis to operate, and of the restrictions in place that limit facility choices to a few, needlessly so, except to exert authority which has no place otherwise. That the service providers use control agents upon residents is a given condition of living in a corrections environment. The reason that the second floor is invaded through the emergency exit door on the southwest side is that workers on the business/athletic side can access the doorway at the very end of the corridor.

The plaintiff states that this mode of access can be done and circumvent the security cameras, and without logging in on the security station at the front desk. That one of the front desk workers has been inside, even if only to install a utility bag, of a resident's living area that was later involved in a fire incident means that it must be important enough for the service providers to work together to make events come (expulsion of resident) to pass. That the back stair well has been a point of access for the administration only constitutes a probable cause of unwarranted actions, and that methods are in place to exploit the loop holes that would provide documentary proofs of incidents which are intended to be a part of the security record. As in the Plaintiff's experience, such security records may have been caused, and have been used to implement plans to address plaintiff's actions so that plans of behavior modifications are documented and exercised. Plaintiff has had measures of behavior modification applied by the DEFENDANT and the defendant party in this civil action. A civil action MICV2004-18288 has been initiated to address egregious behavior on the part of the defendant, where actions are at least describable.

The plaintiff has been working to secure the place of residence in alliance with a housing authority, and a residence provider. Even subsequent to the 2004 changeover of locks, as the management company says to ensure compliance with principles there, ". . . to move you back onto the system . . . ." It has meant very little respecting the Plaintiff's use of the facility to the purposes of establishing gainful employment, and growing a business, and being forward to personal autonomy intended in the guidelines for the provision of residence from the McKinny Vento assistance plans/laws.

I, Jeffrey L. Taylor, state and depose for the purposes of this record the preceding content with attestation for the truth and the accuracy herein this 17th day November 2004.

[signature]

November 17, 2004

There was a front desk attendant with a telephone handset at his ear last Friday October 08, who stopped me as I went to the resident's door to gain access to the upstairs, where the residents live. "Come over here," the guy demanded of me.  Since I was not absolutely not sure the other ten people in the businesses of the front lobby just after seven o'clock, I asked, and repeated if the query was for me.  My day cross town and at the other side of the financial district was ended about five thirty, and I had walked back to Cambridge, after a meal near Inman Square, and this was the second trip into the lobby, because I had made a short run upstairs to retrieve something to take along with me to make a quick return trip to the store on Massachusetts Avenue.  "Just a minute," the guy demanded, "Weren't you the one I let into the [athletic facility] ?  Didn't I let you in and you go downstairs?"  What is this all about I am wondering.  "No, you didn't let me in the facility," I said, "what are you taking about?"  But the front desk staff was persistent in driving at something to stop me further from going upstairs.  He was checking me out for something.  "I let you in a couple of hours ago," he was saying.  But he could not be more incorrect.  "Didn't you, Didn't I let you in, you were  inside the athletic [facility] just a couple of hours ago."  "No," I continued, "What is this all about?"  The front desk person was still on the phone attempting to talk to me at the same time, and sort of let me pass and said I was free to go upstairs.  the kind of business that was on the phone seem not to be too demanding,  But I turned and came back and demanded more information from him, WHEN he got off the phone.  "What is this about?"  But he looking at his security screen, or panels, and was not able because of the other distractions of the front desk not able to elaborate.  "I thought I had let you go into the [athletic] area and you were in there just a couple of hours ago," he said, as I was standing under the two cameras at the edge of the service window.  "I could not have been me, as I just come in from a day outside," I informed him.  The YMCA front desk staff thought he had let me in past the front door to the gym for some reason, and I thing he was trying to say that he was calling me down for entry into the gym area.  I do not belong to any membership with the YMCA gym at this time, and his is mistaken about letting me in the access door to the entrance into the athletic facilities.

490 words