

|  |  |  |
|---|---|---|
| Jeffrey Taylor, *ProSe* <br> *Plaintiff* <br><br> *verses* <br><br><br> Ally Fowler, <br> *Defendant* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CA-04-11802-EFH <br><br><br><br> Affidavit for Miscellaneous Content <br> and Errata:  Supplemental Motion |

A Miscellaneous Filing with Content for Affidavit on Motion for Dismissal of an action pursuant to statute 42 U.S.C.S. 11361 and following.

1.   Erratum:   Plaintiff, amends error found on the December 21, 2004 AFFIDAVIT submitted in CA-04 — 11802, on the end of a paragraph at the second or third page from the end-page, which reads, "Please note that the first authorized entry this year by the property management staff has been August 18." The correct statement is, and should read: ". . . authorized entry this year by the property management staff has been August 2004, which is fully eight months before they have asked to enter the room #216 on any business, since the turn of the 2004 year." And this event was to install a lock with a cylinder that can be opened by a master key,

occasion after hours, though is was plain he used a key. The Plaintiff has since learned of a master key kept at the front desk area, that is intended for the fire captain, marshals, or fire company's use for access, which is a universally cut building key only for the fire department control. The property management company complaints that it has not any right to conduct a search of someone's room itself and content, even on probable cause, much less than make an action upon entry in someone's room for reasons of maintenance and property interest.

Addendum material includes attachments:
2.   October 14 ,2003 letter of assistant property manager to YMCA residents. At the initiation of the import of the letter, DEFENDANT begins a campaign of control on ostensibly personally informed issues, and interprets the document according to needs that the defendant has seen fit to exercise; this activity the employer The North Charles Institute, among one, has declared his actions as a issue not unlike the rogue to a central duty owed to them (North Charles does not maintain a contractual relation on what is regarded as defendant's personal time with the resident site in which defendant's own residence is maintained for the convenience of The management of the YMCA on the residential initiatives, according to another representative and residential unit director of the North Charles Institute). That DEFENDANT maintains an interpretation of the October 14 document causes him to act in the manner in which the treatment shown to Plaintiff in the manner displayed on property defense, means that privileges accorded to the DEFENDANT as an individual far exceed that of a typical facility user. That some of the ground-tactical displays are based on use of common area rights, in defense of the rights of a privilege to light up a cigarette on the premises is another factor in an assumed off-

a non-smoker's privacy on tobacco use have had a significant impact on the politicizing and manipulations of the residence capacity for a tolerance stance over tobacco use. That Plaintiff has been badgered by two, perhaps three, smokers is a posture that demarcates the business side of a movement to keep smoking tolerated among behaviors in the residence, even though the ventilation inside does not support an environment free of tobacco smoke.

3. October 01, 2004 letter of YMCA management to YMCA members, urging athletic facilitates users to be aware of theft. Plaintiff sees a vast gulf of rights that differ from the essential status of rights of the residence side of the YMCA. Just on the face value, it has occurred to the plaintiff that in a certain view, the plaintiff has entertained the thought that MEMBERS of the YMCA and RESIDENTs of the YMCA should have basically a similar, if not IDENTICAL status of rights regarding the use of the YMCA facilities, but sees no instance of favor to hold either of the status of an member or resident on an even keel. There is mutual exclusivity between the use of one side and another, though, certainly there is the container of the building that is a single unit. That Plaintiff is treated any differently than a suspected thief, and being detained upon a suspicion, although incorrectly on the occasion of the October 08,2004 false accusatorial, is nearly tantamount to being held in contempt on false charges on suspected unauthorized entry. This includes being appraised as a common thief, and being subject to pressures of liability to damages and losses sustained by the YMCA membership ranks. Plaintiff asserts that visits to the #216 room by unknown persons, in absence of the plaintiff at the plaintiff's residence, can be viewed as reason to suspect management that management may be conducting search, and for the properties taken, search and seizure of material belonging to the plaintiff, in possession of the

certain limited number of other residents, or personnel, who are acting the favor of management.

4. November 22, 2004 letter of S-C Management Company, Inc., designed to bring to the attention of trespass issues for the entire building, but is addressed to the residents of the Cambridge Family YMCA Affordable Housing Partnership, LLP, sponsorship and other entities. This action, the Plaintiff has learned, is purported to be based upon incidents in which some intruder to the theater area has left trash or another such mess for others to clean up, as a sign that the interior of the YMCA has been breached by unauthorized persons. The threat of legal action is explicitly outlined for measures to be expected for unauthorized access into the YMCA interior, proper.

5. Plaintiff submits the printed page as it was proffered to the office of the property management, in which ostensibly a review would mean possible inclusion in the RESIDENT's newsletter, with an appropriate editorial rewording. The plaintiff asked the front desk supervisor, Jean, of the hours and of the duty hours of a front desk staff who was in attendance at the October 08, 2004 incident in which Plaintiff was detained at the lobby at the point of access to the residence upstairs. Plaintiff also states, here, that on the preceding day of the incident of false accusatorial, plaintiff exited the second floor and the building not in the typical manner, but through the employee entrance at the ground level, where there is a building exit not a hundred feet from Green street. Plaintiff exited directly following a general alarm call inside the entire building October 07, 2004, about 12:07 p.m. Plaintiff used the rear exit door to the second floor at about 12:10 in the afternoon, in the buzz of general fire alarm, on an alternate exit way. On the exit corridor, Plaintiff learns of doors at the ground level for exit, and another door for the subterranean interior of the building, as well as an

Boston financial District.  As with the next day, October 08, Plaintiff was engaged in other activities for the period of the entire afternoon of each day.  Plaintiff did not return to Cambridge until after the close of a normal business day.

