FILED
IN CLERKS OFFICE

2005 FEB 24  P 4 14

U.S. DISTRICT COURT
DISTRICT OF MASS.

CA-04-11802-EFH

|  |  |
|---|---|
| **Jeffrey Taylor**, *ProSe* <br> *Plaintiff* <br><br> *verses* <br><br> **Ally Fowler,** <br> *Defendant* | **Affidavit and Misc. Filings** <br> Incident 11 February 2005 |

Affidavit to address 11 FEB 2005 incident and Affidavit filings on Miscellaneous Documentation regarding the living arrangements in Cambridge, Massachusetts with respect to the Cambridge Family YMCA Affordable Housing Partnership, LLC., related to defendant in capacity of the defendant and defendant's party to receive advisement and directions from management in operation of funds for housing subsidized by housing agency authorized by McKinney Vento Act.

1.   In relation to Plaintiff s party at the Cambridge Family Young Mens' Christian Association:   in employment there with the property Management company S-C Management Company, Inc., is one activities assistance in which the job facilitates the activities of the residents, and acts as a coordinator.   This

announced by the company in a memo.  (This inspection
follows a pre-inspection of the premises done by S-C
Management Company, Inc., on 15th and 16th of December
2004, with the intent on housing agency mandates.)
PLAINTIFF in the case wrote an apology to the
advertiser for damaging the sign, and also plaintiff
left the notice in place on the elevator lobby bulletin
board after photocopying and removing the corner
section.  This part of the sale notice is the left
corner and is attached [taped] with this AFFIDAVIT.  At
the lower margin of the SALE notice there was written
five days, or thereabout, before, something of
reference to the Plaintiff's own material,
specifically, here written is "Rm 216 Better," in hand
penmanship.  Then somewhere about January 6th or
seventh of this year, another hand written graffito,
made on the right side of center page, not displayed
here] was appended to the writing on the left corner,
such as to continue the thought      [ "— at what?" ].
The poster/owner of this notice has resided in room
#300, and has used the elevator lobby to advertise, at
least through the months of November and December 2004
for this computer monitor with a 22 inch screen.

2.   PLAINTIFF ensured that the Resident Services
Coordinator, an office appended directly to the
property management offices, received a facsimile of
the page of the personal advertisement containing the
graffiti.  Kristen, the Resident Services Coordinator,
had a copy in her office, which is situated at another
entrance to the elevator lobby, and could use the copy
as a reference to questions.  [Another (anonymously)
request to the office social worker has ended in a
stilted outcome with the donation of plaintiff's
Christmas gifts to a resource-less individual on the

floor common room, TV viewing area, on February 11,
2005.  Resident of #300 and advertiser of the sign with
the orange marker writing, was watching TV from a sofa
on the northeast side of the room, and accosted the
Plaintiff, "someone said that you . . ." go about and
destroy, remove and take down signs, and he wrestled in
the seat and said more to the effect that his signs
were being removed from the [bulletin board in the
elevator lobby].  Plaintiff agreed that on one occasion
he took down a sign belonging to John who resides in
apartment #300, but John interjected some invective.
PLAINTIFF is aware that, like the DEFENDANT, John in a
corner suite #300, has been employed in the human
services field, and has been employed locally years ago
in Cambridge at the Salvation Army shelter, and has
been in supervisory position(s) similar to the DEFENDANT
in this action.  John continued to stir in the seat and
verbally assaulted the PLAINTIFF, ". . . if [this]
happens again, I'll f**k you up.  I'll fuck you up so
bad . . . ."

4.    The plaintiff said to John that the level of
threat he was expressing far exceeded the trouble and
intervention PLAINTIFF caused him to say what he was
about to do, but John did not stop, "I'll damage you
for that.  I'll fuch you up so bad you won't recover.
I'll damage you so bad that you won't be able to
recover."  He was up on his feet, and hobbled away from
the davenport and coffee table to steady himself in
front of the [50+ inch] Magnavox replacement (installed
January 2005) of the 52 inch Sony TV the plaintiff was
momentarily viewing.  "The level of threat you
express," the plaintiff said, "far exceeds the . . . ."
Plaintiff was interrupted.  Randy and ready, John
retorts, "DON'T threaten me," "You don't threaten me

also lost paper advertisements placed on bulletin boards. Plaintiff has been in a routine of replacing the stolen advertisements on a daily basis some weeks before discontinuing advertising on or about December 24, 2004. The marring of plaintiff's advertisements also figured into the removal of plaintiff's signs. Kristen, or one of the co-workers, or associates, in the office has, Plaintiff believes, shared some of the information with someone on the residents' side, to the effect that, "He [Jeff] did this." The result, even if not with resident in #300 directly, had the message conveyed to #300 through other sources.

