FILED
IN CLERKS OFFICE
2005 APR -7 P 2:32
U.S. DISTRICT COURT
DISTRICT OF MASS.

Jeffrey Taylor, *ProSe*
*Plaintiff*

*- verses -*

Ally Fowler
*Defendant,*

CA-04-11802 EFH

**Affidavit and Misc. Filings**
Subject Matter

Commonwealth of Massachusetts
County of Middlesex

---

Affidavit to clarify issues impacting on the services with the Cambridge Housing Authority of recent disposition, and Affidavit filings of Miscellaneous Documentation regarding the living arrangements in Cambridge, Massachusetts with respect to the Cambridge Family YMCA Affordable Housing Partnership, LP, related to defendant in capacity of the defendant and defendant's party to receive advisement and direction from management in operation of funds for housing subsidized by housing agency authorized by McKinney Vento Act.

---

1. Plaintiff advances issues of the loss of privacy within the residence of Cambridge Family YMCA in #216, respecting management at the residence to influence whether Plaintiff is investigated on matters of finance. Plaintiff received March 26, 2005 letter from housing agency which subsidizes apartment in which Plaintiff resides. The notice is dated to February 23, 2005. It presupposes that plaintiff has filed an income tax statement prior to the April 15, 2005 due date on income tax filing. It is also a short notice on appearance for the following Friday, April 01, 2005, scheduled for 10:45 a.m. at the housing agency. The date of this housing agency notice arises the same day in which

management functions have responded to inquiry to the possibility of installing WiFi services within the Cambridge YMCA, a proposal of services lead exclusively by the Plaintiff from the summer of the previous year, two-thousand four, with a written agenda submitted on October 30, 2004, q.v. elsewhere for copy of memorandum and proposal. The property management has responded on this day of Feb 23, 2004 (q.v. attached letter to the Plaintiff in affidavit respecting issues involved with a program activities assistant employed by S-C Management). The twenty-third of February is the day following a phone conversation Plaintiff established with an executive member of the YMCA organization in Cambridge. The Plaintiff in this instance called upon Denise, who is attached to the corporate financing of the YMCA and directs the office there. The intercom system and phone with in the residence allows to call to the front desk. The phone in the room #216 also allows direct calling to the emergency communications center in the City of Cambridge, located on an Oxford Street/Cambridge Street address. The number is 911. The reason plaintiff wanted to establish contact with the offices of the YMCA is because the plaintiff called the property management office on the tenth day of February after months of inactivity on the proposal submitted for the establishment of WiFi Internet services from the DSL link at the facility. From a phone for clients at the Cambridge MultiService Center, 19 Brookline Street, Cambridge, MA 02139, Plaintiff was talking to Kevin Braga in regard to the lack of action of Kristen, who is appended to the offices there. Kevin gave outright refusal to name an individual inside the YMCA management who would be interested and motivated to set up a Hot Spot in the YMCA, for

residents and clientele of the athletics and
communities activities center.  Plaintiff
specifically asked for a person and the who would be
responsible, and who would handle the corporate
donations for the YMCA.  The plaintiff has community
contacts from a church who pledged the donation of
wireless router(s), but was waiting for a go ahead
when a person from corporate donation would come
forward to say they have resolved issues of allowing
the WiFi to be established.  The day following the
telephone discussion with the director is when a
notice arrived from Kevin Braga about canceling the
proposed WiFi connection.  The notice said to a
resourceless resident at the YMCA that a community
connection could be found elsewhere, and that the
YMCA computer lab was available.  Note that Kristen
is in charge of the center two evenings a week, and
that it is typically open from 6:00 to 7:30, when
she is actually there to do so.  For information
purposes, the article dated August 2004 from SC
Magazine on computer security [ATTACHED] has been
provided for bulletin board information at the YMCA
front desk, February 29, 2005.

2.  PLAINTIFF has encountered some biased complaints
of behavior at the residence, and, it poses some
hard questions of the Property Management Office.
The food wars accusation from the assistant property
manager at the office has charged February 25, 2005
that Plaintiff " . . . was seen vandalizing a food
tray . . ." and sent a notice under the plaintiff's
door 2:30 p.m.  The plaintiff has experienced
medical related disturbances in the weeks following
the incident [ATTACHMENT April 05 addressed to the
Brigham Internal Medicine Associates, but also
challenges issues of lost t0x-screen samples].  The

office has a function like a kangaroo court of justice. There are those who breath the contents of papers upon other residents in the residence, but the Plaintiff has not heard a response to the challenge against the complaint notice from A. LaRosa. Plaintiff is of the opinion that because resident of #200, Robert R, has verbally questioned Plaintiff, "I don't knows who's in the room on the first door to the right, ah, Jeff, do you know the name of the guy who lives in the room at the first door on the right? [break] He's wearing a hat all the time, do you know who it is?" This question session occurred in the bathroom on the second floor where #200 has been verbally abuseing the Plaintiff. Robert was referring to the second floor (q.v., Plaintiff responds to LaRosa's letter of the 23rd of February) resident. His banter preceeded the Plaintiff's March 08 letter prompting the management company to respond to a management complaint of unruly and violent behavior. Mister R's involvment is as though he were involved in reading a letter I had authored, but because of misreading the content was also incapable of rendering an accurate assessment of the content.

