UNITED STATES DISTRICT COURT FIRST CIRCUIT
District of Massachusetts

᠎᠎᠎᠎᠎ 27  P 4 10

᠎᠎᠎᠎᠎ COURT
DISTRICT OF MASS.

Jeffrey Taylor, *ProSe*                    )      CA-04-11802 EFH
                    *Plaintiff*             )
                                            )
        - verses -                          )
                                            )      **Affidavit and Misc. Filings**
                                            )      **Subject Material**
                                            )      ᠎᠎᠎ 2005
Party of Ally Fowler                        )
        *Defendant(s),*                     )
                                            )
Ally Fowler,                                )
        *Defendant*                         )
                                            )
                                            )

Commonwealth of Massachusetts
County of Middlesex

Affidavit to clarify issues ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ issues and activity of public
agency Cambridge Housing ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ Affidavit filings of
Miscellaneous Documents ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ living arrangements in
Cambridge, Massachusetts ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ Cambridge Family YMCA
Affordable Housing ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ defendant in capacity of
the defendant and defendant ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ no receive advisement and
direction to and from management ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ of funds for housing
subsidized by the housing ᠎᠎᠎ ᠎᠎᠎ ᠎᠎᠎ by McKinney Vento Act.

1.  Plaintiff advances issues of the loss of privacy
and loss of property. Items submitted herein
constitute support for the assertion of the loss of
reasonable privacy, and in cases, real property.
Actions cited in the affidavit transpired within the
residence of Cambridge Family YMCA, 820
Massachusetts Avenue, Cambridge, MA, in unit #216,
and are respective to the management at the
residence to influence whether Plaintiff is the
subject of an investigation. PLAINTIFF recalls
recent incident May 11, 2005 of the resident's
bathroom being smeared sometime before 7:00 a.m.,
with feces (the toilet in the smaller stall), at the

second floor of the residence of the YMCA.
Plaintiff, and resident #220, passed through the
management offices before leaving the building
somewhere approximately after 9:00 a.m. on the 11
May 2005 and we both verbally complained.  The
impartial act of its being cleaned up after making
the mess was in result of more contamination.  Upon
return in the same day, the cleaning crew has
accomplished a clean-up; most observers would agree
that it was a complete cleaning.  However, PLAINTIFF
would argue that it was incomplete, because of the
remaining light smears, found in the same week, on
the inside of the stall door in the upper left
corner covering the area equivalent to the area of a
quarter sheet of copy paper (see attachment ONE).
It is obvious that the Wednesday morning on which
this appeared had some importance to the plaintiff,
as the plaintiff would normally have been expected
to appear at a 7:30 breakfast discussion group, as
plaintiff has done in the past with his church.  The
fecal smear on the door to the bathroom stall
presumably is one from human waste.  There is a
smear 26 MAY 2005 in the morning again, this
occasion situated on the tiled wall of the first
shower stall, a site in regular use by the PLAINTIFF
as well.  It is approximately 60 cm (centimeters)
from the floor nearly on the medial strip of the
tiles on the shower wall, immediately proximate to
the entrance of the second floor bathroom.
Plaintiff has left without reporting the incident of
a 2 cm square area of human filth, presumably for
another resident to discover, as it most likely will
go un-noticed by the housekeeping.  The presence of
the smear on this day, is a specter that perhaps is
directed to the Plaintiff, as 26 MAY 2005 is another
BostonWorks career fair day, held in Boston that the

plaintiff is scheduled to attend. The specter is also meant as a form of intimidation that the Plaintiff is supposed to experience, which is unique to the person conducting tirades of such medical terrorism. IF one were to review the records, the CIVIL ACTION initiated against the Boston Public Health Commission would reflect the indignity of an injured party to seek a resolve and restitution against similar acts of discrimination as similarly too presented in the complaint, also initiated by the Plaintiff. The case does not present the facet of specter terror in the placement of human excrement on things the plaintiff uses, or reflect those specific conditions of acts against the plaintiff in full detail. The Plaintiff's motivation for the 99-CA-11641 filing is the same as the motivation for the action contemplated in CA-04-11802, in order to obtain relief from egregious activities of the perpetrators. The specter for the contaminated environment created by unknown individual(s) is a problem that defies the solution, since the unknown contributors to filth and biohazardous activities are either very dumb or are very smart, but are also ones who have persevered in perpetual relation to the Plaintiff. [The plaintiff has not informed the management company of the YMCA about the dirt on the partition door for the small bathroom stall. The plaintiff has not informed the management on the fresh deposit of more dirt in the shower stall today. There perhaps should be some room for other residents to step forward.] The plaintiff believes, like the programme of behavior modification of the DEFENDANT in this case, and in MA CIV2004-1828, in former actions against the plaintiff, there is a continuing threat of similar behavioral management activity in manifest, with one

