UNITED STATES DISTRICT COURT FIRST CIRCUIT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Jeffrey Taylor, *ProSe*<br>*Plaintiff* | CA04 — 11802 — EFH |
| — verses — <br>Kevin Braga,<br>*Defendant,*<br><br>S-C Management Corporation,<br>*Defendant,*<br><br>Cambridge Family YMCA<br>Affordable Housing LP,<br>*Defendant* | Affidavit and Misc. Filings<br>17 June 2005<br>Reprinted & Amended |

Commonwealth of Massachusetts
County of Middlesex

---

Affidavit for submitting June 17, 2005 relevant material in action against property management company, and those responsible to the day to day operation of the facility, and party of property management company, for inadequately securing the premises which has been accorded to the residence of the Plaintiff under the terms of agreement with respect to the Cambridge Family YMCA Affordable Housing Limited Partnership. Ownership Cambridge Family YMCA, Inc., of Cambridge, is entrusted with funds from the government derived from several agencies to manage their residence site and facility for resident populations. These are principally financing arrangements through a housing agency as authorized by the Stewart B. McKinney Vento Act and the Stewart B. McKinney Homeless Assistance Amendments Act of 1988 (and also provisioned through amendments of the public law of Housing and Community Development Act of 1992).

---

1. PLAINTIFF resides in building at 820 Massachusetts Avenue, No. 216, Cambridge, Massachusetts 02139.

2. The location of cited actions of

defendant and party of the defendant(s) is an address of 820 Massachusetts Avenue, Cambridge, Massachusetts 02139; the site of the principal activity in which the prime defendant(s) operate and manage a business to the general public places it in the jurisdiction of the district court.

3. Defendant Kevin Braga is employed at the residence facility as the Cambridge YMCA chief property management agent, and acts at the direction of the property owner(s), and by his employer, S-C Management Corporation of Brookline. The office on site oversees problems of the collective of the residents, *en toto*. The services attached to the property rentals include those such as drug interdiction and rehabilitation services, for example North Charles, Inc, the employer of Ally Fowler; custodial businesses, and security companies are other contracted/hired services which operate on the premises.

4. Defendant S-C Management Corporation, Inc., of 2 Brookline Place, Suite 206, Brookline, Massachusetts 02445 operates the Cambridge Family YMCA affordable housing (contractual arrangements), and also implements actions of the operating authority, on the premises at the location of 820 Massachusetts Avenue, Cambridge, Massachusetts 02139, for services with the residence of Central House. The security services, Plaintiff believes, are hired through this concern, and operate at the

discretion of the YMCA and property managers on location, though there is plenty of room for the security services to be a part of their own companys' agenda from time to time to pursue goals and directives here wherever this may lead.

5. Defendant non-profit: Within the ownership structure of the non-profit corporation of the Young Mens' Christian Association, Cambridge, Massachusetts, the operating agent of physical residence, and over-sight of site management is the organizational body of the Cambridge Family YMCA Affordable Housing Partnership, LP, established to administer the funding through a housing agency to provide residence at the Cambridge YMCA, Central House. Resident agent employed as representative for the association organization is Richard A. Foot, address 820 Massachusetts Avenue, also. Source funding for residence rental assistance is the Cambridge Housing Authority, 675 Massachusetts Avenue, Cambridge, MA  02139.

6. Cause of action stems from source errors of the Defendants and the Defendants' Party: for a failure of a duty owed to Plaintiff with respect to having a secure residence (both physical security, and an environment secure from the presence of health hazard), for neglecting to keep others who have been maintaining a nuisance about the plaintiff's person, and the resident's abode, and

neglecting the obligation to provide a residence with reasonable protections to ensure a comfortable degree of privacy, both in aspects of personal accommodations and accommodation for a reasonable expectation against intrusions into residential privacy. One such aspect is having to fend off personal actions of Mr. Ally Fowler from about November 2003 to July 2004.

