

FILED
CLERKS OFFICE

**UNITED STATES DISTRICT COURT**

DISTRICT OF MASSACHUSETTS

2005 SEP 30  P 4: 47

U.S. DISTRICT COURT
DISTRICT OF MASS.
CA04 – 11802 – EFH

Jeffrey Taylor, *ProSe*
            *Plaintiff*

        — *verses* —

Kevin Braga,
            *Defendant,*

S-C Management Corporation,
            *Defendant,*

Cambridge Family YMCA
Affordable Housing LP,
            *Defendant*

**Affidavit and Misc.**
30 September 2005

Commonwealth of Massachusetts
County of Middlesex

Affidavit for submitting September 30, 2005 relevant material in action against property management company, and those responsible to the day to day operation of the facility, and party of property management company, for inadequately securing the premises which has been accorded to the residence of the Plaintiff under the terms of agreement with respect to the Cambridge Family YMCA Affordable Housing Limited Partnership. Ownership Cambridge Family YMCA, Inc., of Cambridge, is entrusted with funds from the government derived from several agencies to manage their residence site and facility for resident populations. These are principally financing arrangements through a housing agency as authorized by the Stewart B. McKinney Vento Act and the Stewart B. McKinney Homeless Assistance Amendments Act of 1988 (and also provisioned through amendments of the public law of Housing and Community Development Act of 1992).

1.   PLAINTIFF resides in building located at 820 Massachusetts Avenue, No. 216, Cambridge, Massachusetts 02139.

2. The location of cited actions of defendant and party of the defendant(s) is primarily an address of 820 Massachusetts Avenue, Cambridge, Massachusetts 02139; the site of the principal activity in which the prime defendant(s) operate and manage a business to the general public places it in the jurisdiction of the district court.

3. Defendant Kevin Braga is employed at the residence facility as the Cambridge YMCA chief property management agent, and acts at the direction of the property owner(s), and by his employer, S-C Management Corporation of Brookline. The office on site oversees problems of the collective of the residents, *en toto*. The services, known to the Plaintiff at this point, attached to the property rentals include those such as drug interdiction and rehabilitation services, for example, North Charles, Inc, one of the agent employers of Mr. Ally Fowler; other services, such as custodial businesses, and security companies, are either contracted/hired services which are active and operative on the premises.

4. Defendant S-C Management Corporation, Inc., Two Brookline Place, Suite 206, Brookline, Massachusetts 02445 operates the Cambridge Family YMCA affordable housing, and also implements actions of the operating housing authority, on the premises at the location of 820 Massachusetts Avenue, Cambridge, Massachusetts 02139, for services with the residence of Central House. The security services, for example, Plaintiff believes, are hired through this concern, and operate at the discretion of the YMCA and property managers on location, though there is plenty of room for any security services on duty to be a part of their own companys' agenda from time to time to pursue goals and directives here wherever this may lead.

5. Defendant non-profit: Within the ownership structure of the non-profit corporation of the Young Mens' Christian Association, Cambridge, Massachusetts, the operating agent of physical

residence, and over-sight of site management is the
organizational body of the Cambridge Family YMCA
Affordable Housing Partnership, LP, established to
administer the funding through a housing agency to
provide residence at the Cambridge YMCA, Central
House.  Resident agent employed as representative
for the association organization is Richard A. Foot,
address 820 Massachusetts Avenue, also.  Source
funding for residence rental assistance is the
Cambridge Housing Authority, 19 Prospect Street /
675 Massachusetts Avenue, Cambridge, MA  02139, from
the department of Occupancy and Leased Housing.

6.  Cause of action stems from source errors of the
Defendants and the Defendants' Party:  for a failure
of a duty owed to Plaintiff with respect to having a
secure residence (both physical security, and an
environment secure from the presence of physical,
biological and health hazard), for neglecting to
keep others who have been maintaining a nuisance
about the plaintiff's person, and the resident's
abode, and neglecting the obligation to provide a
residence with reasonable protections to ensure a
comfortable degree of privacy, both in aspects of
personal accommodations and accommodation for a
reasonable expectation against intrusions into
residence.  One such aspect is having to fend off
the personal actions of Mr. Ally Fowler from about
November 2003 to July 2004.  That plaintiff is
addressed as a "punk" and other epithets by that
individual attests that in no uncertain terms he
does not know the plaintiff, while in dealing with
other persons of similar educational attainments as
the Plaintiff, it has been sometimes, and always,
"Yes, sir. No sir," it has not been so with the
Plaintiff.

7.  On August 15, 2005 at about 4:00 p.m., Ed Braga,
maintenance, S-C Management Company, knocks at
Plaintiff's residence door.  He carries a ladder.
Even before Plaintiff was moved to call in
maintenance for a smoke-alarm detector check-up, Mr.
Braga appears at #216, and was prepared to enter the
room.  The plaintiff has not been moved to call for
a check of the functioning of the smoke

detector/alarm due to the intermittent nature of the chirping. Sometimes mechanical shock of the neighboring apartment door closing would set it off, or an exceptionally moist day (very high humidity) would meet sufficient conditions to tick it off.