The breach of etiquette at the front desk is by no means of the imagination considered only accidental, but considered only an aspect of the general treatment residents have through the encounters with a socialization process undertaken with the front desk staff (Plaintiff is not an employee of the YMCA, but would such a status change the reception Plaintiff has been occasionally receiving from the YMCA staff?). Generally, though not as a rule, there is a predilection for the security process to be friendly, or have sympathy with a larger percentage cross-section of the residents who happen to live here (At the other side of condition, there is a highly significant number of YMCA residents who enjoin in regular socialization with any security who happens to be at the front desk, or on duty).  In interactions on call with the security desk (outside of the YMCA standard business hours) the Plaintiff has heard one such complaint from the security of conditions found inside of a resident's room (e.g., establishing a complaint that "it's a wonder that [the resident's] room has not caught on fire, what a mess, cigarette butts on the floor").  If the person referenced in this tirade lived near to plaintiff, the question plaintiff asks is, "if this guard is so familiar to the environment there, when has Henry been inside, as Plaintiff has never seen this person on the floor, or heard the presence of Henry on the second floor?"  (When does the guard attend to the business of looking into the room of individuals?  On at least one occasion the Plaintiff has informed a guard of the medical condition of a neighbor, and that on the condition of fallen-down [semi-conscious, or drugged, groveling after a collapse on the floor] and groaning,

something that not to be unexpected in dealing with support services that are tied to the resident populations with Cambridge Family YMCA Affordable Housing Partnership, LLP, and the volume of persons overseen at the front desk, for example. It gives the appearance of a true interactive element, however, this is sometimes a misleading sign into an interaction with another person (consider, for example, an individual "button-holed" by a dubious character). Empty citations can be in service of a goal, as long as the interactive is a maintained state with a directive for the advancement of their position, or, to gain something of value, e.g., into social service workers value of their program materials. Non-verbally, the interactions can mean simply getting a response from a subjected object person and it is just as likely that it is all that the interaction has been designed for – to satisfy a curiosity. Building a case is also the second point in the general plan for another's attention. Building a case means that points are charted, and agendas are engaged, and it means work/involvement for any associates who are in the position to reciprocate with the efforts of fellows and colleagues, and especially of co-workers whose job it is to share the work of clients and with clients. It can be a self-referential legitimacy. Being subjected themselves to such a liability of a law suit also means a special prerogative, which brings an attendant agenda of its own; a defensive posture in subject to an legal action places the individual party in an especially modal disposition in which their "casework" and directed efforts merge and attain a new legitimacy. As an example here of apriori agenda, dated September 30, 2004, the attachment for the proposal of the creation of wireless network for the purpose of bringing wireless Internet access to residents. For those who have computers, the Plaintiff has submitted a plan of action for the adoption of such a service to the building residents, as well as a benefit to other communit

at the YMCA, from the originator. On the other side, however, it is to be <u>expected</u> that residents participate in affairs and activities that the property management office devises, such as painting on a hallway mural, for the usefulness of such a project, and the utility of having a painted sheet just under thirty feet in length strung along the wall of a resident's corridor. The mural is intended for residents who have an expressive interest, and that their own mark can be left on the wall paper installed, January 12, 2005.

    The plaintiff also considers the motion for false accusation is sort of a machination that is only supposed to be an empty vehicle. Though, that another of the employment has taken it upon themselves to be in charge of inspections, and targeting of a likely prospect's room in which to find suspected material, even contraband material, can be a pastime that maintains a status. The plaintiff's room, the plaintiff's utility bag, the plaintiff's knapsack, or backpack, seems to have been the target of many events for theft and rifling (similar activity as that of the probing of being inside the YMCA athletics). That papers and personal effects of plaintiff's have disappeared from the interior of these containers, on a regular basis, means that more effort than just search for contraband is in existence. The plaintiff posits that a means of discrimination is extant, and one of the means to accomplish this prejudicial act is to compromise the security for the plaintiff's physical and emotional effects to appease another individual or to gratify a standing order under which such a person is obliged to obtain. Searching a person's room is against the peacetime constitutional law forbidding the unreasonable search on unfounded and unjustified cause. Looting in the times of war typically means that a Marshall Law will be added to counter law-less-ness behavior in atrocity. That the thought is entertained the subject of the search has questionable

Planting false evidence may perhaps bring action against such charges by such individuals, who are manipulating the signals that an enforcement agent is meant to follow.

The plaintiff has lost computer privileges among the workings within the interior of the YMCA. If one is suspected of subversive activity, especially with computer use and the knowledge of the design of computer systems, it presumably is considered that it would be a threat to the management of information systems at the YMCA, and hence, to log onto an Internet-linked network to obtain updates from the Internet is forbidden.

6. Last Misc. filing is copy of stolen white paper business form for use in a state food stamp certification process. Appropriated from Plaintiff's room closed locked; similarly, but not quite, yellow leaf submitted uncompleted.

I, Jeffrey L. Taylor, state and depose for the purposes of this record the preceding content with an attestation for the truth and the accuracy of the statements herein this 15th day January 2005.

_____
[ signature ]