6.    An e-mail notice in the morning of February 11, 2005 sent by PLAINTIFF to the Senior Property Manager, may have caused an alert that may have started other wheels cranking to other purposes. Perhaps also, to have been inappropriately acted upon. This message from the plaintiff regards deposits of biohazard material on the shower environment, in particular, one in use by plaintiff. It addresses the need of someone with the tools to clean a purposely created mess of human excretia intended to communicate a nasty sense of offensive. In part, Plaintiff believes this is an attack on the sensibilities of health concerns, and it is directed to someone who has worked in medical arenas. The deposit of the nasal excretia has been on the handle of the shower since February 10, minimum. It is an act that mimics the dastardly things done on the shower room on the fourth floor, where the partitions were a target of activity and nasal excretia left in sections about half a square meter on the upper portions of the panel by the shower curtain when it is compressed, in the direction that the complainant moves the curtain.

this period in the elevator lobby.  The property
management signs on display by the offices appear to be
unaffected by the presence of the ad disrupter(s).
Plaintiff is of the opinion that the unknown person(s)
attempting to influence John, also knows John to be a
person who is easily aggravated into behavior that may,
or may not, be controlled.  That John is being
manipulated is fairly obvious, but the goal of the
disruption may not be so evident.  It is assumed that
since the person here has worked with human services,
it may just as well be as likely that another person,
or entity, has employed his services to run a risk
assessment, as though DEFENDANT's behavior could be
explained in the same light, if the DEFENDANT's actions
cited in the previous filings with this Civil Action,
and with MICV2004-1828B, were considered in these
terms.  Risk assessment is another term for a
"determination " which can either be sort of an
experimental approach to defining a given situation
with a given individual, or rely on a settings approach
to look at things which may strongly influence a
participant.

8.   A telephone call placed later that same evening,
roughly four hours later, with the party in Room #300
at the Cambridge YMCA, with a recorded message
addressing what had transpired at five o'clock, has not
been returned, nor response generated at this time.
Plaintiff firmly states #300 reaction exceeds
reasonable bounds of acceptable standard of behavior.

9.   PLAINTIFF registers losses of a DATA CD-ROM in
period of December 2004, to January 2005, not limited
to CD-ROMs, and in particular a CD-RW disc which has
been labeled by disc reading programs as damaged and

10.  PLAINTIFF registers a loss of president's message in Millennium Pharmaceuticals, Inc., January reprint on the company's progress in the commercial world from BioExecutive International.  This briefing has been distributed with the collection of other offerings by the representatives at the Hire Health LifeScience Career Fair, February 17, 2005.  The booklet [reference:  http://www.bioexecutiveintl.com] has been misplaced from the desktop, or wherever, and it is assumed that is has been appropriated with the intent to deprive the plaintiff of any useful content.

11.  Reference:  Shaws Star Market invoice 05762, store567.  Purchase date 19 February 2005, 14:51 Lane 7, with one item of Tetley TEA.  Sometime between then and Sunday Feb. 20, the box was ripped open in the apartment where it was put on reserve in the pantry. It has been breached and the box and cellophane torn by unknowns entering the apartment while plaintiff was away from room #216.  The tear in the wrapper closely matches a tear in the wrapper of a packet of seaweed in PLAINTIFF's pantry of food.  [ATTACHMENT] Unknowns have maintained a common nuisance and have an almost guaranteed entry into Room #216 where the Plaintiff resides;  regardless of privacy protection rules in effect at the outset of housing choices, and common decency, a common nuisance has been established.  The illicit activity is predicated upon spoliation, a predictable, and wanton course of destructive action of certain items, roughly with respect to the tears of packages, October or November of 2004.  Complaints regarding conditions about the security of the room have been dismissed by the management (one original complaint of the ice cube being taken out of the refrigerator), albeit an upgrade of locking mechanisms

of the unknown persons who have pillaged the place of
abode.  Plaintiff has heard of one advisement of a
problem of property destruction from the [management]
housing staff, and in this instance of breaching a
fire-exit door, and its security device and alarm
[vandalize], has claimed with a degree of certitude,
"we have a good idea of who it is," but can offer no
disclosure to those not a part of the organization, at
the present time.  An assertion of an expectation of a
decent level of privacy may be of no importance,
relative to the mandates of the Stewart B. McKinney
Homeless Assistance Amendments of 1988, or the Fair
Housing Act (42 U.S.C. 3601-19), not to mention
criminal destruction of private property in one's own
personal residence.