3. April 01, 2005 Meeting with John Cassama of the Cambridge Housing Authroity, as scheduled by the housing agency. Like a border crossing in economics, it seems the papers are not in order and more are required to satisfy the curiosity of the Leasing Officer employed under public housing director Michael Johnson. Please refer to attachment for the housing agency request of "February 23, 2005" sent to Plaintiff in March. The post mark on the envelope is franked, 03/23/2005 $00.37º 012H16202563. Plaintiff was not called in

reception area. Plaintiff prompted the receptionist to discover an appointed time, since if the Plaintiff was to meet with pantry distribution, it would have to be before it closed later in the morning, possibly 11:30-11:45. After 11:05 a.m., the beginning point of the conference in Mr. Cassama's office, the conversation devolved around the demand for records of a cellular phone account Plaintiff allegedly was operating. "The cell phone bill for six months," John demanded, "you have a statement for a cell phone." But Plaintiff denied the existence of any phone billing statements. You have a cell phone, the leasing officer persisted, "[so you are] saying Kevin is lying? -- he knows you have a cell phone." Before the verbal exchange went forward at the interior of Michael Johnson's office in the front, John was insistent about his information which had been provided to his office: "He said that you have a cell phone" you can tell him that I said that, he said verbatim, "because he told me." In the office I queried John, in the presence of his superior, "Did you ask about a cell phone, or did Kevin [Braga] provide that information to you?" John said that he did not know, as though hé was thinking back on a conversation with Kevin but did not know how to interpret it. "Did Kevin," Plaintiff asked in the presence of Johnson, "give that information to you? Or, did you solicit information about a cell phone from him?" Mister Cassama said he did not know where in the conversation that Kevin told him about a cell phone, apparently discussing Plaintiff's finances and the reporting requirements of income which is used in certifications for determining the rates of which re-imbursements are handled through public financing of residences in a private housing provider.

Plaintiff provided the housing agency with income
information to the effect that Plaintiff's income
has not exceeded five-hundred dollars in the 2004
tax year. "No one can live," Michael Johnson said,
"on that amount. You have to have some sort of
income." Plaintiff will comply with information
requests in the week of April 04. The Cambridge
Housing Authority has stated it would be acceptable
if Plaintiff gives twelve months of bank statements
for a checking account. In addition, because of the
re-certification on income, the housing agency
demands a Social Security Administration report of
earnings and benefits statement, to be generated on
demand of form [provided, SSA-7004-sm (4/95)] which
will give the housing agency a 25 year report of
history of work. Plaintiff expressed disapproval of
the idea that income outside of the contractual
arrangements with the Cambridge Housing Authority
would be brought into a relation that has only
extended a history of five years. Johnson stressed
that the authority exists to use any and every bit
of income information the plaintiff has is not
outside of the scope of the review of his office.
"We can request that," he was saying, because they
can request it to see what the income is, and has
been. Attached is April 05, 2005 letter of JLT to
the housing agency re-iterating some of the gist of
the discourse (ATTACHMENT for April 05 letter to the
Cambridge Housing Authority). Also is an attached
form letter which is a copy of a form, Plaintiff
Believes from conversations with the leasing
officer, which is used for determining the amount of
benefits from state agency Food Stamps that are
alotted to the Plaintiff.

4. Plaintiff is still experiencing drain of

personal effects, not limited to the contents of back-pack. On March 21, 2005, plaintiff attended the symposium titled, "Impediments to Change: Revisiting the Women in Science Question." For a discussion of the loss of personal notes please review electronic mail communication about event and theft. [ATTACHMENT (6 pp), dated email 04 April, 2005."

I, Jeffrey L. Taylor, state and depose for the purposes of this record the preceding content and attachments with an attestation for the truth and the accuracy, and for true copy of any material attached, of the provisions herein this 07th day April 2005.