of the focus of agendas being the behavior of the
PLAINTIFF.    Those who have perpetrated and have
directed the activity of behavior intervention, and
schemes of behavior control, remain behind a door of
secrecy.    Issues addressed in resource centers as
the Cambridge MultiService Center, 19 Brookline
Avenue, Cambridge, MA 02139 in some ways deny legal
remedies against the residence, and management
company for such unclean conditions, and the issues
of recurring actions (". . .you will not be able to
obtain relief,"). Those responsible are not aware
of the impact, or, if they are of implementations
for the placement of such unhealthy and dastardly
actions, must have a look at their own behavior and
reconsider whether the full force of their actions
are deemed worthy of use. The individual in the
middle, the actual source of out of control behavior
of a body issuance (the person who is the immediate
causal can be considered as likely a casualty to the
impact of the perpetrator[s]), may be unaware of the
influence and the effect of being under the
influence of a distal player messing the residence
up. If the person who is the proximal cause for the
uncleanliness of the public bathroom is out of
control on food intake, then he may be in need of
purer diet. But for the inconvenience of the
Plaintiff, there have been too many incidents which
have affected days important to the productivity of
the plaintiff. The pattern fits to closely to the
acts, acts not registered in the complaint,
perpetrated in the motion to civil action filed by
the plaintiff in 1999 against the defendants Boston
Public Health Commission, and Shelter, Inc.   Too
many acts coincidental are suggested in the pattern
of these events to not be random, but created, as
they were evident then, as the non-random acts

appear to be at the present time. The specter of
biohazard is particular to the plaintiff, since
plaintiff's father has in the past been employed, in
the capacity of Civilian defense employee.   The
father of the PLAINTIFF has been career employee of
the federal government working in areas of
Department of Defense programs aimed in the defense
of security and preparedness against biohazardous
attacks from internal and foreign agency to
accomplish wartime goals of such attack.   This
uncleanliness is a form of warfare.   That the
Plaintiff has been presented with the specter of
hazards in relation to the microbes that inhabit the
earth is evident in the problems the plaintiff has
experienced also with respect to the inadequate
level of medical care, and that it is not available
on a level required by Plaintiff.   Probably a
predictable lineage of medical doctors, or
representative from certain affiliations of medical
schools, is another problem affecting the
environment for the Plaintiff, the plaintiff feels,
is as relevant in today's disturbance of the peace.
It does not have to be taken in this perspective,
the Plaintiff would like to view these as accidents.
Plaintiff recalls that in the work with KNF&T, April
2001 to September 11, 2001, that there were two
incidents of reporting of spoilage of the
environment in which the plaintiff uses.   The
incident prior to the last, the plaintiff recalls a
telephone discussion to the property manager at the
time, E. Brouillard.   Then on the morning of
September 11, 2001, the plaintiff faxed a notice
before 8:30 a.m. - if the plaintiff recalls
correctly -- to the management company complaining
of the misuse of the shower room.   The management is
not expected in the office before 8:30.   This agenda

may have been the real reason the plaintiff's loss
of employment on September 11, 2001.

2. Unknowns who have been permitted to have access
to the plaintiff's residence at the Cambridge YMCA
have also been at work invading the business domain
of Plaintiff, and which Plaintiff has been
attempting to finance and establish a business for
the production of medical products. Evidence of
this activity has surfaced with the recent loss of
notes and meeting Program with the seminar oriented
on the discussion of set-backs experienced by women
in academic sciences (*Impediments to Change: Revisiting the
Women in Science Question*, cosponsored by the Harvard
Graduate School of Education, March 21, 2005). One
of the participants in the Q&A period seated next to
the plaintiff asked to look at the program, seeming
to come late and not to have acquired one. She
would have first hand knowledge that the program
itself contained notes on the speakers' talks.
Removed for the inconvenience of the plaintiff were
the first hand notes of the particulars of the talks
of the dismissal of minorities participating in
research of late, beds of research activity, into
the Klinefelter genetics (XXY chromosomal variant),
the queer genes (work done by researcher D. Hammer),
and the fat genes (leptin), for example. The person
who appropriated the notes now has views not only of
the content of the forum, but as well, the notes of
the recording process of the Plaintiff. Leptin
genetics are of particular interest to the business
of the Ishmus Oligo venture.