7. Actions of building's owners' agents have managed to offend the peace of the Plaintiff in ways the owners may perhaps not be aware, or, in some ways would be averse to know. Massachusetts General Law 12, Section Eleven "eye", permits an aggrieved individual to bring action against a party for wrongs encountered from violation of rights to the secured conduct of laws of the Commonwealth, and where laws of the nation are in place dedicated to the goals in which citizens are allowed to go about day to day lives. The course of a state action on the basis of this premise leads the Plaintiff to the path of a civil action in the Superior Court. One such action concerned the territorial dispute led by Fowler, to exert control over access and presence of the Plaintiff at the dedicated shower room, and from a common area bathroom. Another is to provide improved security with a locking door mechanism that would be impervious to the system lock and key, currently installed, and as it has been used in the past.

8. The embodiment of the principals for housing assistance are the responsibilities in housing agencies to operate residential sites for people without resources to enable them to establish community resources in employment and resources for health care. Such statutes and public laws provide residents housing, and with access to community resources (the McKinney Vento Homeless Assistance Acts and amendments following) so that participants are enabled to move into economic independence, for self-sufficient living in the larger community. The PLAINTIFF, having had savings and checking accounts depleted in associated fees on housing rental at times plaintiff has had no income, has been in no position to advance an application, nor security deposit, for another place to reside, or develop in other ways (health care, *e.g.*), economically prosperous to the plaintiff, or to the benefit the community. Further, the MGL 12, Section 11, I, reads:

> Any person whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or rights secured by the Constitution or laws of the Commonwealth, has been interfered with, or attempted to be interfered with, as described in Section Eleven H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. …

The state action proposed by the Plaintiff will be to petition a judge under Massachusetts General Law 12, Section Eleven "I", in order to secure the premises with

personal locking mechanisms to prevent persons operating on the site or operating from the outside with assistance on the inside of the perimeter security belonging to the DEFENDANTs' facility, and the security perimeter attended by the hired authorities who work on the premises, but work for another concern with interests to the adverse interest to the privacy of the Plaintiff. Arguments are also raised under the premise that trade secrets and the state laws that mandate an observance for securing of these ideals for business be one which is conducive to the commercial environment. Plaintiff will be in a better position to work in these secure areas considering trade climate for the industry in which the plaintiff is evolving to exercise employment. In particular, since the PLAINTIFF has in the past experienced residence invasions, and locker evacuations (at other locations) and other security box tamperings, collectively on a number of occasions, actions pursuant to Mass Gen Law Chapter 93, Section 42A injunctive relief and the protection of trade secrets, are in order.

9. Rights exercised under the McKinney Vento Homeless Assistance Acts and amendments lead the plaintiff's action to petition to cite bias that exists in a minimum of balancing the infractions experienced by PLAINTIFF respecting loss of privacy, loss of property, damages experienced to property inside the unit of the rental property, and trespass

related to the health and safety of Plaintiff. There is a reasonable expectation of privacy of living in a Single Room Occupancy (SRO) residence as it were applied to a similar right of a passenger who has boarded a bus for the transport of the general public, but has instead been invaded by a number of inquisitive persons and parties adverse to the PLAINTIFF, and the plaintiff's desire to be left alone. Persons conveyed by bus on public transport from point of origin to a destination some time away from the start are accorded more rights than have been granted /or accorded to plaintiff respecting an allowable degree of deprivation of privacy, and have placed in jeopardy plaintiff's safety and livelihood in order for adverse parties to become intimate with just about every facet of the Plaintiff's personal, business and pubic property. Most of these effects have been contained inside the residence within the YMCA. The adverse actions by Defendant and Defendants' party have caused great inconvenience to PLAINTIFF. One example, of recent history, is the lock out experienced by the PLAINTIFF on the First day of JUNE 2005, in which the plaintiff was away from the living space at room #216 for a few minutes on a routine of nature's call and returning to the room to find that the key that once operated the lock was now a key which did not lock or unlock the Room No. 216 door. Comprehending the change of modes of lock operation led the plaintiff to suspect

schemes of a management who wanted Plaintiff to desist from use of spaces in the building, however temporarily disassociated from the room. [SYSTEM LOCKS — with a single key the cylinder is removed. Open to re-insertion of similar identical key-cylinder combination, or, as the plaintiff surmises, a change in key-cylinder position combination, at the discretion of the management company. The missing cylinder can prevent access to a given room. The reverse action requires perhaps a similar, or an identical key. Another key may prevent a lock to work, as may be the case in question.] There was some delay of departure for the business plans the Plaintiff had taken in for June first. It caused the PLAINTIFF to cancel Boston activities, and to pursue rights of redress for incorrect/improper actions by property management company (consider the impact upon resident in room No. 219 the same day who was inconvenienced, but was also out side of the room many, many hours until the resolution).