Mister Braga came to the residence at #216 because he said was that the resident in #202 had reported a faulty alarm in the room. No. 202 has reported chirping of the alarm on the ceiling, because in that particular week something has caused it to report on conditions in the environment, such as dust and humiture. As Kevin Braga has done in the past, to enter into room #215 to follow up on Plaintiff's report of electrical usages (light continuously on) while the resident there was away on extended leave, Ed Braga has come prepared to enter the room of the Plaintiff to attempt to repair a fixture on the ceiling, which was reported by another resident. This could be considered a minor violation of the contract rules of terms of occupancy agreement with the Cambridge Housing Authority (stated in the contract/lease terms are that entry is to be anticipated only with a day or two notice given to such a resident occupant). The exception to the rule of Landlord presence in the room is for emergency conditions, which is stated in (F), section 2, OBLIGATIONS OF THE LANDLORD agreeing that reasonable access should be permitted for maintenance.

Plaintiff speculates that seating or reseating of the contacts, or power hook-up inside of the alarm unit, has not been effective whenever a checkup had been performed last occasion (such as if the operation had to have occurred on another visit to "fix" the unit, prior to the day of 15 August 2005).

The plaintiff has requested that entries into the #216 residence be logged. The log registry is next to the doorframe above the dresser drawer. The pledge to upkeep the log of entries by the property management has not been consistently upheld, despite reminders. (q.v., as has appeared for the building site visit by the exterminators. The attachment notes on a copy of the, "pest free" signage given to the management company). ⎡ Deferred. ⫿V

The defendants, who operate a login register at the front desk of the YMCA business end, have shown a disconcerting reaction of Plaintiff examining the logbook kept at the front desk for visitors from the outside of the unit who are allowed access to the residence interior. Visitors are also permitted into resident units, such as to install a telephone. In each instance of a visitor who brings "Services" to the residence, there is an entry. Except for those who wish to enter and leave no record of entry on that log in book, there are no entries, and access is either taken or admitted on the basis of the authority of the front offices, not limited to the property management offices appended to the residents' entranceway. There are incidents of unauthorized access the management will have no responsibility for (for example ones in which the plaintiff has discussed of the use of the entryway on ground level on the southwest wing to come up by the stairwell at the end of the corridor on the second floor).

The reaction of the front desk is more worry, and concern that names will be let out. "What are you looking for?" is the verbal report of the staff at the front desk. Plaintiff is "looking at the log entry book" where authorized visitors are registered, as do any outside weekend visitors who have come to be conjugal with a friendly resident. Vendors who supply the food and drink machines are perhaps also required to enter a visit with the front desk.

8. Recent commentary by the resident #200 who has been subject of events elsewhere noted in this civil action regard the gift items. It is current commentary that he thinks, or was told, that the Christmas gifts were turtlenecks for women. It was not the reason then stated that they were given up. This month #200 has said they were given away at the first opportunity because he would not use them, on the account that the items were women's wear. The front desk of the YMCA is where the presents were transferred, according to #200, from the on-board social worker that is employed at the first floor. It is through the social worker and the front desk

staff that the identity of the giver was made known
to the recipient of the gifts.  This disclosure was
against the specific wishes of the Plaintiff, and
violates rights on privacy matters discussed with
the social worker.

9.  Item:  Complaint written and delivered in hand
by Plaintiff against resident Robert who has
pestered the Plaintiff on matters of a business
ownership with allusion to low-life activity, and
disparagement of the objects person's class.
Derogatory and product libel made by the resident
was a standard mindset for this individual against
Plaintiff and the Plaintiff's personage.  That the
person living in #200 has invoked religion on the
basis of argumentative ploys has been a central
feature of this person's constitution.  Plaintiff
asserts that the timing of the annoyances from #200
resident Robert are situational and rely upon a
reference time and activity of the Plaintiff.   In
such a way that the agenda coming across has been to
ingratiate him, or another person to whom is
attached to the resident in #200.  The topics of
current hacking against a proprietary endeavor of
the Plaintiff are with the intention of disturbing
Plaintiff's composure.  The complaint has been
discharged with the comment upon religion withheld,
and the copy submitted in the September 2005
affidavit is referenced here as draft material,
though this copy exists in print form.  Though there
is an electronic version, on a back-up disc, it may
be easily discoverable.

     The Complaint delivered to the #200 Robert
resident has discussed the abuse of trade libel, the
PLAINTIFF defers upon the current expression of the
resident.  PLAINTIFF acknowledges that #200 Robert
may be expressing the words, and or works, of
another individual whom is attempting to influence
Plaintiff's business concerns, or especially
personal matters.  Those concepts of imagery for an
individual not welcome in a new position, or a
history of laws broken in another community, and
earning wages as a janitor have come to the surface
in discussions taken place by PLAINTIFF in the

context of another confidential setting (subject to further commentary not available in this document).