12.  Part of the concept in risk assessment in the
challenge of the behavior of an individual means that
predicted outcomes have been considered, either for the
entertainment, or, for the experimental measure of
traits upon reaction.  That the property management
have on hand a resident pool of eligible persons to
participate in experimental proceedings means also that
the parameters are also available for validation, in
accordance to plans to certify those processes of
assessments.  It stands to reason from having an
unending supply of persons with which to conduct these
trials on the evaluation of individual candidate traits
for the selection of testing that the choosing of the
person, time and place of events are at the discretion
of the management company.  By compromising personal
security and personal security measures to ensure
compliant behavior help regulate the containment of the
property inside.  By compromising security, limits can
be held in check so that activities in which

by telephone.  It was with respect to the proposal of adding a WiFi service to the DSL Internet already established at the YMCA from a communications company in Cambridge.  Does Kevin Braga appear to have the same agenda?  Kevin Braga's refusal to provide the name of any of the YMCA administration staff handling an Internet access upgrade is a sign that he may be protective of servicing a "Hot Spot" for the YMCA. Consistent with an inquiry to the administrative dispatch February 22, Plaintiff has found that Kevin Braga's position is clarified with a notice dated the 23rd February 2005 to the effect that the YMCA does not support the liability issues involved in access to the Internet through in the in-house DSL connection, but only of one to three hours a week with Kristen in the computer laboratory (Cf., attached letter of Feb. 23, 2005 of Kevin Braga, Property Manager of the YMCA, to JLT).

14.   In the experimental design of the residential assistance arrangements afforded by the McKinney Vento Homeless Assistance dollars, at the handling by the Cambridge Family YMCA Affordable Housing Partnership, LLC, some of the negative events transpiring require a degree of cooperation among others in the community. In the terms of community relationships, one says of an agent provocateur that the role means facilitation of a set goal or plan of action that involves another, person.  In this scenario the person is an individual. The individual in question in this civil action has been subjected to diverse ways of traumatic incidents of losses of personal effects, of invasion of the residence property spaces in which the individual lives, and has had business relations challenged by activities inside the residence.  Computer property,

secured.  A briefcase, or shoulder bag, being the
target of illicit activity is a risk the property
management has advised that it cannot be held
accountable.  The system of locks for the doors now
have a crossbolt.  The security survey from the police
department says that a second key is in use to achieve
entry, that it was the only way to get inside.  As in
the past, residents using their own locks are not given
the blessing of management prosperity respecting the
right of the management to enter the premises on
searches of contraband, illegal substance, or other
nuisance matters related to safety.  The management can
"offer no protections" for the presence of a lock which
is not issued by the property office.

15.  In the experimental design of the residential
assistance arrangements afforded by the McKinney Vento
Homeless Assistance dollars, at the handling by the
Cambridge Family YMCA Affordable Housing Partnership,
LLC, some of the negative events transpiring require a
degree of cooperation among others in the community.
In the terms of community relationships, one says of an
agent provocateur that the role means facilitation of a
set goal or plan of action that involves another,
person.  Let Plaintiff count the hours of a plan of
action that involves presenting the damaging effects of
effort it takes to recount the losses and replacement
costs of each and every item someone has taken from the
PLAINTIFF in trusted residence with the YMCA.

16.  In the experimental design of the residential
assistance arrangements afforded by the McKinney Vento
Homeless Assistance dollars, at the handling by the
Cambridge Family YMCA Affordable Housing Partnership,
LLC, some of the negative events transpiring require a

exclude the plaintiff from taking morning showers in
the dedicated shower room.

17.  In the experimental design of the residential
assistance arrangements afforded by the McKinney Vento
Homeless Assistance dollars, at the handling by the
Cambridge Family YMCA Affordable Housing Partnership,
LLC, some of the negative events transpiring require a
degree of cooperation among others in the community.
In the terms of community relationships, one says of an
agent provocateur that the role means facilitation of a
set goal or plan of action that involves another,
person.  Let me count the hours it takes to clean up
after another person messes up, to see what YOU do as
an object of attention to gather some insight on what
that person does with sputum on a shower control
handle.  If it is cleaned, what does the subject do
with a cc of sputum (that cubic centimeter volume
measurement).  Does subject use disinfectant?  (Can not
afford to pay for it.)  Does subject complain?  Does
subject complain to cleaning staff or to management?
What does subject think if it is put on the shower
handle in the only shower that he uses?  Does subject
think that "has he done this in his life before"? and
now the tables have been turned and it is now being
done back to him, in retribution?  Has the subject had
guilty thoughts about bioterrorism?  Has the subject
had guilty thoughts about personal violence when
someone treats him the way DEFENDANT has treated, and
the defendant's party, has treated and subjected him to
distinct threats of violent behavior?  If it is risky
placing an individual into the community who has these
expected traits, what if . . . ?  When can a
recommended time be put into. . . ?  The matter also is
likely in placement of the spectre of the issue of