[ signature ]

August 2004

www.scmagazine.com
sceditorial@haynet.com

**Editorial** Having IT equipment stolen is an expensive way to learn a lesson

**News** APWG welcomes anti-phishing proposals; man arrested for spam conspiracy is AOL staffer

**News** Wireless virus threatens wide range of pocket devices; support for Microsoft's new NAP technology

**On the highway** It's time to start seeing risk analysis through new eyes

**News** SOX prompts discovery of serious weaknesses in systems; Mastercard moves to tackle phishing attacks

**Perspectives** Why better security solves business problems, too

**News analysis** Business users need wait no longer for IM interoperability

**News analysis** Police follow gaming racket's trail back to Russia

**News analysis** CERT's advise has done little to harm IE

**News digest** Network Associates officially changes name; CyberGuard and Intel build development platform; Alacris joins Smart Card Alliance

**Letters** Your feedback and opinions about the state of the industry

**Calendar** Your guide to courses and events over the next few months

**Last word** Gavenraj Sodhi explains how standards will help both protect firms and improve the user experience

**18** Cover story

**26** Storage security

**37** Perimeter security

**Curb those dispersed users**
How a worm invading his network led an IT technician at the YMCA to tackle the problem of dealing with mobile workers

**SC Awards 2005: a preview**
Changes are in store for the world's biggest infosec awards program

**Consultant's view**
What countermeasures are available that enable you to actively respond to, and control, phishing attacks?

**New storage security rules put the spotlight on data**
If there is a legal dispute over an email sent last year, will you be able to locate it? Better make sure it's stored away safely

**Long-distance information...**
iSCSI was meant to provide a cheap way to link dispersed storage. How has it worked out?

**Keep control of your passwords**
The security at casinos might be famously tight, but they need to extend it to control how their IT systems are used and accessed

**Why storage has to be for keeps**
With legislation threatening senior managers with fines or even jail if stored data is lost on their watch, failure is not an option

**The SC Forum**
The forthcoming IT Security Executive Forum promises to be the busiest and most stimulating so far

**Why strong walls are no longer enough**
Protecting a network used to be so simple. But with wireless, web and remote access, protecting the perimeter is now just the start

**Divide and rule is the new way of working**
In a connected world, you need to supplement the perimeter with other techniques – and zoning could make a significant difference

**Product reviews**
Software for corporate disaster-recovery; and an SQL database for data protection and auditing

**Group test: Anti-virus**
Getting the best from your AV system needs careful management

**Group test: Auditing tools**
Keep track of which software is being used where and when

*SC Magazine*™ (ISSN No. 1096-7974) is published 12 times a year on a monthly basis by Haymarket Media Inc., 114 West 26th Street, 3rd Floor, New York, NY 10001 U.S.A.; phone (646) 638-6000; fax (646) 638-6110. Periodicals postage paid at New York, NY 10001 and additional mailing offices. POSTMASTER: Send address changes to *SC Magazine*™, P.O Box 1027, Lowell, MA 01853. Copyright © 2004 by Haymarket Media Inc. All rights reserved. Reproduction in whole or part, or storage in a retrieval system, or transmission in any form without the prior permission of the publisher in writing is prohibited. *SC Magazine*™ is distributed without charge to qualified readers in the U.S. and Canada. Annual subscriptions to others: U.S., $80; Canada and Mexico, $75; other foreign distribution, $160 (air service). Single-copy price: U.S., Canada and Mexico, $8; other foreign, $16. Please enclose check or money order, payable to Haymarket Media Inc., with your order (U.S. dollars only, payable through a U.S. bank). *SC Magazine*™ is circulated to key information security personnel throughout all segments of government and the financial, insurance, service and manufacturing industries. Articles, product releases, news, upcoming events and other editorial copy are selected to provide a broad-based understanding of information-security issues, technologies, services, products and their applications. Haymarket Media Inc. reserves the right to refuse any material that does not conform to its policies. Haymarket Media Inc. is not responsible for the content, representations or opinions in submitted material and interviews, both editorial and advertisements, or for transcription and reproduction errors, nor can they be held legally responsible for any injury and/or damage to persons or property from any use or operation of any methods, products, instruction or ideas contained in the material published herein. All trademarks are acknowledged as the property of their respective owners.



# How to curb those

**When a careless user brought a worm into his network, the YMCA's Even Quach (above) became just the latest IT staffer to realize the importance of endpoint security. Marcia Savage outlines the challenge facing companies**

It's not always fun at the YMCA, especially when someone has introduced a network worm into the system. Not long ago, a staffer at the YMCA of Columbia-Willamette managed accidentally to unleash a worm on the nonprofit's network when he took home a laptop that had been in storage. It didn't have the latest patches and anti-virus signatures, so when he connected it to his cable modem it became infected, and when he brought it back and plugged it into the network, the worm spread through the organization.

That incident, which sent technicians scurrying to find and repair infected machines, plus the hazards posed by insecure clients, showed just how easily security could be breached. With staffers accessing the network remotely via VPNs, connecting from home PCs, or sometimes plugging in their personal laptops at the office, the YMCA technicians had plenty to keep them busy.

So they decided to try out technology from StillSecure to check whether a PC has the latest patches, virus definitions and is free from worms and viruses before it is permitted network access.