3. PLAINTIFF moves that pursuant to the provisions
outlined in Massahcusetts General Laws against the
taking of trade secrets, Chapter 93, Section 42A,

that injuctive remedies are available for competing
interests against the conversion of trade interests
of a company, or of a person. Is there not a
competitive interest involved in another where
commandeering of resources in possession of an
individual, such as the plaintiff, and is one of the
fundamental activities of such a competitive and
antogonistic interests? Missing from the interior
of the plaintiff's residence and locked room, are
Khypermedia® optical discs 5108FI192LH1833,
5108FI192LH1836, 5108FI192LH1778, of most recent
vintages, and several other optical discs. These
media contain material and archival resources from
the hard drive of the Plaintiff's computer,
generated for the intent of having a copy in the
event of a loss of the capacity of the computer used
for the business Plaintiff. The losses registered
are not the extent of the real losses incurred by
the loss of the data contained therein.

4. Item mention. May 19, 2005 plaintiff was
engaged in the use of a community-room computer at
the Rotary Technology Center, basement room of the
Cambridge Public Library, Pearl Street, Central
Square, Cambridge. At a computer console, the
Plaintiff composed and made use of the Internet
Explorer browser. The plaintiff had prepared an
electronic mail to go to Yahoo Mail and to be sent
to the family relation to the Plaintiff, who lives
in Georgia. The plaintiff pressed the send button
on a "forwarded" communication received in one of
plaintiff's email accounts. The Plaintiff lost the
mail at the point of pressing the send button. The
motion of sending the email was attemped three
times, but plaintiff was not able to send the mail,
nor was the plaintiff able to confirm that the

mailings were processed. There are no records
present in the email accounts in use by the
plaintiff that reflect sending the mail on the 19th
May 2005. The plaintiff also that occasion disposed
of the tissue on to which the plaintiff blew his
nose. The person exiting from the computer lab
picked it up, but before leaving had left the
tissue, the plaintiff believes, with a confederate
at another of the consoles at which this person was
watching. This is not the only occasion Plaintiff
notes that others have picked up the tissue dropped
by the plaintiff. For convenience plaintiff
disposes on the floor only to be picked up when the
station can be left, not in the middle of plaintiff
work at a console.

5. Item deposit, December 07, 2004 letter of JLT to
the New England Medical Center, with an attachment
describing the content of daily mail in the month of
August in that year. Privacy issues were addressed
to the office of general counsel, which handles
input regarding the nature of confidentiality at the
hospital. Before inquiring into the medical
facility release of information pertaining to the
plaintiff, a communication with the privacy officer
of the medical facility was initiated. Please note
that the content of the junk mail folder reflects an
under current of issue, in some ways deflected to
the plaintiff's mail. Unlike other periods, when
plaintiff would be flooded with emails from dubious
vendors about schooling, loans and debts, and from
credit card cleaning companies, at August 2004, the
material is from another quandrant altogether
different, some thing close to medical issues,
rather than by clearing up indebtedness. The
plaintiff has not advanced the issue with the

medical center at this time.

6.  Item deposit.  News clipping from the Wall
Street Journal, March 05, 2004, "Database for
Doctors Tracks Litigious Patients."  This news
clipping covers topics of particular interest to the
plaintiff, as it may reason why the Plaintiff has
not found suitible health care for a very long time,
since leaving the employ of the University of
Maryland School of Medicine, 1991, in capacity as
research assistant.  The second attachement is
recent work of Plaintiff to address remarks in the
patient records regarding the quality of care, and
whether a point of service exists between the
primary care, and the residence of the plaintiff.

7.  Item Deposit:  March 11, 2005 memo of residence
in which plaintiff resides.

8.  Item deposit:  notes of a May 24, 2005
discussion.  Two page issue that describe a process
that underlies living arrangements with the YMCA.

I, Jeffrey L. Taylor, state and depose for the
purposes of this record the preceding content and
attachments with an attestation for the truth and
the accuracy, yesterday, and for true copy of any
material attached, of the provisions herein this 27th
day MAY 2005.

[ signature ]