    Plaintiff has lost two power supplies to the computers he has operated at the residence in the span of three months. The most recent loss — on the primary computer — on the evening of June 08, 2005, was one due to a power surge from the electrical outlet attached to the apartment (the plaintiff does use surge protection).

    The event followed the plaintiff's visit, and use, of the computer lab in the YMCA, on this evening.

    The damage elsewhere applied to the

office equipment in the plaintiff's apartment include the broken left speaker button of speakers mounted on the monitor (the illuminated button is one that turns the speaker amplifier circuit on and off), and a theft of a memory module (a 66MHz, labeled as 64MB) occurring minutes after the return from the attendance of a flea market June, 2004. Plaintiff has lost, due to theft, more than 1800 Megabytes of data contained in optical storage disks. Papers, many for services for the benefits of food stamp program (State services), financial papers, and personal correspondence have also disappeared from the site. These losses speak of the secreted activities of another person, or group(s) of persons, discovering the business, activity and/or plans of the PLAINTIFF. The activities of the surveillance are most disruptive to the life of the Plaintiff. The theft of records, and business correspondence is equivalent to the destruction of those records, simply because they are out of use for the benefit of the PLAINTIFF. Because the Plaintiff's financial resources have been depleted, it suggests the step in economic control is a stage in control which is important to another controlling agency, one such to impede movement of the Plaintiff to visiting a business attorney, for example, as was intended for the first of June.

10. In continuance to documenting causes of redress to harm of Plaintiff, AFFIDAVIT is filed with the following contents, amended as

fitting an improperly printed document, such as it was filed on the 17 June:

11. On the 10 June 2005 the plaintiff has cleared a fee in question related to the demand of the rental agents for the Housing Authority. This has been the twenty-five dollar amount appended to the YMCA monthly rental. The director of the Cambridge Housing Authority, Michael Johnston, verified over the phone, that the associated fee is waived, so the review of the financing of the apartment and the fees has been completed June 17, 2005, arising from the efforts of the CEOC and Plaintiff, the housing authority would have us believe.

12. Item. June 10, 2005 letter of JLT to the Medical Records Service of the Brigham and Women's Hospital, 75 Francis Street, Boston, Massachusetts 02115. [Conformed copy] Plaintiff has contacted the hospital and one of its physicians employed in research capacity related to _one_ of the Plaintiff's research projects in 1997, and 1998. The nature of the initial contacts were what is referred to in business as cold calling contacts. The Plaintiff's interests were denied and turned down chiefly due to customs in privilege, and having sufficient credibility to warrant a business interest from the hospital or the representative. Personal innuendo had been asserted by the contact person, Steven Grinspoon, M.D., also in which no information has been proffered on

a topic of mutual interest in basic research. Other connections with the hospital staff there have been less than cordial.

In the year 2004 and 2005, Plaintiff was in another relation to the Hospital, without medical insurance and ran an application with the free-care pool, in lieu of a medical insurance plan, and medical coverage which has been beyond the financial reach of the plaintiff. The interim health care has been in question, with an apparent conflict with some of the health care PLAINTIFF has ACTUALLY been receiving there, and in the health experienced in the residence and the community in which the plaintiff resides.