In the voice of resident Robert in #200, those insinuations have come under suspicion. Robert is bound to a wheel chair. For a year, though not the current year, #200 has on occasion to prevaricate about the acquisition of a van, one that would be especially equipped for him. Someone has pledged the donation of a van, he has said (and in another pledge, a laptop). (*N.b.*, Plaintiff does not own a van, nor a laptop.)

10. With respect to Plaintiff's office equipment, Plaintiff has relied upon these instruments to perform job search activities. They are primarily used for communications, which is essential for the functioning of the Plaintiff. The plaintiff is under an impression that the communications center has been destroyed as an aspect of pressures exerted by others to conform what may or may not be expected of Plaintiff to do.

With respect to the records contained in some 1.8 gigabytes of data appropriated from the plaintiff's use are maintenance data for use of the plaintiff.

[By depriving the Plaintiff of the use of the roughly one-and-a-half gigabytes of data, it prevents the mounting of claims to be processed against the defendant's, and the defendant's party.

Likewise, depriving the PLAINTIFF of the 1.8 Gigabytes of data, it prevents the Plaintiff from supporting claims in a civil action that would substantiate claims of the Plaintiff. Alternately, the benefits the party in control of the records could mean that the work of the person who produced the records are converted to the use of the controlling party.]

Plaintiff asserts affirmatively that known uses are current, and are in use in ways known to the opponents of Plaintiff. That the personal writings and productions are in the control of another entity is not in question. It is a matter of time for the Plaintiff to discover where the records are in use. One example: Since Plaintiff has entered the loss of optical storage disks into the complaint record,

one immediate effect can be observed.  Plaintiff has
in the notes of one or two particular weeks in the
last ten months that in the medical surveillance,
and treatment, of the resident next to the Plaintiff
in #aaab, for example.  Here, there are details as
to the times and amount of phone traffic transpiring
in the interior of the room.  On certain days, there
were dozens of calls that were not answered
(assumption:  someone occupying 150 square feet of
space will have to willingly let a phone ring ten
and twenty times, and not answer it).  Those notes
reflect that the resident's phone was very actively
receiving phone communications.  The notes will
detail on some occasions that the Plaintiff was
aware that the occupant had stepped out of the room,
or was away from the room all together for huge
expanses of time, and receiving telephone calls.
But because the resident in #aaab was away, or,
inside on those occasions, it did not stop #aaab's
phone from warbling.  It not from a bell-type sound,
but an electronically concocted sound.  The
telephone was given to the resident the Plaintiff
believes.  The amount, and duration of telephoning
have been an annoyance, to a reasonable person.  In
the past, the resident perhaps would also have been
annoyed, because the plaintiff has observed more
occasions that not, callers who come to the door,
are refused.  And the callers do not get a response,
or have not been received at all because #aaab
hasn't always responded.  The volume of the warbling
has also been at a level that it has been easily
observed at the another end of the corridor, a
hundred feet away.
       Once the Plaintiff has made it known of the
loss of Plaintiff's optical storage disks, the
telephone calls to the #aaab apartment had ceased.
Its occurrence, or the discontinuance of phone
service, might be just coincidental.

11.  The attached letter to the health care
provider, of the past at Brigham and Women's
Hospital, dated for the 23 September 2005 is the
response of the patient to a denial of request for
records access, and for editorial oversight with
content of material in with the physicians notes,

with respect to the Plaintiff's Primary Care
Providers.  The development has transpired because
of the provision within the records management of
the hospital declaring that disclosure and
disclosure data are granted, upon request:

The right to change the content may be limited
to the express condition to depend on an attached
statement where change requests are not be dealt
with in an editorial manner, so that manual records
inserted by the writers shall not be overwritten.
However, the stated purposes of disclosures and of
accounting of the records being released by the
primary care group, is:

"[y]ou have a right to get a record of the times that your health
information has been shared.  You must make your request in writing.
You may request this as far back as six years, beginning April 14, 2003.
The listing you get will include the date, name, and address (if known)
of the person or organization receiving your information.  It will also
include a brief description of the information given, and a brief of
statement of why the information was shared." [*There are seven
exceptions listed outside of this rule, there are eight clauses describing the
conditions mandated for the request of a change of the content of record, and
information.*] The hospital association has incorporated these provisions
derivative of the Health Insurance Portability and Accountability Act of
1996 (HIPAA), and 45 CFR parts 160 and 164, and from a reference
titled "Standards for Privacy of Individually Identifiable Health
Information".

12.  The Plaintiff has had experience with an aspect
of dealing with issues of medical origins, as he has
been manipulated out of a job and profession in work
with the University of Maryland School of Medicine.
Normally employees are rewarded for positive
accomplishments on the job, adding to the work
environments and community, and sometimes
neighborhood relations.  This was not the case with
the Plaintiff in 1990-1991.  Plaintiff was employed
there in the spring of 1989, and within nine months
had given a boost to his personal health by the
discontinuation of coffee consumption.  Drinking
coffee as a mainstay drink had been broken off in
January 1990.