Cambridge Family YMCA Affordable Housing Partnership, LLC, appears to the PLAINTIFF to be aligned with efforts at the prevention of abuse to research animals, akin to direct affiliation with the movement known as people for the ethical treatment of animals.  This terrorist organization, not at all affiliated with the Society for the Prevention of the Cruelty of Animals, presents a voice to the constituency among either the residents who are aligned with the operation of the YMCA here in Cambridge, or of those who are in the position of the role as management and is a policy enforcement issue among the administration.  Plaintiff has ascertained that the killing of vermin causes plaintiff harm, in personal and emotional health. Plaintiff avers that vermin have invaded the residence from either or both adjoining rooms in which plaintiff resides and stores food, but that plaintiff has been able to stay the effects of the Rodentia population spoliating food by hanging the perishable pantry items from the sprinkler pipes in the upper reaches of the room.  The conflict with fire codes of Cambridge mean that issues have been drawn on the storage of food in the plaintiff's residence, even though plaintiff takes pains to keep the hanging food from areas under the sprinkler heads.  However, the specters of terrorist activity used by management or of other residents in alignment with the management who have knowledge of policy issue of criminal probes have misplace their effort to target Plaintiff's activities, as Plaintiff has not been personally involved in research that is directly sponsored by the Department of Defense.

18.  In the experimental design of the residential assistance arrangements afforded by the McKinney Vento Homeless Assistance dollars, at the handling by the

enter the apartment in which the subject lives, and
removes something of importance to the subject, what
does subject feel about this?  If the apartment is
entered and his food wrappers are breached, does he
always take the item back for a refund (informed
consumer)?  If the apartment is entered by [agent
provocateur] and a data disc is removed, does the
subject even think about the data again?  Is subject
bothered by loss of data?  Does subject know if data
has removed?

19.  In the experimental design of the residential
assistance arrangements afforded by the McKinney Vento
Homeless Assistance dollars, at the handling by the
Cambridge Family YMCA Affordable Housing Partnership,
LLC, some of the negative events transpiring require a
degree of cooperation among others in the community.
In the terms of community relationships, one says of an
agent provocateur that the role means facilitation of a
set goal or plan of action that involves another,
person.  If the apartment is entered and the food
wrappers are tampered with, is there a concern about
the quality of nourishment?  Is the subject aware of
potential harm of food packaging with tears in it,
assuming the subject does not know whether, or can not
determine, whether the package disruption occurred at a
food store, and not the home?

20.  In the experimental design of the residential
assistance arrangements afforded by the McKinney Vento
Homeless Assistance dollars, at the handling by the
Cambridge Family YMCA Affordable Housing Partnership,
LLC, some of the negative events transpiring require a
degree of cooperation among others in the community.
In the terms of community relationships, one says of an

expectation of privacy in the bedroom studio style
apartment?  If subject has to share the right of use
with others, what boundaries is subject failing to
observe, since the subject in question has had a
history of an allegedly burglary incident [written in
school applications material, which has been disclosed
1999, and following]?  If subject has had property
removed, vandalized or tainted, how does subject feel
regarding his own property being damaged since the
subject in question has had a alleged history of
vandalizing [complaint of member of a fire department
in Maryland ca. 1994, 1995, or 1996 expressed to
Plaintiff, assumed to be on record of some public
nature]?  That match sticks are left at the door of
plaintiff residence regularly, it could stand to reason
that the specter is in place for the burned ones, or of
the ones that are simply torn from the booklet.

21.   In the experimental design of the residential
assistance arrangements afforded by the McKinney Vento
Homeless Assistance dollars, at the handling by the
Cambridge Family YMCA Affordable Housing Partnership,
LLC, some of the negative events transpiring require a
degree of cooperation among others in the community.
Since there has been indictments, PLAINTIFF assumes, in
the past for office stealing, or removal of contents of
file cabinets, how does the subject relate to his own
property being subjected to such abuse?  How does
plaintiff bear up to being victimized by this
treatment?  Or, simply, in paradigm of research, the
plaintiff is allegedly with a history of these
activities:  the punishment of this subject will
include theft of plaintiff's personal property, papers
of official nature, removal of folders and files from
the holding of this person.  How does subject feel?