"We were always worried about potential viruses and worms being brought in from the outside," says Even Quach, an IT technician at the Portland, Ore.-based YMCA, which offers child-care and a variety of adult and youth fitness programs and activities.

# dispersed users

Quach even had to make home visits to those who were allowed to connect from home via VPNs to make sure their PCs were clean. "The problem is how to ensure these computers are up to date all the time? I don't have control over their home environments," he says.

Like the YMCA, many organizations are looking to protect themselves from threats introduced by individual PCs, and other endpoint devices, while at the same time opening up their networks to partners, contractors and suppliers. The task is made even harder by an increasingly mobile workforce and the growth of wireless access, which opens up the network to a host of new dangers.

"The phenomenon of the disappearing perimeter has forced us to refocus a lot of our security protections on the individual endpoint systems," says Phil Schacter, analyst at research and advisory services firm Burton Group.

Much of this is due to new ways of working, as Scott Olson, senior vice-president of marketing at Whole Security, explains: "Employees are now demanding anywhere-anytime access – from home, the road, kiosks."

The network has become boundaryless, he adds. Instead, it is defined as where the employees are, rather than where the company's buildings are, which makes traditional network security less effective because it is focused on keeping attacks out of the hardened perimeter, while assets are moving outside of that perimeter.

There are several solutions for locking down endpoints, including anti-virus protection, personal firewalls, intrusion prevention, and patch management systems. But an emerging technology that has generated growing interest is the kind of policy-enforcement system used at the YMCA. Before allowing a device to connect to the network, it checks the client's security, such as the level of its anti-virus protection, patch status, and whether it has a personal firewall.

Several companies provide this kind of solution, ranging from small startups to security stalwarts Check Point and Symantec. Networking giant Cisco got into the act last fall with its Network Admission Control program and Microsoft is incorporating "health-checkup" technology into its software.

Matthew Kovar, analyst at research and consulting firm Yankee Group, predicts that 95 percent of corporations will deploy some endpoint security strategies within the next five years.

If the first wave of security was all about protecting the perimeter, the second wave of investment is focusing on endpoint security, according to Bill Scull, Sygate Technologies senior vice-president of marketing.

"It was a simpler time. If you protected the inside from the outside, you could do a credible job," he says. "Increasingly, for a whole set of reasons, that's not enough. It's not that you should take that away, but in itself it doesn't fully protect networks from breach."

**Employees are now demanding anywhere-anytime access – from home, the road, kiosks**

**Scott Olson, senior vice-president of marketing, Whole Security**

## PartnerRe beats the next Blaster

[illegible]

## Wells' Dairy beefs up its defenses

The shift from dial-up to a high-speed VPN, combined with the boom in home broadband, led Wells' Dairy of Le Mars, Iowa, to beef up its endpoint security.

According to Jim Kirby, network architect at the company, more employees were working from home using broadband services, and the company realized that it needed to secure the clients before allowing VPN access.

So the maker of Blue Bunny brand ice cream deployed a centrally managed firewall from Sygate on 500 systems. "It's part of our standard for laptops now. We don't issue laptops without Sygate installed," says Kirby. And to prevent users from disabling the firewall, the company instated a policy of no VPN access without an operating firewall.

"That's closed the gap for us," he adds. ➤

Case 1:04-cv-11802-EFH Document 19 Filed 04/07/2005 Page 11 of 20

A big reason for that, he continues, is the shift from private dial-up networks, which are not easily hacked into, across to VPNs.

Add wireless access to VPN connectivity, plus opening the network to partners, and the perimeter has become a veritable Swiss cheese, notes Adrian Vanzyl, CEO of Seclarity, a startup that makes hardware-based endpoint security products. And with all that anywhere-anytime access, the threats for organizations have multiplied.

Indeed, Fred Felman, vice-president of marketing at ZoneLabs, a division of Check Point Software Technologies, warns that "It's pretty phenomenal how much risk organizations are taking on with the expansion of access."

There are two primary concerns for large enterprises: the fast-spreading, fast-mutating worms that devastate users as well as IT productivity; and the targeted information threat attacks that try to pick off specific pieces of information or intellectual assets.

### Skyrocketing risks

The total risk profile has "gone through the roof," declares Dennis Brouwer, senior vice-president of business development at Endforce: "You've gone from just having someone look at your data to having a rogue application on your network that can bring the entire enterprise down for an hour, a day or a week."

For instance, he says, the Blaster worm, which tore through corporate networks a year ago, was something of a wake-up call for many companies in terms of endpoint security. He reports hearing "some real horror stories."

At the YMCA, however, enforcing security policies at the endpoint not only prevents virus outbreaks, but also ensures systems do not have spyware that can leak confidential information, or bandwidth-hogging peer-to-peer applications, explains Quach.

"We have tons of childcare centers, and the information we store on each child is amazing. We have to do everything we possibly can to secure that data," he says.