Plaintiff can not establish a link between the Free-Care Pool health resources and the residence and community in which the plaintiff actually lives and resides. Nevertheless, Plaintiff has addressed an inquiry to one aspect of the B&WH health care, with the potential to link any continuity of medical care from this source. Attachment is a letter of the plaintiff of June 10, 2005. This communication addresses inconsistencies within the conversations and dialogs found in the medical records shared among the dedicated primary care giver's group at the B&W Hospital. The discrepancies are noted in the response sent in return for the review. Until the actual records have been amended to reflect the patient's input, those records have been sent back to the Information Services at the B&W Hospital. There are some other basic flaws in the

operation of the set up with this medical group that could never be addressed here, but this is a point of departure of the Plaintiff as hashing over grounded principles the physicians' group is operating with is beyond the scope of their principles of work (*I.e.*, whether past care the plaintiff has met is sufficient, whether another area of concern in dentistry has been sloppy). The practice there is not in accord to the needs of the Plaintiff-Patient. The inherent flaws, so basic to the plaintiff, are briefly touched upon in the review of the omissions and failures encountered in the digest and report of the physicians records (which, also INCIDENTALLY, are not enclosed in review on grounds for technicalities in law). What is noteworthy from the inclusion of such a session in this complaint is that there may be a link which the plaintiff is unaware, and that Plaintiff will not be able to discover on this complaint against a residence and "services" appended to the residence. But OTHER commerce with "medical" services established at the residence can not be ascertained either, though are relevant to the bias in the disturbances experienced from others in the residence from time to time.

   The plaintiff takes exception to the medical group's use of their establishing of a term of "delusion," particular to the reference of some discussion point with the intake physicians while plaintiff was distressed with some ailment. Part of the group wants to assign a <u>LABEL</u>, from the

psychiatric viewpoint, to address the affect of the plaintiff. Another part of the physician's primary care group, those who have not been involved in direct "urgent" care requested by Plaintiff, appear to want to follow the suggestions laid down by the first viewers. So there seems to be the *praecox* of the view for paranoiac that has been inserted into the records, and another point of question on the affect in which Plaintiff expressed opinion as to whether pheromone receptor responses are responsible to the aversive conditioning the Plaintiff has experienced in some rather public environments (to anyone outside reading the remark, it would appear "you are a threat!" to "someone"). The groupthink in and of the records of the troop of physicians suggest that the vomeronasal organ has not existed in the human being. The medical team denies permission, do not want to process, and do not grant establishing the LABEL to affix to a jar of refrigerated urine brought to them as a sample of origin of a questioned substance. It is not recognized as a legitimate endeavor (Contrast the effort of a band of doctors to establish and create a psychiatric LABEL) to label a fluid sample brought by a patient to be subject to an analysis. The review of the records pertains to the contents, yet only a portion of the records viewed at the site have been sent on the request dated for the 18 MAY 2005, which has specifically recalled a summary of the accounting to the disclosures of the records,

and not simply the content. If the patient's records have a history of disclosures, this part of the records are being withheld, as the only persons who have authorized access are the contributors. It does not describe points of access. It does not explain why there was an open account for the patient, as it was discovered that the individual record has no electronic lock in place either, until the middle of May 2005, when financial assistance personnel were asked to close it.

The medical team on the primary care has decided not to offer the procedures to ensure proper testing for a questioned substance be initiated. There was a urinalysis performed on the visit following urgent care request days before, but no tox screen. The urgent care report by Dr. Ip was one that did not appear to be integrated into the stream of the other records, as Plaintiff had to specially request the absent report from medical records services (perhaps the records reflect a water-cooler-level conversation of sharing in which issues are bantered about but are only loosely inclusive to patient A, or patient B, and relative environmental information). These levels of care are insufficient for the level of care desired.

13. Item of June 14, 2005 letter of JLT to the YMCA Property Management. Here, there is a request that is following up upon earlier requests sent to the property management offices of S-C Management Corporation. The electronic mail communication listed in prior

AFFIDAVIT is cited as being a blocked communication. It was noted that the work-around for the apparent block of this direct communication was for the PLAINTIFF to go to the library and print a copy of the "FAILED" communication attempt, and to present the copy of the recorded unsent mail to the front desk of the YMCA, the point at which the RESIDENT property management has regular mail delivery. The ISP email subscription service has remarked upon the recipient's mailbox as being full. The paper sent to the Property Manager will also provide Kevin Braga notice that he is experiencing additional problem with his email account at the ISP and URL: <HTTP://www.lycos.com>. The property manager may be unaware of a box-full status.