One or two of the things a psychiatrist can
disable a person with is, in the patient's own
habitude, with such a habit in excesses of coffee.

Next to being a regulated substance found in MOST
patients with a psychiatric condition are those with
substance abuse labels, and probably the most common
of which is with coffee and drinking caffeinated
compound drinks.  [If one drinks a given amount of
coffee for the day, one can very likely be labeled
as a substance addict simply for the choice of
imbibing in the commonest drink of market.  Other
regulated substance materials or compounds may be
something like dopamine and metabolites, as may one
day be adrenaline.  Regulated with the express
intent of modifying a subjects behavior.]

Secondly, by the middle of June 1990, the
Plaintiff has discontinued cigarettes, and smoking
tobacco.  Not that the Plaintiff has chewed tobacco,
but the newly instituted regimens for health, and
health benefits, were boosted a second time with a
cessation of another useless habit, and this is from
tobacco use.  The Plaintiff was then an employee
with a position of betterment of health, and this
was from the new platform of discontinuing two very
detrimental habits, which some in the professions
are still characterized as they have been since the
1950s.  It's sexy to smoke.  It's cool.  And it will
make you respected.  Those who were visualized in a
laboratory white coat with the habits of either
coffee consumption or cigarette use were elevated in
consideration as thinkers (cf. 1950s).  And the
thinkers do a lot more for society.

Was the Plaintiff, as an employee, given a
special dispensation for attaining a new status for
this new health platform?  Often times a newsletter
or bulletin will feature bonus programs, and
incentives for employees to make those choices, as
the Plaintiff has done in 1990.  Plaintiff has not
been through an employee program, or enrolled in the
employment assistance ventures to improving the
employees' health, though it probably would have
been beneficial.  Dollars bonus.  Publicity of
participating in these events would cause many to
see the rewards on their paychecks, or in a
promotional plan.

This was not the case for the Plaintiff in 1990
and 1991.  The plaintiff in the first use of
intensive medical benefits and treatments sought out

care for an infection in a lachrymal gland of the right eye, and treatment for the associated conditions. But because the Plaintiff had a primary care service that was running another agenda than the plaintiff had bargained for, it was determined that Plaintiff should go see a clinical psychiatry team.

The psychiatry then, was without a handle to affix to the Plaintiff. Substance abuses from the habits of caffeine and tobacco would normally grant most afflicted with a label for this or that, and what is known to be common in the field as a dual-diagnosis. It is a double indemnity for the physician to work with.       *    *    *

Never more than a step away from placing the Plaintiff's person in distress (beyond years in recovery) it has been the goal to keep the plaintiff away from education. It has been the position of the medical establishment that only pain and distress would be the only education suitable for the Plaintiff (for that matter, any member of the Taylor's). Whenever the plaintiff has sought to advance in some educational or economic way, the position is that at this point Plaintiff should be medically compromised so that check up can be maintained, and limited should the call be in place.

The plaintiff suspects the underlayerment of problems in the residence to be related to medical investigation.

13. Item deposit: Health care. For primary care the month of September 2005, Plaintiff delivers copy of requested medical report relating the haematology and chemistry from work done on sample of Patient material of the Plaintiff, especially one of January 25, 2005. In weeks prior plaintiff delivers the content of the two report-pages of Paul Toff, M.D. to the reception of the current PCProviders. The report was not available to the physician September 21, 2005 at the office visit of Plaintiff. Physician in charge, and preceptor, reviewed reasons why the absence of the report, and decided to have patient request delivery of the report. Attached is copy for Plaintiff's move to have disclosure of

report of blood chemistry given from the reception of the PCP.

In the past year, the Plaintiff has had choice of food, and has been able to purchase and select the food not available on demand from food pantry. The reasons that many of the decisive factors on choice and the absence of choice are laid out in the environment is simply because they are reserved to the ones with the upper hand. When the plaintiff does not work, and is disturbed in peace at a home environment, these choices remain in the other party's hand.

14. Arguments are also raised under the premise that trade secrets and the state laws that mandate an observance for securing of these ideals for business be one which is conducive to the commercial environment. Plaintiff is currently not in position to work in these secure areas considering trade industry climate. The reason, Plaintiff asserts, is that security to perform in this arena is denied, as it is permitted for intrusion to occur into the residence of the Plaintiff. It is not denied to the operator of the premises, or of its agent in employ at the residence. Business advice in the law, which Plaintiff has researched, indicates that there would be no barriers to conduct research from an Internet hookup, and to carry the development of such a business concern would present no community hazards. The city address sector at the residence of the Plaintiff, important in the zoning of tax assessment in the city of Cambridge, is one in which it is also supportive for business and development of commercial enterprise in the current location. Plaintiff does not find enablement in any economic sense that would sustain the basics of telecommunications services that would allow even the hookup of an Internet Service Provider.