LLC, some of the negative events transpiring require a
degree of cooperation among others in the community.
The novel of Nathaniel Hawthorne contains the character
modeled on an inquisitor person by the name of Roger
Chillingworth.    If Rev. Arthur Dimmesdale is
experiencing discomfort from a guilty conscience about
his love relationships, is the prescription being
forced to confess supplied to him a just resolve in the
treatment of human ills, not medical issues?    Is this
appropriate and ethical treatment, consented to by
living in such arrangement, for the treatment of
alleged offender who "owes" his conscience to the
husband, who has been considered missing, and absent?
The attitude expressed in the management suggests the
workings of ethical treatment that involve the
Plaintiff, and the relation to Plaintiff's former
employer, who had water spillage, and inflicted damages
on research material at a hospital setting.    That #217,
and similarly with other residents, runs water and
leaves water running for the plaintiff to shut off, as
a regular habit, is reminiscent of such treatment.
That water drips from the ceiling in Bathroom on the
second floor, at times for no apparent reason, involves
times when the plaintiff is in use of the bathroom
sinks there is another reason.    These are also public
knowledge, in the last five years also disclosed in
school applications.

23.    In the experimental design of the residential
assistance arrangements afforded by the McKinney Vento
Homeless Assistance dollars, at the handling by the
Cambridge Family YMCA Affordable Housing Partnership,
LLC, some of the negative events transpiring require a
degree of cooperation among others in the community.
How much harassment can the subject withstand, before

incident has occurred, Plaintiff has observed the
resident of #207 many occasions in discussion with the
property management personnel.

24.   The plaintiff states that social science research
can involve unwittingly subjecting an individual to
practices and assessments intended to yield clues and
"evidence" that behavior is adept and responds to
situation upon demand from the environments.   Stimuli
may likely as well have attributes appended to a facet
of the interactions designed to elicit a response from
a subject, as this is the definition of the testing
paradigm that someone is engaged in behavior that is
responsive to the demands of a methodologically
designed interactive device.   Consider a design on a
system test between two designated target individuals:
one mentally compromised and another considered on the
same level, but perhaps functions at a another level of
functional.   All that's important for the design to
have effect for data collection is that one or either
is designated "mentally" disaffected, and that some
interaction is planned for the assessment.   One has the
new ownership of a belt.   Not just an ordinary belt,
but instead has two braided leather belts, one black,
one red.   Purchased at an arranged price of two for X
dollars.   At bedtime a confederate snatches one of the
belts belonging to "Abel," before a week has passed in
which he has had ownership.   At some point in the
future, hopefully, in the near event cycle, it is
intended that "Caneable" discover that his black belt
had been taken from his domicile, and has no one to
suspect for theft.   The black belt ends up around the
waist of an Indian and the two are related in the meal
programs the two happen to share.   Or that the two are
related to the public housing options both are

stolen from Caneable's wardrobe?  Did another shelter
clothing give-away display the stolen belt, and "Abel"
select the stolen belt?  Did "Able" who is mentally
defective appropriate the belt from the person who did
steal it from you in the rooming house?  Did the person
who performed the theft donate the belt to the
dormitory manager to distribute to whomever was in need
of a belt?  Was merry olde Robby Hood being the good
Samarhitan when he donated the appropriated belt to a
needy fellow (the belt was spoken for by Maiden
Marian's comity to the thane when she attributed to
Robbyn the belt she got from Bobbyn Cyould)?  Abel has
attributes he considers the same as the original victim
of the villainy, so why not get a little laugh of this
tragic irony?  Is this retribution against Indians, or
little-Endians, simply for being of End race?  Now that
the belt had surfaced, Caneable considers the prospect
to get a return of the red belt?  Canealbe considers
the likeliness of getting the belt back by theft, by
doing a stealth raid of the room where the Indian
lives.  Does Abel live in comfort with the security
which would make this feat accomplishable, without
undue risk?  Can Caneable consider replacing a
duplicate belt, one bought for the set of color
variety?  If so, it is unlikely that the bargain prices
paid previously will be there on the third trip to the
store.  If "Abel" is not a participant in the theft of
Caneable's red braided belt, but a donor recipient, it
would be unwise to either accuse "Abel" of a stealth
theft, and to reproach "Abel" for something he may not
be capable of understanding.  If Caneable is a
Christian, he could let "Abel" have the braided leather
belt, and enjoy the good taste in the consumerism he
once participated in.  Caneable could even don the
second belt, the black one, to Abel, for one turn

are at one another's throats in the welfare offices,
one accusing the other of righteously jealous and
contemptible deeds.  Such as the nature of social
research with captive populations, unwittingly
manipulated as instruments to detect the presence of
traits to be placed on a chart.  Their research demands
the theft of property, following up on activities, and
subjecting this person to victim-hood.  And for the
price of a belt have not enriched the landscape, except
for the wreckage and scars left in the wake.  The item
taken for enriching the contents of a research report
has not been replaced, because of the expense of
replacement, and the time to go bargain shopping for
the matching set of braided leather belts by the GAP,
has been superceded by the pressing need to find work,
which has only been promised to one of the human
participants, and denied to the other participant.  The
experimental social researchers have fatally erred,
when their approach is based on the principle that both
of the belts are to be recognized solely on the value
of a theft item, *i.e.*, that at the outset, those belts
have been considered as inventory losses of The Gap
store of Boston, to illicit activity by small-time
kleptomania, when this is not so.