Organizations are turning to technology that enforces security policies at the client level because they cannot rely on end users to maintain anti-virus software, patch management systems and personal firewalls, says Endforce's Brouwer. Without an enforcement framework, there is nothing "to make sure the software you buy and distribute is used, must less used properly and kept up to date," he says.

Enforced compliance takes the human element out of this. "Administrators don't have to guess whether the endpoint is actually patched and up to date," says Stacey Lum, president of network security specialist InfoExpress.

### Cleaning up in-house

Companies also realize they need to enforce policies on clients connecting within the LAN, not just remotely.

"The weekend warrior unplugs his laptop, takes it home, and might or might not come back to the enterprise LAN over the weekend. On Monday morning, after being on the internet for up to 48 hours, he comes back to work, walks past the firewall and plugs it into the LAN," says Brouwer. "At that point, you have the same requirement to do active endpoint enforcement as you would for remote users."

Solutions that ensure client integrity use various techniques to inspect systems. While some, like WholeSecurity, inspect remote systems via a downloaded Active X control, other solutions use client-side agents. StillSecure's Safe Access is agentless and tests devices through a common gateway.

Despite the differences, there are some common features that companies should look for in endpoint protection, say security executives. For instance, when a system detects that a user's machine doesn't have the proper security, it needs to help users get their system patched or otherwise secure.

"The end game is not to block people from network access, but to make sure they're secure when they do access it, otherwise the company would pay a productivity hit," says Sygate's Scull.

Moreover, a system needs to point

## What to look for in an endpoint security solution

- Flexibility – to enable you to test dial-up users, VPN clients and internal devices;
- Agentless solutions – to avoid the need to deploy agent software to user devices, and keep them updated;
- Easy implementation – but not at the expense of losing advanced features;
- Customizable tests – to help you meet all your software requirements, or simply avoid deploying software that you don't want on your network;
- Out-of-the-box built-in tests – so you don't have to build your own;
- Reporting capabilities – it is always good to be able to quickly identify, locate and audit non-compliant devices;
- Automatic updates – these should include the latest patches, worms, P2P, viruses, spyware and other applications for which you need to test;
- Testing capabilities – what can you test for? The tool should enable you to test for all kinds of worms, spyware, viruses, keyloggers, P2P, other applications, almost anything you want;
- Control over how often to retest a device – what if a device is compliant now, but the user then installs a P2P app, say, or disables virus software?
- Support – the speed with which the supplier can resolve your issue, help with writing or customizing tests, product placement, and so on;
- The ability to deliver information to end-users on why they are not allowed on the network – such documents should list which patches, service packs, worms, spyware, or whatever, are missing or should be removed from their machines. They should also remind them of the company's computer use policy;
- The ability to deliver information to end-users on the steps they need to take to become compliant or who to contact for help;
- The ability to apply tests or policies down to a single device, computer name, IP address, subnet, and so on.

Evan Quach

**The end game is not to block people from network access, but to ensure they're secure**

**Bill Scull, senior vice-president of marketing, Sygate Technologies**

users to a place where they can come into compliance without having to call the help desk.

### The management challenge

Manageability is also key for endpoint security. ZoneLabs' Felman advises that it is important, with thousands of endpoints, to have a management platform that is easy to operate.

"If you can't manage it, you're not going to use it," he says.

Compatibility is yet another essential feature. It is important to make sure that whatever solution is selected will embrace the VPN vendors, the switches that are in place and make best use of the security investment already made.

Users are likely to face a range of options. One powerful contender is Cisco Systems, with its Network Admission Control (NAC) program. But as Endforce's Denis Brouwer points out, NAC is fundamentally a Cisco solution, and while companies tend to heterogeneous security infrastructures, the fact that Cisco – with its market dominance – entered the endpoint security arena indicates just how important a technology it is.

David King, director of business development in Cisco's VPN and security business unit, says the vendor developed NAC to give customers a way to deal with virulent, fast-spreading worms and viruses. "It was clear that historical ways of dealing with the problem weren't working," he recalls.

NAC enables Cisco routers and other equipment to block or restrict network access to devices that lack anti-virus updates or operating system patches via the Cisco Trust Agent, which sits on endpoint systems, collects data from security clients and relays it to the network. NAC, which became available in June, is a cooperative effort with Network Associates, Symantec, Trend Micro and, more recently, IBM.

While Cisco develops NAC, another industry giant, Microsoft, has its own endpoint security plans, which include shipping Windows Server 2003 Service Pack 1 with VPN-based client inspection. In July, the company announced Network Access Protection Technology, which it describes as an "extensible standards-based technology," which will be available in an update of Windows Server 2003, codenamed R2, next year. The technology determines whether a client is compliant with security policies before it is allowed network access, isolates non-compliant systems and can update them. More than 25 companies, including McAfee, Symantec and Trend Micro, support the technology.