   The issue is one of public health, and perhaps a need from time to time to do a thorough and general cleaning of environment areas, ones that have been impacted by an episode of misuse or abuse by residents, who may or may not be in control of their bodily functions. The housekeeping staff, hired independently, like the security staffing, do cleanup details, and presumably have the antiseptics and anti-microbial cleansers on hand for mishaps and spills, that residents do not have. That management fails to act on notice of these hazards are of interest. A cause of interest may be noted else wise, because PLAINTIFF believes that actions are being directed to his uses of the facility, and are personally objectionable. Plaintiff believes that the UNKNOWN person, or

UNKNOWNS, who have perpetuated these acts, are ones who are exerting a pressure upon the PLAINTIFF, and this is a method that such parties exert their control on others to dominate them. Plaintiff asserts that pressure is being made against the plaintiff in ways that are adverse to the health and well being of the Plaintiff (as well as to others), and that those parties know that this affects the PLAINTIFF's sensibilities regarding medical issues and standards of cleanliness that exist in the environment in use by people of diverse background. Plaintiff reads that the Boston *Metro*, weekend edition newspaper, has featured a front-page story detailing proposed legislation at the State House in Boston. It's photograph June 10, tells that the students' manifest with facial masks are protesting construction of biohazard research sites coming to Boston's laboratory spaces. That this is happening and the kind of spoilage is transpiring in the YMCA residence public bathrooms aught to be suggestive that YMCA supply the residents on high-risk days with facial masks to undertake to be inside environments under conditions of contaminations.

14. Item Deposit: This is an illustration of one of the changes that have been inserted into the realm of the residence of the plaintiff, from an incident April 13, 2005. The image comes from that of a bottle lid, in this case also has a felt-tipped <u>streak</u> on it. The jar was obtained at the services of

the Cambridge Economic Opportunity Commission as a food giveaway object of their food pantry. The lid was blank prior to leaving it on the inside of the room, locked. The writing on the lid reflects the impression of a letter "D" or "A" and, apparently, the placement was made while the plaintiff was attending community events in the evening.

15. Item letter of L.C./S-C Management Corporation, dated for the 3rd day November 2003. It concerns room inspections performed by the property management which also invites questions as to the purpose of an inspection. The date of the activity in residence 216 was completed initially October 06, 2003, with a follow-up a few days later to check for door obstruction and stuff hanging from the pipes on the ceiling, which are the conduits for the room's water sprinkler system. The door would not swing the full ninety degrees, with the offset from the wall at another 12 inches. Plaintiff needed to adjust things an inch or two for the door to make it to the 90 degree requirement. It should be noted that on the 20 day of October 2003 that the inspection was followed up too by pest control company which treated the other residences for mice. Plaintiff posted the "PEST FREE" sign and requested these services pass by this room. The Plaintiff declared residence not to be colonized by mice, and the property management company excluded the services performed on that day, or days, when at the property site. The Plaintiff had used

one or two parts of the overhead pipes to hang stored food, or hang clothing. But since the mice problem disappeared, it was no longer necessary to hang things beyond the reach of the rodents, the bags were put elsewhere to store food in the premises, not limited to a small refrigerator which has no working parts (the metal casing of the fridge is a second block to the contamination of food sources). It serves as a pantry now.

16. On the 16th June 2005 Plaintiff was through the shower stall in question on the plaintiff's letter of June 14, 2005. The item in question on the subject of hazard had not been acted upon. Today, this morning, it is apparent there has been a spot cleaning. The corner of the toilet stall door is not cleansed, nor does it appear to have been attempted to be scrubbed yet.

I, Jeffrey L. Taylor, state and depose for the purposes of this record the preceding content and under the penalties of perjury attest the truth and the accuracy, and for true copy of any material attached, of the provisions herein this 17th day June 2005.

Emendations transpiring 20 June submission.

_____
[ signature ]

_____
[ printed ]