15. With the recent rent fixes the Plaintiff has experienced with the CHA and CHA-member policy interfaces, Plaintiff recalls that sums of dollars to be demanded for rent. This translated to seventy-five dollars. In June the re-establishment of the minimal pricing structure was instituted.

And it was also the time rental eviction notices
were instituted (Cf. letter, April 14, 2005,
Cambridge Housing Authority).

In June 2005 the computer power supply was also
corrupted, the cost of the replacing of the power
supply was determined at seventy-six dollars.

The first re-assessment in 2005 of SRO
financing — which is termed for an occupancy of a
moderate rehab unit — brought Plaintiff to the
director of the Housing Agency inquiring as to the
life income history and potential for earnings,
"nobody earns a hundred and sixty dollars in one
year," it was said, "you just can't do that."   In
the face of being investigated under false reporting
of income Plaintiff also brought the Leasing staff
person to the Director of Leasing and Occupancy to
wring some detail of Plaintiff's allegedly "owning"
a cellular telephone.

Plaintiff is not responsible for false reports
from CHA, or CHA-member, agents in trust for
Plaintiff.   The matter is not different that what
has been put before the financing of the plaintiff's
residence, without income, and answer for summary
charges of $75 to pay for rental arrears, while at
the same time to fund and match the replacement
charges for a damaged computer.   It could just as
easily be asserted that the manipulations around the
$75 rental arrear were simply to test and examine
the spending habits, whether Plaintiff would buy
this or that needed thing, or first spend the charge
of funds for a residence.  (The other trajectory of
abuse from residence providers the Plaintiff has had
a history of contending with is that attorneys
responding to claims appear to be originating from
the southern end of town, and are presentably
experienced in repeating experiments that the
resident agents bring them to bear.)   The Plaintiff
considers the test as a form of harassment, similar
in a design paradigm of the stolen belt (presented
in the image of someone else wearing it).

The embodiment of the principles for housing
assistance is that housing agencies are responsible
to initiate, provide, and operate residential sites
for applicants without many resources to enable them
to link with community resources for employment and

health care. Such public laws provide residents
housing, and with access to community resources (the
McKinney Vento Homeless Assistance Acts and
amendments following) so that participants are
enabled to move into economic independence, for
self-sufficient living in the larger community. The
PLAINTIFF, having had savings and checking accounts
depleted in associated fees on housing rental at
times plaintiff has had no income, has been in no
position to advance an application, nor security
deposit, for another place to reside. For reasons
of this complaint, the Plaintiff has found that the
means necessary to ensure advancement and
participation are beyond the plaintiff's reach
simply because they are denied. The attempts of the
Plaintiff to establish Internet connections appear
to be prohibited, and where Plaintiff assumes a
community based openings for access to the internet
it appears that the use of the equipment, and
environment only bring about another layer of
adversity, and of supervision that is also
incompatible with the goals of Internet use for the
Plaintiff. One of these goals is setting up a
business. (cf., letter of housing authority, March
24, 2005, advising of advocacy, and available in the
city of Cambridge)

16. For the years 1998 to 1999, Plaintiff from time
to time signed up for Brigham and Women's Hospital
research offers of instant cash, and participated in
research projects that provided plaintiff cash
surety, in the amounts of 15 dollars, and twenty-
five dollars, with Dr. Wolf's visual perceptions
work. There were perhaps less than a dozen
occasions of these computer simulated language-
contextual manipulations experiments. These
contributory exercises assisted in funding the
enrollment of the plaintiff in a health and exercise
club. While these participations were prior to
joining in with MassHealth, Plaintiff has since
learned that this status should have disqualified
the laboratory work, as being without medical
insurance is cause for disqualification of many
biomedical research based projects conducted
primarily on the campuses of our medical schools.

In the year 2004 and 2005, Plaintiff was in
another relation to the Hospital, without medical
insurance and ran an application with the free-care
pool, in lieu of a medical insurance plan, and
medical coverage which has been beyond the financial
reach of the plaintiff.  The interim health care has
been in question, with an apparent conflict with
some of the health care PLAINTIFF has actually been
receiving there, and in the health experienced in
the residence and the community in which the
plaintiff resides.

Plaintiff cannot establish a link between the
Free-Care Pool health resources and the residence
and community in which the plaintiff actually lives
and resides.  But Plaintiff has addressed an inquiry
to one aspect of the B&WH health care, with the
potential to link any continuity of medical care
from this source.  Attachment is a letter of the
plaintiff of September 23, 2005 in which plaintiff
has indicated dissatisfaction with the inadequate
response of the Information services group.