25.  Plaintiff is aware that being motivated to redress
store-bought grievances by returning defective
merchandise to the vendor is a chore in itself.
Respecting the attachment on this AFFIDAVIT the
Plaintiff addresses the issue of being a consumer, and
standing up for a consumer demand for quality goods.
One, that the damages inflicted on the Tetley tea item
on the purchase on February 19, on a state-sponsored
food program, it is just as likely that the tear in the
box has happened in the journey from the food store, or

that do not require the second trip to the store to
exchange defective items.  Two, that granted, a two
dollar item is easily donated to a food program where
any tampering with the contents will not be felt and
secondly to incur impact on the health of a single
individual over the entire use of the contents (80 bags
of tea).  But the PLAINTIFF has to acknowledge the
limits of liability of the store where the item was
purchased:  Plaintiff is more assured that when the
item was checked-in at the register and at unpacking
the item for the pantry store there was container
integrity.  Then, the liability of the store has ended
here once the package left the store in one piece, and
has been untainted in some manner inconsistent with
public health once a part of the distribution of the
store.  Three, where the store manager may be involved
is if in some way, their employee has been steered to
PLAINTIFF in a way which is not consistent with
wholesome and natural customer relations.  If employee
#4xx is female and attractive and has been directed by
the instigator of social research to conduct business
with customers in a way that differs from every other
customer, then the store may have liability issues,
from the standpoint of participating in group behavior
that has other facets of business which has broken into
the plaintiff's room and disturbed the peace.  But if
there is a researcher and there has been a breach in
the apartment of the PLAINTIFF to damage the store's
box, purchased recently at the neighborhood store, and
if there is an investigator who wishes to observe an
unwitting experimental subject interact with a member
of the opposite sex, then the purposes are arranged.
It is just as likely that the manipulator involved in
social research has chosen to do the research in sexual
behavior, but the Plaintiff protests that returning the

(at the part where the silica gel pack rests at the
bottom of the bag) the same person is likely to be
responsible for the destruction of the outer layers of
pantry items purchased on state-program of food stamps
of the Department of Transitional Assistance.   To
accomplish both acts (the Sushi Ana Yakanori was
purchased on a hike of about five miles on foot, at
about the time of a October 2004 shopping visit).
PLAINTIFF suggests that the tear in the food items, and
this is strongly indicated, has come from a person who
has maintained access to the finite recesses within in
the Plaintiff's residence.  It is reasoned as well,
that a person monitoring the food purchases, and
storage, inside the apartment, has been someone
involved in cataloging, or examining, just about every
square inch of the apartment;  the person, Plaintiff
alleges, is likely a person who has job mandates that
require this person to have an exhaustive and intimate
knowledge of the working contents of the PLAINTIFF's
residence.  The PLAINTIFF alleges that the property
management offices appended to the homeless assistance
act in Cambridge, Massachusetts, assists the unknown
person(s) in maintaining access to the person who has
invaded the plaintiff's room on a continual basis.  The
cooperative role of the management office, PLAINTIFF
asserts, has been denied on occasion to do so by S-C
Management Company, Inc., with respect to the entering
and maintaining a nuisance to the premises of Room
#216, which has been accorded as living spaces for the
plaintiff of this civil action.  That the plaintiff
found a blank door key on the floor of the second level
on the southeast wing and presented it to the offices
brought no reaction by the property management with
respect to the prospects of such an issue being easily
converted into a useable key, one, for example, that