**It's phenomenal how much risk enterprises are taking on with the expansion of access**

**Fred Felman, vice-president of marketing, ZoneLabs**

Meanwhile, the Trusted Computing Group – an open industry standards body – is developing the Trusted Network Connect specification for multi-vendor networks. Slated for availability later this year, the specification will provide a common architecture for solutions that enforce endpoint security. Vendors helping in this effort include Extreme Networks, Juniper Networks, InfoExpress, and Sygate. ■

Customers in 55 countries and half the Fortune 100 use PhoneSweep to scan their phone system for modem vulnerabilities. PhoneSweep is the security and audit professional's wardialer of choice.

When modems are connected, attackers can gain access to your network. According to the SANS Institute, "the best defense against this type of attack is to sweep your site for modems periodically". PhoneSweep is their recommended commercial solution for wardialing.

PhoneSweep is easy to set up, configure and start scanning. It identifies over 580 different systems. Available in 1,4,8,12, and 16 line configurations, PhoneSweep also includes brute force password checking. To get your free demonstration of PhoneSweep, call Sandstorm today.

Demo PhoneSweep
www.sandstorm.net 781-333-3200

> > >
> > >
> > >
> > >--- Lis Maguda <emaguda@radcliffe.edu> wrote:
> > > >
> > > > TODAY TODAY TODAY TODAY TODAY TODAY
> > > >
> > > > The Radcliffe Institute for Advanced Study
> > > > at Harvard University presents
> > > >
> > > >
> > > > IMPEDIMENTS TO CHANGE: Revisiting the Women In Science Question
> > > >
> > > > Monday, March 21, 2005
> > > > 4:30 p.m.
> > > > Agassiz Theatre
> > > > Radcliffe Yard
> > > > Cambridge, MA
> > > >
> > > > A panel discussion cosponsored by the Harvard Graduate School of
> > > > Education
> > > >
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>__________________________________________________
>Do You Yahoo!?



**RADCLIFFE INSTITUTE FOR ADVANCED STUDY**

**HARVARD UNIVERSITY**

**Impediments to Change: Revisiting the Women in Science Question**
**Monday, March 21, 2005**
**4:30 p.m.**
**Agassiz Theatre, Radcliffe Yard**
**Cambridge, Massachusetts**

**Cosponsor:**
**Harvard Graduate School of Education**

**Speakers**

**Mahzarin Banaji**
Carol K. Pforzheimer Professor and 2004–2005 fellow, Radcliffe Institute for Advanced Study, and Richard Clarke Cabot Professor of Social Ethics, Harvard University

Mahzarin Banaji studies human thinking and feeling as it unfolds in a social context. Her focus is primarily on systems that operate in implicit or unconscious mode, attending to how social perception and memory reveal new characteristics of attitudes and beliefs. In particular, she is interested in the unconscious nature of assessments of self and other humans that reflect feelings and knowledge (often unintended) about their social group membership; e.g., age, race/ethnicity, gender, or class. Her educational Web site (http://implicit.harvard.edu), which is maintained in collaboration with Anthony Greenwald and Brian Nosek, has accumulated more than 1.5 million completed tasks on various measures of implicit social cognition.

Banaji received her doctorate from Ohio State University. She is a fellow of the American Association for the Advancement of Science, the American Psychological Association (APA), and the American Psychological Society (APS). She has published articles in numerous journals and has served as associate editor for *Psychological Review* and the *Journal of Experimental Social Psychology*. She is currently coeditor of *Essays in Social Psychology*. She chaired the APS's task force on dissemination of psychological science and is currently on the APA Board of Scientific Affairs Advisory Group on Conducting Research on the Internet. She has received a fellowship from the Guggenheim Foundation, a James McKeen Cattell Fund Award, Yale's Lex Hixon Prize for Teaching Excellence, and a Gordon Allport Prize for Intergroup Relations.

**Nancy Hopkins**
Amgen, Inc. Professor of Biology, Center for Cancer Research, Massachusetts Institute of Technology

Nancy Hopkins obtained a bachelor's degree from Radcliffe College in 1964 and a doctorate from Harvard University in 1971, and she was a postdoctoral fellow of James D. Watson and Robert Pollack at the Cold Spring Harbor Laboratory. She has been a professor at MIT since 1973. Her laboratory worked on retroviruses that cause leukemia in mice and, more recently, on the genetics of zebra fish development. She coauthored the fourth edition of a textbook, *The Molecular Biology of the Gene*, with Watson and three others. She codeveloped and taught the first freshman biology course required of all MIT undergraduates. In 1995, she was appointed chair of the first Committee on Women Faculty in the School of Science at MIT, and in 2000, she was appointed cochair, with Provost Robert Brown, of the First Council on Faculty Diversity at MIT. She is a member of the National Academy of Sciences, a fellow of the American Academy of Arts and Sciences, and a member of the Institute of Medicine of the National Academy of Sciences.