This communication addresses inconsistencies
within the conversations and dialogs found in the
medical records shared among the dedicated primary
care giver's group at the B&W Hospital.  The
discrepancies are noted in the response sent in
return for the review.  Until the actual records
have been amended to reflect the patient's input,
those records have been sent back to the Information
Services at the B&W Hospital.  Some other basic
flaws in the operation of the set up with the B&WH
medical group prevent the Plaintiff from addressing
them here.  Hashing over principles the physicians'
group is operating with is beyond the scope of their
principles of work (I.e., whether past care the
plaintiff has met is sufficient, whether other
medicinal concerns in dentistry has been adequate,
for example).  The practice there is not in accord
to the needs of the Plaintiff-Patient.  The inherent
flaws, so basic to the plaintiff, are briefly
touched upon in the review of the omissions and
failures inside the physicians' records (which, also
INCIDENTALLY, are not enclosed in review on grounds
for technicalities in law).  What is noteworthy from
the inclusion of such a session in this complaint is

that there may be a link that the plaintiff is not
purposely informed.  It is apparent also that
Plaintiff will be unable to discover whether, and
what, "services" are appended to the residence.  As
OTHER commerce with "medical" services established
at the residence cannot be positively ascertained.
The environmental bias experienced in the personal
relations and disturbances from others in the
residence from time to time are clues to the
operation.  The complaints against other residents
will serve as a beginning example of the destructive
measures of the presence of the "therapeutic"
services in use.

When collecting blood and chemistry report data
at B&WH Information Services, a general alarm was
place upon entry into the building.  After
retrieving the reports another general alarm was
activated.  The Plaintiff put trash into a canister
in the Primary Care Delivery suite, August 04, 2005,
and then the plaintiff watched exiting the site.

17.  Because Plaintiff has experienced disruption of
normal existence in many environments, the effect of
the government activity at the home base is a
distributed one, and that addressing acts of the
defendants and the defendant's party may only be
partially effective in a global set.  It may be
partial and incomplete for other environments, where
employment may be factored in as well.

18.  Please note a change in information with
respect to the Cambridge Economic Opportunity
Committee, in that the information Plaintiff has
relied upon on matters that regard the occupant,
John in YMCA residence room #300.  The prior record
reflects that the employment is with the committee.
The employment is rather with another food
distribution source.  The non-profit organization
shares office space with the Eleven Inman Street
address, and that resident #300's work is for that
employer and not the CEOC.

19.  To update the basic descriptions of the
environment previously discussed in the earlier
passages of the current volume, some items will

necessarily be brought into the discourse. A) Since
December 2004 a Coke° machine has been installed
inside the TV room, to complement the vending areas
laid out for the fourth floor residence inside the
Residence of the Cambridge YMCA. The sink and
cooking area are improved in the fourth floor with
the addition of a newly constructed counter. B) A
sink in the first block position of the second floor
necessary room has been placed on the wall, and then
removed, and then re-installed after several weeks
of lying on the floor. In the absence of the
original sink at this location, the NEW sink covers
the vacancy under the mirror, where there was
formerly a carriage of a cast iron frame. The
second (middle) sink currently has a fracture in its
basin on nearly the exact position as the fracture
that characterized the first sink to go out of the
bathroom area in the past two years. The size of
the hole, roughly a square centimeter, and radiant
fracture lines are roughly identical to the prior
sink's break, and is positioned three quarters of
the way up the sloping part of the bowl, toward the
center of the right partition of the basin. The
impact that caused the fracture must have been
identically placed as the prior sink's injury. It,
the injury, has occurred a few weeks after the
installation of sink in the first position. The
third sink since September has been rearranged. Up
to Mid-September 2005, the faucet structure has been
inoperative and was bent upwards some ninety degrees
to the left of the center axis, while also pointing
left another ten or so degrees. On the 26th of
August 2005, the shower curtains covering the first,
second, and third shower stalls were pulled from
their hangers as a display of a wildperson's
strength of force on the second floor bathroom's
interior and environment. C) There has for the
first part of 2005 been a total reconstruction of
the shower stall for the handicap users: This means
that the leak in the flooring, and under the pan and
siphon jointing, has been repaired, or has been
alleviated. The water circuit has been restored,
and the third shower partition is functional with a
new tile floor, with replacement of every lower-
register of wall tiling. The shower light bulbs are

still disappearing from time to time, but the
maintenance has been kept up to date with the burned
out/missing incandescent bulbs fixtures above the
stalls.  D)  Personal residence.  This year it is
noted that the options to set menus for reading, and
changing the protocols on the voice mail at the
intercom in the room have been removed.  Plaintiff
is not permitted, without the involvement of the
property management authority, to change the menu
options to simple things on the voicemail system.
Simple things like being able to set and change a
greeting, and use optional greetings.

20.  On the 26th September 2005 Plaintiff was through
the second floor necessary room and viewed the
toilet stall in question earlier this year.  The
item in question on the upper corner of the
partition door, on the subject of potential hazard,
has not been acted upon though requests have been
issued to the property management.  In the past, the
plaintiff has utilized the space between the door
and the frame partition to insert the holder of the
backpack.  The corner of the toilet stall door is
not cleansed, nor does it appear to have attempted
to have it scrubbed yet.  On September 27, 2005 a
urinal has been newly installed for the second
floor, and is operational though the valve has been
retained.