26.   PLAINTIFF believes that an attachment exists on
the food stamp, where by unknowns have access to the
interior of the plaintiff's room at the Cambridge YMCA,
and unknowns perpetrate theft, and rifling of the
content of the plaintiff's personal properties and
papers.   The attached FAX cover page has attempted to
address and issue with the state Department of
Transitional Assistance by tapping their resources for
copies of items that should be in the file, and in the
residence of the plaintiff's abode.   The content of the
DTA file contains the INCOMPLETE yellow copy of the
income/residence verification given to the plaintiff at
the initiation of the benefit application in October of
2002.   The reason the YELLOW copy is there, is because
what the plaintiff had (in possession at the time of
the beginning of the program) only consisted of
possessing the yellow copy, in the incomplete state.
During consideration of the food stamp program,
plaintiff separated the upper copy (white) of the
mimeographed lower form.   Because the white form was
the only copy in his possession at the time the rental
office was to complete the verification, the white form
was to be the submitted copy.   However, at the time of
submitting the forms to the DTA, in plaintiff's
possession then was simply the yellow one, which was
given as the only available paper entrusted to the
plaintiff.   Since October 2002, Plaintiff has learned
January 12, 2005 upon a DTA appeals hearing, that the
content of plaintiff's folder at DTA contains only the
yellow copy of the verification form (see other
attachments in other filings).   PLAINTIFF re-asserts
that the theft of papers from the apartment #216
includes the white copy, and it also includes theft of
a copy of another paper of the DTA before the January
12, 2005 hearing of the DTA reviewer;   this cache of

power of the plaintiff.  And this is the field for the
ancestry, specifically, from October of 2002, until
January 12 of this year, PLAINTIFF has been recognized
as coming from an Hispanic origin, inside the data
field denoting racial origins of the DTA databases.
The supervisor verbally said that this issue would be
corrected by the end of the January 12 hearing.

27.  Plaintiff has offered to the property management
company a suggestion to the solution of the personal
lock for the door, since it is obvious that the
residence has no security, except for what is granted
from time to another time when the harassment has been
subdued.  The senior property manager has expressed a
fair warning about using personal locks, because the
integrity would not be guaranteed, and has said on more
that one occasion that it would not be permitted.  In a
discussion with Legal Advocacy and Referral Service in
the autumn of 2004, plaintiff was offered the
suggestions to present the case to a judge, and at the
time of the next report of trespassers in the residence
of #216 Kevin had changed his tune to the effect that,
"only then," he said, "would I recognize a right to do
that," and to honor it.  So, at the time of complaining
of another entry and theft and trespass, the last
occasion, after the LARC has prompted the action for
petition of a personal lock, the plaintiff hears the
identical assent to the solution to a sticky problem.

I, Jeffrey L. Taylor, state and depose for the purposes
of this record the preceding content and attachment
with an attestation for the truth and the accuracy, and
for true copy of material attached, of the provisions

Residence Apt. 216, 820 Massachusetts Avenue, Cambridge, Massachusetts 02139
V-mail: 617.876.2858, 216

June 11, 2004
(errata correction added: AUG 31, 2004)

Kevin Braga, Property Manager,
S-C Management, Central House
820 Massachusetts Avenue
Cambridge, Massachusetts   02139

Dear Kevin,

    Thank you for the notice of Cambridge Housing Authority
inspectional services interest and intent on a site visit in the
next week.

    Most things are in tip top shape.  April 29, 2003 I have
installed the steel wool in the baseboard where the pipes course
through adjacent walls.  Thank yous for the suggestion, as they
have upheld their purpose very well.  As a result, the bed has
been re-oriented November 22, 2003, resulting in an improved
ergonomic of the spaces and in room lighting too.  The room has
been so much improved; albeit such a very small lodging, I am
very pleased with the resulting change.

    Although I do not use the upper window as it is bolted in
place (a window company choice could have been much better
considered), some time over the summer I think the screen should
be rinsed — it was new in 2001, I believe.  If there is time for
this, I could ask for assist.

    *Please,* if your offices will accompany your visiting
supporters, sign-in the guest's log; see the door frame
above the bureau.  Pens will be found there.

                    Sincerely,


                    Jeff Taylor

  Hand Delivery

To:         Antonnette LaRosa, Assistant Property Manager

From:       Jeff, resident No. 216

Date:       December 07, 2004

SU:         ROOM INSPECTION

Thank you for the December 02, 2004 notice regarding the upcoming premises inspection. The second floor is to be expected on the 16 December.

Should the bathroom be on the list, please note that there are certain conditions extant and should have some attention applied to remedy.

- ➢        Toilet seat is not securely fastened, in small stall.

- ➢        Paper dispenser that serves the handicap stall is not functioning. It seems that the bearings have corroded or have been jambed. The rolls should freely flow without much exertion to get a strip of toilet paper.

- ➢        The shower without a ledge on the entrance is non functional.

- ➢        The sink that was removed has not been replaced. This is the third set in a set of three that is intended for the second floor.