**Evelyn Fox Keller**, moderator
2004–2005 fellow, Radcliffe Institute for Advanced Study, and professor of the history and philosophy of science, Massachusetts Institute of Technology

Evelyn Fox Keller received her doctorate in theoretical physics at Harvard University, worked for a number of years at the interface of physics and biology, and is now professor of the history and philosophy of Science in the Program in Science, Technology and Society at MIT. For almost two decades, Keller's research has focused on issues of language and science. Much of this work has concentrated on the history and philosophy of twentieth-century genetics and developmental biology. She is the author of many articles and books, including *A Feeling for the Organism: The Life and Work of Barbara McClintock*; *Reflections on Gender and Science*; *Secrets of Life, Secrets of Death: Essays on Language, Gender and Science*; *Refiguring Life: Metaphors of Twentieth Century Biology*; *The Century of the Gene*; and *Making Sense of Life: Explaining Biological Development with Models, Metaphors, and Machines*. Keller has received numerous grants and awards, including a John Simon Guggenheim Memorial Foundation Fellowship and a MacArthur Fellowship. She has also received eight honorary degrees from universities in the United States and abroad.

**Mariangela Lisanti**
President of Women in Science at Harvard-Radcliffe, Harvard College

Mariangela Lisanti is a physics concentrator at Harvard College who expects to graduate with honors in 2005. She is also copresident of the *Harvard Science Review* and cochairs the Task Force Undergraduate Working Group at Harvard with professor Howard Georgi. She has published several articles on the Casimir force and has also conducted research on nanowires. Her thesis focuses on the skin-depth effect on the Casimir force. She has

been the recipient of numerous awards, including the TR100 Award, Goldwater Scholarship, and first prize in the Intel Science Talent Search and the Siemens Westinghouse Science and Technology Competition.

**Charles Rosenberg**
Ernest E. Monrad Professor of the Social Sciences, Harvard University and Emeritus Professor, University of Pennsylvania

Charles E. Rosenberg is a professor of the history of science. He has written widely on the history of medicine and science and has published many books, including *Cholera Years: The United States in 1832, 1849, and 1866*; *The Trial of the Assassin Guiteau: Psychiatry and Law in the Gilded Age*; *No Other Gods: On Science and American Social Thought*; *The Care of Strangers: The Rise of America's Hospital System*; and *Explaining Epidemics*. He has also coauthored or edited another half-dozen books and is currently at work on a history of conceptions of disease during the past two centuries.

Rosenberg is a recipient of the William H. Welch Medal of the American Association for the History of Medicine (AAHM) and the George Sarton Medal (for lifetime achievement) from the History of Science Society. He has served as president of the AAHM and the Society for the Social History of Medicine (UK). He has also served on the executive board of the Organization of American Historians and on the council of the History of Science Society and of the AAHM. He has been awarded fellowships by the Woodrow Wilson Foundation, the Guggenheim Foundation, and the Rockefeller Foundation. He is a member of the American Philosophical Society, Institute of Medicine, and the American Academy of Arts & Sciences. Among his editorial responsibilities are a term as editor of *Isis*, the History of Science Society journal and as editor of a Cambridge University Press series on the social history of medicine.

**Elizabeth S. Spelke**
Berkman Professor of Psychology and codirector of the Mind, Brain, and Behavior Interfaculty Initiative, Harvard University

Elizabeth S. Spelke conducts research on cognitive development in human infants and young children. Her current research focuses on the nature and origins of human knowledge of objects, space, and number. Spelke graduated from Radcliffe College in 1971 with a bachelor's degree in social relations. She received her doctorate in psychology from Cornell University in 1978. Before coming to Harvard in 2001, she taught at MIT, Cornell, and the University of Pennsylvania. Professor Spelke has received Guggenheim and Fulbright fellowships, and she is a fellow of the American Association for the Advancement of Science and a member of the American Academy of Arts and Sciences and the National Academy of Sciences.

**Upcoming Science Events at Radcliffe**

The following events are designed for the scientifically interested layperson and are free and open to the public. For more information, please visit www.radcliffe.edu or call 617-495-8600.