I, Jeffrey L. Taylor, state and depose for the purposes of this
record the preceding content and under the penalties of perjury
attest to the truth and to the accuracy, and for any of the
true copy of material attached, of the provisions herein, this
30th day September 2005.

_____
[ signature ]

Item 15



CAMBRIDGE HOUSING AUTHORITY

675 Massachusetts Street, Cambridge, MA 02139 · voice (617) 864-3020 · TTY (617) 864-3038 · fax (617) 868-5372 · www.cambridge-housing.org

March 24, 2005

Mr. Jeff Taylor
220 Massachusetts Avenue #216
Cambridge, MA 02139

Dear Mr. Taylor:

I am in receipt of your letter dated March 21, 2005 and have taken the time to review both the letter and the attachments. Unfortunately the issues that you have raised in your letter are landlord/tenant issues and not something that the Cambridge Housing Authority will become involved in.

If you wish to have someone advocate on your behalf, I would suggest DECD at 11 Inman Street in Cambridge. Their number is (617) 868-2000.

In the meantime, I have placed your letter and the attachments in your file.

Sincerely,

CAMBRIDGE HOUSING AUTHORITY

Michael J. Johnston
Director
Leasing and Occupancy



Item 15



CAMBRIDGE HOUSING AUTHORITY

649 Massachusetts Avenue, Cambridge, MA 02139 • 617.864.3020 TD • 800.545.1833 x112 • 617.864.3547 • www.cambridge-housing.org

July 14, 2005

Jeff Taylor
820 Mass Ave # 216
Cambridge, MA 02139

Dear Jeff:

Due to the interim re-certification of your family composition and income, your rent effective July 1, 2005, will be $ 25.00 monthly.

Please remember that you are required to report ANY CHANGES in your household income, medical expenses and/or unusual expenses. If there are to be any changes in your family composition, a person leaving or an addition the household, you must notify the CHA immediately.

If you have any questions, please contact me at 497-4040 x 418

Note: Your waver will run from July 1, 2005 through September 30, 2005.

Sincerely,
John Cassama
Leasing Housing Staff

Cc: Landlord
    File



PO Box 391701, Cambridge, Massachusetts 02139-1701
Voice Mail: 617.918.7873
< j_taylori@yahoo.com >

September 23, 2005


Privacy Office,
  Health Information Services
Brigham & Women's Hospital
75 Francis Street
Boston, Massachusetts  02115

Dear Health Information Services,

The requests I have place with the privacy office have three
functions:

Requests placed June 10, 2005 and June 27, 2005 have sought to
determine primarily whether there are disclosures, externally, or
internal channels with personnel whom are unrelated to the mission
of the PCP group in relating health care issues directly to me.

Secondly, the response generated from the hospital(s) has been
supremely guarded.  Not a single instance, as is guaranteed in a
policy statement on accounting of disclosures general, is even
discussed.  Counting myself, an August 04, 2005 disclosure of
laboratory testing data has been disbursed.  There is no mention
of this occurrence at all[8] in the September 09 letter of this year.

Thirdly, respecting the content again, The Health Information
Services central oversight functions have been requested to
insert, at very specific places, relevant data, insight, and
editorial commentary, with the assent of the physician care
providers themselves.

Any content disclosure will have those points circulate to
potential candidate reviewer.

Very truly,



Jeffrey Taylor

---

[8] "Thank you for your requests dated June 27, 2005 concerning documentation contained in your Brigham and Women's
Hospital medical record.  Unfortunately, we are unable to comply.  The appropriate clinical staff has reviewed your
requests, and based on the information you supplied, it has been determined that the clinical information contained in
your medical record is accurate, and therefore your record is to remain as is." — September 9, 2005 letter, BWH.

[ Item 9 ]

820 Massachusetts Avenue, No. 216, Cambridge, MA 02139
V-mail: 617.876.2858, Ext. 216

August 08, 2005

Robert
Resident #200
820 Massachusetts Avenue, No. 200
Cambridge, Massachusetts 02139

Dear Robert:

On the first day of August 2005, I was present with you at the
bathroom.  The talk of a business owner who created a company.
The insinuations you carried in a five minute monolog purported
to describe the business owner catering to janitorial needs, and
misfortunes that brought this person to ruin.  You claimed this
business person had broken laws.  The person also was a person
you ascribed as not belonging to society, as you described, was
exclusively occupied with sweeping floors, and allusions to
cleaning other's dirt.

Informal

There was also the expression of dislike of Catholic religious
activity.  You claim to have been long established with Seventh
Day Adventist.

Copy

Your commentary at the sinks is unwelcome and offensive to me.  I
am called Jefthro on many occasions because my name is being used
in a jest, and it is not conducive to talk.