# FAX COVER

DATE: _____DECEMBER 23, 2004_____

TO: _____The DTA / FS program_____

FAX: _____617 348.5311_____
_____617 776.5385_____

FROM: _____Jeff Taylor_____
_____Cambridge, MASS_____

TEL: _____617.376.2858 x216_____

PAGES: _____one_____

COMMENTS: RE: FOOD STAMP / DTA REQUEST
FOR EMPLOYMENT CONTACT / JOB HUNT CERTIFICATION

Please duplicate and send blank form with
instructions set, as a replacement is currently
required. If you have other paper generated
December 16, upon this recertification date, excepting
registration document, please send replacements, too.



THE MERVYN D. DEMILLE
RESIDENCE AT THE
CAMBRIDGE FAMILY YMCA

820 Massachusetts Avenue
Central Square
Cambridge, MA 02139-3296
Property Management: 617 876-4626
Fax: 617 876-4619

# VERY IMPORTANT NOTICE

January 7, 2005

All Residents
820 Massachusetts Ave
Cambridge, MA 02139

Dear Resident:

Please be advised that we are having a very important inspection on Tuesday, January 11, 2005. The inspection will begin at 9:00AM. The monitoring agency that will be conducting the inspection will be randomly choosing 26 units to enter. If your unit is chosen, you must allow Management Staff along with the inspector to enter your unit- there will be no exceptions. The inspector will be accompanied by Management and you do not have to be home while the inspection takes place. We thank you in advance for your cooperation during this very important inspection.

Please be sure that your door opens 90 degrees, your smoke dectector is connected and functioning, all clutter is cleared off the floor, nothing is hanging from the sprinkler or the sprinkler system pipes, and that your room is generally clean (free of dirty dishes, free of dirty clothing on the floor, etc.)

If you have any questions or concerns, please do not hesitate to contact me directly.

Sincerely,

Kevin Braga
Property Manager



**STAR MARKET**

Store# 567
MGR MARTY O'HALLORAN 617-494-5250

Lane 7   Transaction ID 5762

Welcome Rewards Card Customer
Acct no. 44445179317

**PRODUCE**
```
  (4)CAL NAVELS         DFC
      4 @ $0.25                    1.00
      Regular Price 5/$3.00
      REWARDS SAVINGS $1.40
                          -------
  PRODUCE Subtotal               1.00
```

**GROCERY**
```
  LUNDBG BASMAT BR      DF         3.49
  (2)PARMLT 2 MLK       DFC
      2 @ 2/$3.00                  3.00
      Regular Price $1.69 ea
      REWARDS SAVINGS $0.38
  PLSBRY WLDBRY MF      DF         0.99
  TET TEA RND 80        DF         2.69
                          -------
  GROCERY Subtotal              10.17
```

**FROZEN FOOD**
```
  (2)TNAS CHIX BUR      DFC
      2 @ $0.25                    0.50
      Regular Price 5/$2.00
      REWARDS SAVINGS $0.30
                          -------
  FROZEN FOOD Subtotal           0.50
```

**DAIRY**
```
  LARGE WHITE EG        DF         1.99
                          -------
  DAIRY Subtotal                 1.99
```

```
                          13.66
  ELECT FS                      13.66

***************YOU SAVED****************
SHAW'S REWARDS SAVINGS            2.08
TOTAL SAVINGS                    2.08
Total % Saved This Visit          13%
****************************************

-------- EBT-FS --------
AUTHORIZATION: 016704
REFERENCE: 21226903
WinEPS Sequence # 075715
EMPLOYEE: 411
CARD #: **************1944

EBT-FS PURCHASE:                13.66
TOTAL EBT-FS SALE:              13.66

EBT-FS BALANCE                  53.01
EBT-CASH BALANCE                 0.00
```

Visit us at WWW.SHAWS.COM



THE MERVYN D. DEMILLE
RESIDENCE AT THE
CAMBRIDGE FAMILY YMCA

820 Massachusetts Avenue
Central Square
Cambridge, MA 02139-3296
Property Management: 617 876-4626
Fax: 617 876-4619

February 23, 2005

Jeff Taylor
820 Massachusetts Avenue #216
Cambridge, MA 02139

Dear Mr. Taylor:

Thank you for your recent suggestion to Central House to provide wireless Internet Access at the Cambridge Family YMCA.  As you know, I passed along your suggestion to the appropriate personal of the YMCA.  Unfortunately, providing wireless Internet to residents and members is not something that they are interested in doing at this time for a variety of reasons.  They did say, however, that they will keep the suggestion in mind for the future.

I recommend that you ask a local business that provides wireless internet for a password for your use if you are still interested in obtaining wireless access.   Otherwise, please feel free to use the computer lab with Kristen during open lab hours which are posted on the bulletin board outside her office.

Thank you again for your suggestion.

Sincerely,

Kevin Braga
Property Manager