**Dean's Lecture Series**
"Innate Confusions: Nature, Nurture, and All of That"
Evelyn Fox Keller, 2004–2005 Radcliffe Institute fellow and professor of the history and philosophy of science, Massachusetts Institute of Technology
Thursday, April 7, 4:30 p.m., Askwith Lecture Hall, Longfellow Hall, Appian Way, Cambridge, Massachusetts

**Conference: "Designing Biology"**
It is now possible to provide a detailed description of many biological processes and, in some cases, to explain how they function. Scientists aim to use these principles in the future to predict and control the behavior of biological systems by design, using tools developed at the interface between biomedical and physical systems. Speakers will discuss different areas of biology and the promise they hold for the future in further understanding and predicting their properties.
Friday, May 6, 9 a.m.–5 p.m., Askwith Lecture Hall, Longfellow Hall, Appian Way, Cambridge, Massachusetts

**Lecture in the Sciences**
"Symbiosis in Evolution"
Nancy Moran, Regents Professor, Department of Ecology and Evolutionary Biology and Department of Entomology, University of Arizona
Thursday, May 12, 4:15 p.m., Lecture Hall A, Science Center, 1 Oxford Street, Cambridge, Massachusetts

The Radcliffe Institute for Advanced Study at Harvard University is a scholarly community where individuals pursue advanced work across a wide range of academic disciplines, professions, and creative arts. Within this broad purpose, the Institute sustains a continuing commitment to the study of women, gender, and society. For more information, please visit www.radcliffe.edu.

DIRECT AGENCY REQUEST: Cambridge Housing Authority
675 Mass Ave, Cambridge, MA 02139
ATT: John Cassama
617 864-3020

April 04, 2005

REQUEST INFORMATION OF TAFDC BENEFITS FROM:
Massachusetts Dept Transitional Assistance
One Davis Square
Somerville, MA 02144
617 629-1464 617.629.1400

Claimant of Inquiry:
Jeffrey Taylor DOB: 12/08/50
Social Security Number: 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
Residence: Central House, No. 216
820 Massachusetts Avenue
Cambridge, MA 02139
Telephone: V-mail, 617-918-7873
Telephone: V-mail, 617-876-2858, ext. @ 216

The Cambridge Housing Authority (CHA) is required by law to verify the income of all applicants and members of families applying for or currently receiving subsidies operated by the CHA. To comply, the CHA requests current claims information of TAFDC Benefits, which will be used in determining eligibility for CHA housing assistance with respect to the Stewart McKinney HA Act.

Authorization for the release of information from applicant:
I, Jeff Taylor, hereby authorize the Massachusetts Department of Transitional Assistance to furnish TO THE Cambridge Housing Authority the following information made to the above named individual. My personal tax identifier number is 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.

_______________ Date _______________ Signature

DTA staff completes information for this section for **TAFDC BENEFITS**:

The Gross Amount of monthly grant is: $__________.
Grant is for #__________ in the household.
Amount allotted for shelter costs: $__________ begin:__________.
Amount allotted for vendor payments: $__________ begin:__________.
Recipient enrolled in Work/Study program: YES [ ] NO [ ]
Recipient works part-time/volunteer: YES [ ] NO [ ]
Dependent enrolled in childcare/daycare: YES [ ] NO [ ]
Currently receives child-support YES [ ] NO [ ] begin:______.
Benefits will terminate on: __________

SIGNATURE OF AUTHORIZED REPRESENTATIVE:______________________________.
**APPLICANT HAS NEVER RECEIVED PUBLIC ASSISTANCE CHECK HERE [ ]**

SIGNATURE of CASEWORKER: ____________________ DATE: ______________.

RETURN ADDRESS: CAMBRIDGE HOUSING AUTHORITY
675 Massachusetts Avenue
Cambridge, MA 02139
ATTN: John Cassama, FAX: 617.520.6420

PO Box 391701, Cambridge, Massachusetts 02139-1701
Voice Mail: 617.918.7873

April 05, 2005

Suite D
Brigham Internal Medicine Associates
Brigham & Women's Hospital
75 Francis Street
Boston, Massachusetts 02115

Patient Care Representative:

As a free-care patient with B&W Hospital, I am not satisfied with the physician's description offered as opinion for the presence of a sebaceous sample brought to you. Like the dumping of a sample of urine, which was described as a "sample not properly labeled," it was treated with insouciance. The comment for the sebum was that it was the stuff from the skin that makes spots on clothes, and like scum from the underarms causes odor, and can cause pimply-skin as seen in a teenager.

Without a chance to cover these issues, and take remedy for a smelly condition, it is not consonant with good primary care, if one needs work. And one does require the "aura" of a non-offensive stance when it comes to going to the people filled offices with the neutral smell. [I have been in the position of cleaning, scrubbing, and showering, but sometimes going into a personnel-environment, and suddenly to have body odor having showered only hours before.] If on advice to use deodorant: the question arises, well, "why does this tendency exist NOW, when there are times a problem with body odor was non-extant?"

Drug store de-odorant is a solution. What's another one? How about looking at causes. The sample fluid presented for analysis, and another sample from an urgent care visit, were provided for a perfunctory tox-screen. The March 29, 2005 report of the sample contents leaves no room for determining a problem. The sample values are null. It is suggested the primary care group has dumped samples to prevent a developing knowledge.

Sincerely,

Jeffrey Taylor