Should you continue to use this name-calling, a complaint will be
written for it.  And if you continue to pollute the air with
incense and odorizes, more shall be said of that.

Very truly,

Jeff Taylor
Resident #216

[ Item 13 ]

## MOUNT AUBURN PROFESSIONAL SERVICES
## AUTHORIZATION TO USE AND/OR DISCLOSE HEALTH INFORMATION

I, [name of patient] _J. Taylor_ , [patient date of birth] _12/08/50 DOB_

[Address and Telephone number of patient] _820 Mass Ave., No. 216, Ma    (Cambridge)_

_02139 , 617.918.7873 v.mail._

authorize [provider name and address] _Mt Auburn Professional Services / Primary Care_
_office staff [ front desk]._ to use and/or disclose my health information as identified below to
[name and address of recipient] _Dr. M. Butterfield, for the intended_
_purpose to review records conveyed to M. Butterfield, D.O._
for the following purpose(s):

__ Moving from area __Changed insurance __Doctor/practice is hard to access [please explain]

__ Other [describe each purpose; if requested by patient and no purpose is identified, then you may state "at the request of the individual"]
_for the request of the physician, the presentation and_
_conveyance by purveyor, Jeff Taylor. August / September 2005_.

By initialing the spaces below, I specifically authorize the use or disclosure of the following health information
and/or records, if such information and/or records exist:

____ All office records for [provider or practice name] _____

_√_ Medical records needed for continuity of care of [condition] _Consisting Haemotology, Chemistry Jan 2005_

_√_ Billing statements for [dates] _____

_√_ Other [describe] _Outstanding report dated Jan 25, 2005_

* The following items must be initialed to be included in the use or disclosure of other health information:

____ *HIV/AIDS related health information and/or records

____ *Venereal disease records

____ *Mental health information and/or records

____ *Genetic testing information and/or records

____ *Drug/alcohol diagnosis, treatment, and/or referral information (Federal regulations require a

description of how much and what kind of information is to be disclosed. Federal law prohibits the re-

disclosure of such information.) _____

Except to the extent that action has already been taken in reliance upon this authorization, I understand that I may revoke this authorization at any time by giving written notice to the Privacy Officer, Mount Auburn Professional Services, Inc., 330 Mount Auburn St., Parsons 2, Cambridge, MA 02138. Unless revoked earlier, I understand that this authorization will expire 180 dates from the date of signing or upon [insert applicable event or date of expiration] _____.

I understand that I may refuse to sign this authorization and that my refusal to sign will not affect my ability to obtain treatment, payment, enrollment, or eligibility for benefits. I may inspect or copy any information to be used or disclosed under this authorization.

I also understand that, if the person or entity receiving this information is not a health care provider or health plan covered by federal privacy regulations, the information described above may be redisclosed and no longer protected by these regulations. However, the recipient may be prohibited from disclosing my health information under other applicable state or federal laws and regulations.

~~I further understand that the person(s) I am authorizing to use or disclose my information may receive~~ compensation (either directly or indirectly) for doing so.

_____          _September 18/21, 2005_
Signature of Individual or Individual's Legal Representative          Date


_____          _____
Print Name of Legal Representative (if applicable)          Relationship of Legal Representative to Individual


(A copy of this signed form will be provided to the individual and/or the individual's legal representative.)

Link
⌐ Item 16 ⌐

PO Box 391781, Cambridge, Massachusetts 02139 1781
Voice Mail: 617.918.7871
< f_taylor@yahoo.com >

July 27, 2005

Laura Booth,
Director
Cambridge Economic Opportunity Committee
Eleven Inman Street
Cambridge, Massachusetts 02139

Dear Laura Booth,

Thank you for the time to hear housing, and finance developments.

I have recovered a letter of complaint about the housing conditions which had come about after the realization that trespassing has become a substantial issue.

Cambridge Family YMCA Affordable Housing, LP., runs the housing program by the housing agency, but it appears that the access mechanisms from the lobby of the YMCA is being permitting to run on "authorized entries" into the room (the third paragraph is sort of invalid, and could be ignored). The letter, only dated for November 2002, is from an unemployment period, and records a complaint for the "open house" status of the residence.

Another attachment is a facsimile of a document that was confiscated shortly after it had been filled in. As the disappearance of this document from my possession has become an issue of October 2002, it is an important landmark, as the services the document applies to is one in which a disruption act has been applied. The methods to dislocate, and to mess-up, the service are both intrusive, and offensive.

The civil action initiated against another resident, MICV2004-1828D was resulting from the aggressive posture of a resident of the YMCA. The attached inquiry as to the facts of a person's employment relationship with the YMCA.

Best wishes to you,

Sincerely,

Jeffrey Taylor
Enclosures:    cc Letter from JLT to CTR, Nov 2002
               cc Letter of JLT to XLT, Jan 24, 2005
               cc Document, registration for DTA, Oct 2002