FILED OFFICE

**UNITED STATES DISTRICT COURT**

District of Massachusetts    2006 MAR 31    P 4: 42

)  U.S. DISTRICT COURT
)  DISTRICT OF MASS.

Jeffrey Taylor, ProSe
    *Plaintiff*

)
)
)
Post CA—04-11802    **EFH**

- *verses* -

)
)
)

**AFFIDAVIT**

31 MARCH 2006

Cambridge Housing Authority
    *Defendant,*

)
)
)

Central House, YMCA,
Residence, and CHA-member
    *Defendant,*

)
)
)
)

S-C Management Corp.
    *Defendant*

)
)
)

John Doe, Unknown Entity
    *Defendant*

)
)
)

Commonwealth of Massachusetts
County of Middlesex

1. PLAINTIFF resides in Cambridge at an address of 820 Massachusetts Avenue, No. 216, Cambridge, Massachusetts 02139, the location subject to the party of the defendant, who controls leased housing under government subsidy program, USDHUD, to the Cambridge YMCA. Although procedural docketing requires a minimuum of four copies of any bill of complaint or issue, today, a single copy will have to suffice. Until Plaintiff has resolved printing and

supply problems, a single copy has been available for
recordation of housing issue, mindful w.r.t. criminal
activity.

s

2.   Pursuant to the QHWRA, of 1998, Section 507a,
this limited civil action addresses environment of
residential conditions which the Cambridge Housing
Authority (the CHA) sponsors, and for which funds are
administered through the Housing and Urban
Development block grants.  Cambridge, Massachusetts
is the location of the jurisdiction relevant to the
District Court, because prime defendants oversee the
contracts, individually to agency-member groups such
as the Cambridge Family YMCA Affordable Housing, LLP,
and to the tenants, and residents, therein.  A small
claims action entered in the Middlesex District Court
has addressed portions of rental certifications
handled through the rental and leasing operations of
the housing agency.  There are other(s) who are a
part of the party of the defendants which influence
the Plaintiff, but such persons/entities have yet to
be identified, and who are major sources of problems
reaching the PLAINTIFF.  The complaint refers to
actions, not legally constrained, and a
responsibility housing agencies perhaps should be
following in Quality Housing and Work Responsibility
Act of 1998.  One of which is a initiative that could

re-imburse improperly charged tenants, or residents, for minimum rents, and rent rates which are wrongly contrued for those without a regular income.   The environment in which improperly administered charges on rent has resulted in financial collapse for the Plaintiff's personal economy, along with all savings and checking assets from earnings.   The effects of the manipulating of plaintiff's assets and potential equity sources has distressed PLAINTIFF to such a degree that it has only been possible to deal with the environment, and not with the activities considered vital to the plaintiff's business for employment and travel.

3.   The residence itself is the Cambridge YMCA, for which the housing agency funds are utilized, and which acts at the direction of the property owner(s), and by the employer, S-C Management Corporation of Brookline who oversees the Central House residential aspects.   S-C Management Corporation, Inc., of 2 Brookline Place, Suite 206, Brookline, Massahcusetts 02445 is the home company that implements the Cambridge Family YMCA Affordable Housing, LLP., a CHA administered account.   The location of 820 Massachusetts Avenue, Cambridge, Massachusetts 02139, is otherwise known as Central House and serves as CHA-member vehicle for low-income tenants.

There are residential sectors of other tenants who have major supporters in the community, and have rents and rates structured on a different plan, for example, shelter, Inc.  For the other residents in these programs some have employment as a core of the focus, and are geared to their members banking dollars for meeting market rates and leaving the premises on the YMCA to move with the mainstream.

4.   The activities of the Defendant's party has been one that disrupts the finances of the Plaintiff.   The environment Plaintiff finds himself in means that plaintiff is sometimes routinely subjected to unwelcomed banter and other unwanted interactions, even on occasions of times in absolute preparation of a day's work (these have persisted in the environment and have been specific to the Plaintiff, for a number of years).   In order that relief be obtained from the activities of the unreasonable demands of the Defendant party, a motion is entertained that Defendant(s) produce reason why defendant's party is exerting such a degree of supervisory oversight, and if in part of the experience in the residence, there are controls that enable this to find ways that it can be reduced.

If there is a cause why defendant's party has to destroy a computer part, while at the same time,

trespassing in the spaces accorded to the Plaintiff,
a case will be shown. If there is a reason that
parties of the defendant must maintain a community
surveillance of Plaintiff's activity it should be
stated. It is a *prima facia* statement that by
destruction of Plaintiff property it is intended that
Plaintiff should not be making/using a CD-RW/DVD-ROM
device for music and video rendering, and that when
the bicycles have been destroyed on the premises
(while other bikes at the premises are not attacked)
that a bicycle should not be used OR ENJOYED as the
Plaintiff's transportation.

5. Plaintiff is called vandal for emptying a carry-
out container of a vegetable medley into a tray of
rice — a rather large tray of rice meant to be served
in a cafeteria. The intent, according to an
accusation of a February 25, 2005 letter from
Antonette LaRosa, was to destroy food which the
plaintiff was not going to eat. There has been no
been an apology for the labelling and such
descriptive approbation. The connotation of this
descriptor follows that pattern of Bad Boy, and the
character shortcomings of a teen-ager. Plaintiff has
responded to the accusatory demeanor of the assistant
property manager's charge, and responded a second
time to prompt the management office. Both letters

were addressed to the Senior Property Manager.   Both letters have remained unanswered.   There has not been an attempt to mitigate for the insults of the matter of the food wars accusation.

6.   Defendant's party has expressed the strongest of intent of subjecting Plaintiff to investigation, as for reasons why, for example, that plaintiff maintatins a cell phone for personal use.   More so, that the finances of the Plaintiff may be revealed to the Cambridge Housing Authority, responsible for the income certification process, where plaintiff has no finances.   The conditions under which a person comes under such rash scrutiny, boundless which directions such abstract questions may fall, create a needless, disturbance in Plaintiff's realm.   Irrepearable injury may result from inquiries into the employment and education, past, and current.   These disturbances in which environment the Plaintiff is a part are ones which Plaintiff may be without the resources to repair, financially, or, that the Plaintiff is ethically mandated to remedy, without monetary input.

The facts pertinent to the dispute:

1.  The January 07, 2006 complaint has been filed with a request for

waiver of Massachusetts's court expenses, and a waiver of thirty dollars has been granted to proceed. An amended docketing date places the complaint for a January 31, 2006 filing, with the change of the defendant's descriptor reflecting only a single entity respondent to 356A/2006 docketing motions. The defendant's name is thus, CHA-member, S-C Management.

The request for analytical services on a compromised computer, which contains the Microsoft Office 2000 Suite that the Plaintiff depends upon for writing, transmission and printing facility, has been denied. The response of the court to grant only filing fees and not for testimony on a report on a hard drive status means the regular fees of $30.00 has been waived. Plaintiff has amended, as well, a scaffolding of some core figures in the contractual breaches claimed by the defendant's use of housing agency funding/disbursement. Here plaintiff is not in a position to say defendant's [mis]use of CHA funds. Plaintiff only contracts financial dealings for the defendant and the defendant's party through S-C Management Corp.

The plaintiff is concerned with un-necessary payments plaintiff has made to the CHA-member, due to the prerogative that the landlord's places in its demands to gain dollars and monies from Plaintiff, for the most part, which plaintiff does not have, nor is legally entitled to obtain when regular income does not exist. The enhancement of their revenues is from the bottom resources that Plaintiff maintains, since under these conditions a saving account is not possible. The residence maintains the stance that minimum rent is minimum rent, and that this is twenty-five dollars.

The activities of the CHA-member must include oversight of any

job revenue that Plaintiff has access to, or that Plaintiff can potentiate, before it is time that it is made known, "YOU OWE ME." Plaintiff does not speak for resources defendant's party has at the disposal to ascertain income generated from resources of Plaintiff. Plaintiff acknowledges having a residence (plus electricity and heat), with certain voice mail, shower and toilet. It has a door with a lock, however, Plaintiff asserts affirmatively, the "trusted sources" with the duplicate key(s) are at work, and maintain the access, even at times Plaintiff is not made aware of the presence of duplicate key users who can operate on a schedule of 24/7 days a week.

From donations sent into the front offices, Plaintiff has asked for a microwave oven, three shirts, several pair of pants, one of which is athletic, a blanket and two dress jackets. Plaintiff has received these items in good condition. Though there are other things of use, and needs, requests are not always granted from the workers managing the gifts. In absence of the ability to purchase these, it has been necessary to seek assistance, especially for the microwave at a time when employment has been denied (the plaintiff has used common areas, including the TV room and showers, but not always without harassment from other residents who have claims established on spaces therein).

2.    Also, defendant creates conditions that are reliant upon PLAINTIFF's inexperience and ignorance of the legal environment for the housing laws – applicable to drive the contractual arrangements with Plaintiff's landlords. The administrative person, an assistant appended to the CHA-Leasing and Occupancy department, has from the autumn 2005 to the present time been placed in the purview of

matters respecting this year's contracts handled by Mr. John Cassama in plaintiff's view of their organization. Plaintiff has had interview with this person, Santos Irizarry; Mr. Irizarry is also referred to in prior filing CA99-11641, as a point in the NULL YMCA REFERRAL at the MultiService Center. The null referral was initialized from an employment agency in Boston, Impact Employment (an affiliate of the North Charles Institute) and was then directed to Santos Irizarry, at functions related to the Cambridge MultiService Center, 19 Brookline Street. [The function of Mr. Irizarry has to have been the CHA-representative interviewing prospective renters with the CHA-Cambridge, especially with applications mirrored at the CHA-member, Cambridge Family YMCA. That Plaintiff was not aware of this relation; it should bear this fact out. Plaintiff was interested in residence in which there were no prior smokers, or users of tobacco products. Plaintiff stated a distinct preference for a room without the prior use of tobacco products. On the other side, there was an interview with the property management for a potential room opening on the topmost floors of the YMCA, and a site viewing was made possible.]

3.   On the purchase date of the CD-RW/DVD-ROM drive, 12/31/2005, as plaintiff left the store, a vehicular patrol unit of the Cambridge Police department was parked in the lot in position to observe any person leaving the main exit of the store. Within two hours of the purchase, an unknown entering the Plaintiff's room achieved the ruin of the EIDE device. [Prior attachment: Incident Report #0511190]

The day before, on the pre-purchase trip the plaintiff made to the Micro Center to appraise an EIDE drive purchase, a core employee of

the North Charles residential treatment programs at the fourth floor YMCA, was leaving by the check-out counter area to the front of the computer store, by himself. On first and only glance, plaintiff would not determine if this subject has made a purchase. In the days following this occurrence, Plaintiff directly inquired as to the person's employ, whether he was with North Charles, because the fourth floor is generally where anyone could expect to find him. He is of a similar build to Jean-Luc (who is an evening Thursday/Friday person with the front desk of the Cambridge YMCA). Plaintiff will occasionally only cross paths in the elevator lobby, the stairwell, or general lobby-foyer with the North Charles staffer. The occasion plaintiff questioned him about employment transpired in the stairwell, where plaintiff descends to exit the residence.

4.    Statement: Plaintiff has been employed on an agency hired job April 2001 to September 11, 2001 with corporate offices to perform duties of an accounting clerk in which time plaintiff earned an even $9K. The position was to audit communications billing, and plaintiff worked with the IT department where this function was being funded to assist the company to document account handling and roll-overs in major telecom business transactions. Month to month billing is generally where the tasks plaintiff handled their processing.

There were occasions that the plaintiff lost materials at the desk, and filing cabinets. Billing statements from the telecom providers would be opened, and recorded by plaintiff, for the most part. Plaintiff also processed returns for pagers of the company employees. In the transitioning of one wireless provider to VerizonWireless, plaintiff logged

all former property to be returned to the business from the company employees. In order to solidify processing of these returns, Plaintiff went to manual ledgers (note books), and used this system of pager recordation for the later period of time spent with the employer. With manual records to work with, a second-tier back up systems process was in place. Probably, the time to ensure these records were established meant that the project for placing files in file cabinets for everyone's use was delayed. In fact, at the time of departure, the project to set up the filing system was uncompleted, and not solidly evident that it had started. The project would have placed all the "Xeroxed" statements into another cabinet hold, and transferred from the cabinets then located in the cubicle. Two hand written essay books were produced to ultimately contain the absolute core of records on the pagers, and the return authorizations for the former pager company, and to establish the new pager accounts with VerizonWireless. These should exactly parallel the content of the spreadsheets, and electronically produced records, on the project for pager management. The few pages that turned up missing from the cabinets in plaintiff's charge, were duplicate copies, and that as far as plaintiff is aware the electronic records and photocopies of the pagers is complete without errors, and were completely intact. (Here, plaintiff points out that those few missing statements, either produced by the plaintiff, or especially the copied statements from the telecom companies, meant that in order for the plaintiff to do the work of record integrity, another layer of records had to be entered. This procedure detracted from the time meant to do other parts of the job, but made the recordation secure).

Plaintiff here notes, as well, that at the cut-off time of the relation

to the client-employer, the payroll process used to employ the plaintiff was left running. The checks and compensation in Plaintiff's direct deposit account did not stop. This reflects in the variances of income reported to the housing authority in compliance with the terms of the lease.

The bank account of the plaintiff registered a considerable surge in unearned funding, and, too, the employment agency's activity to recover the matter of hundreds and hundreds dollars flowing into the account of the Plaintiff. The election to process refunds in that manner – returning funds to their check disbursement system – was without the employer notification to the Plaintiff. The irregularity has been addressed to their accounting department as the freak occurrence. In the months following, the principal manager/owner has created a "no trespass" order from the employment agency. Explanations of the series of check deposits from this surge of overpayments have been registered with the Cambridge Housing Authority at the time of re-certification for income changes at the loss of the employment, September 2001, as the CHA review protocol includes bank statements, and sometimes IRS filings.

5.  The question of overpayment of minimum rent is described in the Federal Register [Vol. 64, No. 32, February 18, 1999] as times in which a housing resident is not able to afford payment to the housing agency and is granted a minimum rent condition on the absence of income. What qualifies as a time for minimum payment is thus construed to mean a payment set to appease lease conditions when renter is not fully financially capable, and at points where discontinuity of maintaining

payments of the regular lease schedule is a problem. Minimum rent is defined for conditions where an INCOME is absent, and poses a problem to make rent payment. It also is defined as a period of eligibility for the mandatory waiver of lease contract fees where a hardship exists, such as in the absence of employment, and loss of a job. Plaintiff has considered this to mean that rental demands should cease at the time that income has stopped. For the plaintiff, it is income that is considered from the standpoint of income of employment, as this is the primary means in which the plaintiff can expect to meet the rental obligations on a scheduled payment. When there is no income from employment, the Plaintiff has reported the drop-off, as well as income upon resumption of work plaintiff does for income.

Plaintiff argues that minimum rent has been charged inappropriately, because in SC 356A/2006, plaintiff has paid regular fees for rent in the past in the absolute absence of a regular income. It is in these periods when Plaintiff is out of work and maintaining rent payment on a prior schedule has exerted significant drain on the balance of the savings. Without a re-imbursement, no other way permits these funds to be recovered.

As opposed to banking and saving funds, these conditions quickly empty accounts, and in continuing conditions, even at the minimum rents, the effect is to void savings. Plaintiff's bank accounts were drained completely due to enforcing of their minimum rental payments. Plaintiff's accounts have been drained at the in-between-times it has taken the Cambridge Housing Authority to respond to the fluctuating employment conditions of the plaintiff. The responsiveness of the CHA to re-certify and update lags on the leasing obligations.

Just before one o'clock, March 24, 2006, Plaintiff let the Central House management know the rent monies are not available, as the notice in that week has demanded $50 (fifty dollars) due. The property management of the YMCA has said to Plaintiff that the housing authority sets the rates. There was nothing said about the adjustments to rent, or adjustments that could be made for rental arrear payments. Plaintiff has stated that the income in the past is extremely variable. The March 27, 2006 letter from Antonette LaRosa to plaintiff demands a status report.

Because the way the housing authority determines minimum rent, the drain on the plaintiff accounts has caused indenture. This condition is one which overrides Plaintiff's time needed to find work. The housing authority claims that the YMCA requires twenty-five dollars minimum rent, even at times where there is no income to the individual tenants.

Please refer to the erroneous demand by housing authority staff for cell-phone records. Expenses for communicating with job contacts, and résumés campaigning, are unmet. The demand for cell phone records is something unexpected in the retinue of the unseen Cambridge Housing Authority activity. The entry of an inquiry in the Plaintiff's credit report, one for the May 02, 2005, has been generated for a west coast communications company.

6.    In June and July 2005, the Cambridge YMCA / Central House management have prepared a procedural process to threaten the Plaintiff to pay up, or stand for eviction. The tactics of rental demands are a form of coercion that has not been accorded, within the terms of

the authority granted to the agencies disbursing funds from Housing and Urban Development.  The environment in which this coercion is in place also carries with it the general repugnance of debt collectors carrying on their duty "to the extent the Federal Fair Debt Collection Practices Act applies. [Please note that this communication is from a Debt Collector, and any information obtained will be used for that purpose]" of the task of their collection of money owed.

The housing assistance promised by the government to help those in the community obtain work and health care, which is best done through a place of residence to setup in a community.  That the plaintiff is experiencing harassment from neighbor's activities is also not a wish of the plan to keep their workers productive.  It is hardly different than a common carrier of transportations telling its riders not to ride, or, to get off or put up with bad conditions.  It is not unlike a common carrier of transportation to unjustly demand surcharges, and other unforeseen expenses.  Such as demand of a transportation agent claiming what is due that should not really be due.

7.  [There has been recovery of the following misplaced items:  The optical disks *FI1921H1836, and *FI1921H1778, and *NAMIE disc., and there is the itemized mislaid conference draft of the model GNU public license agreement, noted in most recent affidavit filings past.  The individual(s), please note, who have been dogging plaintiff for more than fifteen years, have also been doing so with the intention of perhaps making it seem as plaintiff should believe things are gone.  The disadvantage Plaintiff works with is having pieces of things in one part of town, then not having access for a while from the other part of town,

for example.]

The unknowns are crafty and work in order so detection can be avoided. Plaintiff has lost most of what amounts to information (and the remnants of a information for professional career) theft. The information eventually neutralized, or made useless, after the fact, is for events that rely upon knowledge gained. This is another form of what has been called identity theft. The McKeldin's biomedical textbook lost while in attendance with the University Maryland, 1992, has only been one of such targets, for example, with a design of making indebtedness, and complicating financial liabilities. In recent years, the bicycle destruction, and the credit to purchase the bicycle, purchased from Sears, and made good by 2002, were targets to disrupt the finances and financial credibility (reference filing CA99-11641, where tangential actions are associated with issues on the civil action).

The move to nix entertainment (the EIDE drive purchased 12/31/2005), and the transportations (two bicycles in the years 1999-2001), is a reminder that "plaintiff is grounded" that no privileges are to be allowed. Defendant "John Doe" may be all together not un-related to the residence attached to the Plaintiff.

If the plaintiff has methods of reviewing entertainment, it's a vehicle that Plaintiff will be enabled to keep current with trends in the entertainment industry. Plaintiff reminds the audience of humanities, and the Bachelor of Arts degree earned in 1986. Such autonomy in having views of the literature and stories are an asset, and by vitiating the DVD purchase it is an act that sets back a facet of education.

The thinking of breaking the economic backbone and preventing an enjoyment of an entertainment center may mean retribution as

motive.

The limitations imposed in the current environment of Plaintiff means not for growth but cancellation of everyday participation. The condition is synonymous with captivity. It doesn't take an essay of Michel Foucault to remind us of de Tocqueville commentary of the degree of civilization is ranked worthy of how it manages its treatment of prisoners, animals, [and its foreigners].

Unknowns have their finger on the pulse of things plaintiff owns, and of his activity. The review is active at any time, and transpires against the plaintiff wish to be left alone. These inconveniences are at the expense of Plaintiff. These individuals are crafty, and must have an eye for opportune moments, such as when the Plaintiff can be taken off-guard. The amount of effort for such surveillance activity is a measure of the effectiveness of a strike (and of the history of the strikes), and it is an assumed cost that society can say it is afforded, or thinks that it is needed.

Plaintiff is also of the opinion expressed in an earlier tract that is based upon a prescience of a notion that means Plaintiff is a deliberate object of another individual or group/s of persons involved in bringing their form of "Justice." In that these raids on person and property of Plaintiff are deliberate with the intent of causing distress, with the overtone of punishment stemming from an assumption that Plaintiff if guilty of perpetrating those same acts (thus, somewhere in the past an accusation has been made implicating Plaintiff in the business, say of purse snatching, and henceforth, a project is determining how distressing Plaintiff will become once his purse/wallet are to be snatched, trial after trial after trial, or one might just as well entertain a

notion of belt snatching as a psychopathological model of thieving for drug dependence).  Businesses and individuals are no different in the mind of Plaintiff, as groups of people easily can be just as sociopathic, and psychopathic, as any individual, whether it under the influence of drugs, or, working together to achieve a goal.  Plaintiff may not be permitted to NAME THE perpetrators, by design.  The acts that plaintiff may cite rely upon after-effects of the activities of those counter to the purposes of Plaintiff's.  Refer to MICV2004-1828.  These acts themselves are disruptive, if not damaging to the property and esteem of plaintiff.  That Plaintiff does not have a healthy bank balance means more than just having debt collectors rummaging through plaintiff's drawers.

This following notation outlines some more basic information of the event of the theft of the black belt and the carryover history:  Plaintiff recalls a conversation with a uniformed Boston Police Department officer upon a casual walk up to the cafeteria on an evening at the Long Island Shelter complex (LI Shelter, not discussed in previous filing, CA99-11641), and plaintiff responding to an inquiry by the officer of whether Plaintiff has achieved a black belt status, i.e., that the officer, among other things was asking if plaintiff was Jiu-Jitsu master of hand to hand combat and earning of the order of the discipline's black belt. Plaintiff remarked there, that because the question is a bit out of order, as well as the question of living on an address on Lee Street (the city was not mentioned, only a reference to the name of the street), that he didn't have a black belt at all.  It was about a stolen belt that was on the mind then, in 1999.  Plaintiff has realized [later] the City the Boston Police officer was in discussion with the hope of getting information on

former addresses of the subject of his inquiry. The officer was fielding questions about plaintiff moving into a residence in the City of Cambridge. (Plaintiff was listening to the question of Lee street residence from the standpoint of friend on 715 Lee Street in Fredericksburg when the question of the Lee Street was fronted, but turned the thought over to irrational then that it was really a non sequitur inquiry). Again, because the officer's question was so off base, the then recent loss of the braided black belt from the UniLu sleeping quarters in the recent weeks, came to mind, and Plaintiff registered a complaint that it is all he could do to hold on to the belts he was in possession of, "I can have only brown belts [expressed]" because the plaintiff has lost the braided black belt twin, "it is the only thing [I] could keep hold of [expressed]." The twin braided-belt was lost at the UniLu shelter [un-expressed] and has ended up with someone who at the time shared an occasion of a food/meal program.

Later after coming into the residence of the YMCA at late in the year 2000, there was an occasion in which [#217 resident] Charles [Gatewood] [Gatewood is a name that a white man calling plaintiff's extension used, as he was looking for the extension number of "Charles"] was telephoned at plaintiff's address, "please get" the message over to Charles, "I think he is at this" address, if he isn't please get message over to him.

Charles #217, now at the YMCA, happened to be on site, at the same morning that the belt was discovered missing at the UniLu. Plaintiff does not recall to whom a report was made of, if any, of the braided belt stolen. But in the circle of events to unfold around this theft of the braided belt, Charles (currently) #217 of the Central House

residence, has been in the face of the plaintiff at the mornings, and once, left a very disturbing and troubling comment about being on federal [probation] is nothing funny (at the time Plaintiff was at the mirror in the newly appointed bathroom in the basement of the University Lutheran Church, Winthrop Street in Cambridge, shaving and was approached by Charles who pressed what an ugly picture it was, that of being on federal detention, and being punished). This is also the same timing of Charles #217 launching a weekly series of complaints against the Plaintiff with the shelter head students, and overseers, about plaintiff dressing at the side of the bunk beds in the dormitory. [Plaintiff has only observed Charles, on a single instance, of him dressing, or undressing, inside the handicap stall of the newly redesigned and created basement dormitory at UniLu. The door to the roomy stall was partially open, but it remains sort of backwater that someone has to have the privacy of a bathroom to dress or undress.] But then over the serial complaints he placed with the students, it would be resolving over the issues in weeks, that is, spanning over the weeks of time he was sleeping there — the shelter would be seasonally closed. Plaintiff does not understand the distress Charles had expressed. Charles expressing such a view in a distorted format was meant to unsettle Plaintiff at the mirror. Perhaps this is recapitulating something held in BELIEF by Charles #217. Someone, plaintiff very strongly believes, has motivated Charles to making ugly statements about being on parole, or detention. And it was done to Plaintiff.

But certainly, there was a pressure being exerted by this individual, today as well as it was then. And Charles No #217 was present and on site at the morning/evening of the timing of the theft of

the black braided belt. Next development has come through a circle of other individuals, placing a braided black belt into the possession of another. In the following time of a year or so, this individual was resident at the Cambridge YMCA, long ago moved out from Rm 432 (around 2005, and months before). Plaintiff only makes assumption that it is the belt from the Plaintiff that has come to be worn in this person and in his possession. It is more or less supposition because Plaintiff has not examined the braided black belt. The only confirmation will come when the belt is ever examined or if other witnesses are found to discover the manufacturer as the twin brown belt purchased a single time by Plaintiff. The person who wore the belt at the time of living in the YMCA (room number 432, and one equipped with visual, and auditory, light signaling for alarm calls), has also in prior times worn a wooden box, which was strapped to the resident's back in a manner of a rucksack. Everywhere on the streets in Cambridge, one could point to the individual with the wooden box on his back.

In a manner of political and sociological utility, it was a similarity to the effigy, this individual has been on display, and been in the care of a mental health agency, local to Cambridge, and to the Cambridge MultiService Center (This troublesome individual has also at one time seized the leather briefcase carried while the plaintiff has had bike transportation). The mental health agency makes the community at large knowledgeable of this troublesome individual and the connections intended to register in association with Plaintiff. It is unknown if this has registered in the mindset of the individual set in a mirror to attributes associated with the Plaintiff (plaintiff does not wear box, but has in Maryland used a wooden box for a lock chest). If there is consent by

such an individual, it has been with the express purpose of making consent. In dealing with people habituated to groups, plaintiff has observed that it is next to sainthood that another steps into the problems of another, and mirror-sets traits or attributes of another. They consider themselves to be the state of grace at times they can mimic someone else, as an imitation with the design of portraying another's behavior, especially is the behavior is deemed mal-adaptive. This behavior is rewarded and it is highly esteemed, even when the behavior is reprehensible and they do not do it themselves in a normal habit. It is just done to mimic a person. It is "done" to a person whom they think cannot, or will not see behavior coming from their own insides.

The theft of the belt from plaintiff was not calculated to remove months of efforts of bargain shopping by Plaintiff. But those are the impacts incurred by Plaintiff for a five-dollar purchase on two belts. The matter is more of the manipulation of the commercial market, and plaintiff's environment for the purpose of running an agenda to suit an unidentified person and agency yet to be identified. The agenda includes disturbing the societal relationship where a predominant variety of people watchers are in place. Where now does the plaintiff relate to the GAP stores, where the changes inserted to the sales people and their personnel? The expediency of trickery and trade of the mental health associations addresses their agenda in an effigy, the forum on a level of non-verbal communication. Treat it in the manner of euphemism, a universally understood language of meaning and intent, and it will be understood.

8. In the span of ten days a week ago, the Plaintiff's neighbor of 820 Massachusetts Avenue, Apartment No. 215, Cambridge, Massachusetts 02139-3228, one called John, has been apparently resident in this time. Plaintiff is aware of the presence of this individual through the pounding of the floors, or walls, of his practice – in the past – of moving heavy or sizable objects with a grace perhaps of a real drunkard that he appears to be. Plaintiff also claims that in the duration of this period with this neighbor present, the loss of personal things from the personal carriers used by the plaintiff, in either the brief case / valise, or the backpack (as well as the rest of the room) are made possible only through a perpetrator who is acutely aware of most of the plaintiff's intimate activity, mostly the coming and going, and whether the door is locked.

In criminal typologies, it is not quite unlike the pickpocket where there is the utmost reliance on taking the victim relies upon the un-awares of the thief's presence and purpose. That it requires organized and sustained effort, one only need turn to Charles Dickens and the London tales of the underground and the gang of children exploited for the degree of community effort it is of taking tag subjects (who must be kept unaware of purposes). Plaintiff is perhaps only one of a few who actually leave the room and locks the door behind on any excursion (our insurance industry would not have reason to want to do business with someone and expect to pay without some basic sense and precautions). The consensus of many of the residents is a view that it is acting paranoid and freakish to leave a room behind unlocked, and, it is a level of distrusting, and is really inappropriate and downright un-friendly. The consensus is to hate distrust as much as they all hate

non-smokers.

What plaintiff brings along on excursions, are what amounts to a large wallet. These were sometimes kept inside of plaintiff's quarters, on excursions to the bathroom 80 feet north up the hall on the short "el" to the left corridor, which ends on one side at a resident exit, and of the right by the stairwell and elevator. But once theft was detected, it has changed this situation.

The door is kept locked, especially on shower, and necessary room functions. Note: Resident of #215 since the time of becoming a Central House member and moving in has stumbled in the hallway on occasions of being under the influence. Until Plaintiff has learned to lock the door on all occasions, especially being home, to prevent intrusions for wayward drunkenness, this particular resident of #215 has crossed the threshold three too many times. There are slightly less than half-a-dozen occasions Plaintiff has answered the door to Resident #217 knocking and discovering that Charles says that he has mistakenly thought someone else was living in Plaintiff's room, number two sixteen (216). This is social, and there are no occasions Plaintiff is aware of here of other guests on his list of, "sorry, I was looking for someone else."

For routine things, Plaintiff leaves the quarters to return in five minutes, and like on the morning of December 31, 2005, most things are on even keel and nothing is to be observed irregular. The distinguishing event was that on that day, there was an entry into the room, and it has been a stealth trespass to destroy. The cover up of the activities is so that any introduced changes will go unobserved, like re-setting the door rug, and other markers in use by the plaintiff. The

cover up may mean including leading clues to others, this is likewise a social endeavor. Plaintiff is aware only because of an intensely motivated PRACTICE of covering up, and sneak thief strategy. Plaintiff has been keenly watched for these opportunities to take hold.

Another slight irregularity is the activity of the stealth attack performed upon the morning of the EIDE drive purchase. Please note, that the plaintiff went to the bathroom twice, in between the time of unpacking the new purchase and discovering the ruined optical disk containing the CD-ROM software. Each visit was approximately no more than five minutes.

9.  The primary backup PC computer with the CD-RW/DVD-ROM newly installed is currently not working due to an inability to read the main drive. This computer also has a Linux Fedora installation on the drives, which occupy other partition locations, and the Linux Operating System is not capable of helping to start the Windows98 system. The plaintiff installed Win98 to convert a used Windows982SE which came with the used drive (note here, that it is a used system traded at the MIT Swap Fest over the summer, and it contained a Windows2000 Office suite which plaintiff has relied upon for productivity suite of software). Along with the potential sale value of a refurbished computer, this is a second reason why the hard drive may have been compromised, so that Plaintiff would not be able to use the office suite. The irregularity plaintiff has discovered is the content of an RTF, MS WordPad, file in which notes were written later to be found erased, or not visible to the immediate use.

[At public computers, it is not uncommon to expect that the floppy

drive does not work, or that when plaintiff opens a WordPad document to translate to the MS Word2000 profile, it has suddenly crumpled into nothing. Internet connections are not unexpectedly delayed, or stopped all together, and sometimes broken to disappear. Plaintiff has worked at public computers and has waited five and ten minutes for a web page to turn over. There are many occasions when it just has not been possible to log out of an email account, simply because of something on the ISP, or in the host server, that will not permit the button to log out to work (mind you that these terminals are allocated to spaces of 20 minutes or an hour of use and it becomes a burden of use when libraries only allow one hour a day for typical use).]

The results of system file checker performed December 2005 and January are not encouraging:

REPORT: the sfc.exe program has not resolved a problem of corrupted files on the used hard drive, nor was there a suggestion that an APPLICATION PROGRAM, outside of the operating system, would be a significant source of malware to fix or remedy. In less than a week's time the newly created computer would be defunct. Like the CD-ROM that has been the target of a direct attack, December 31, 2005, the SystemMax computer there exists the high probability that itself would be under attack. The high probability means that plaintiff is being manipulated, and things are made to make useless. (In the SystemMax computer, all programs of the MS Office Productivity Suite that could have been used for nationwide programming work would only now be found at the county and AGENCY sites offering computer facility. That the Plaintiff's printing was stopped/canceled in the previous summer of

2005 is a matter of timing. The printing only now need be done has been moved to take the electronic files to the Public Library, or at one of the agencies offering printing services).

The drive C: may be found, but the prompt, c:\> provides no functionality. The computer says the system, and the content of the drive, is not recognized. ScanDisk will not start. Scan register program is also not operative, but at one time worked very well.

January 2006 report on system analysis of System File Checker, MS Windows 98 OS platform.
#########################################################

System disk is Western Digital, WDCwd64AA, s/n: WM653 0429324
running Windows98. Disk Mfg date=07Jul1999. 5v/12v: 660mA/240mA,
6149MB EIDE, CHS=13328,15,63, containing Win98SE and W2K Office.
  Acquisition date: Aug 21 '05 MIT swap fest. Exchange for Mac 7.0 OS floppies
  Drive contains 1,450,336,256/6,435,987,456 bytes on disk.
  Available space: 4.606/6.137Mb [FAT32]; 3,159 days since last defragmentation.
  First ScanDisk in 3,170 days. 4,877,848KB/6,285,144KB avail.

#########################################################
BETAone has a 100MHz system board, and has 256MB ram capacity installed, 100/133MHz

sys_max_900 created 08-26-05 is the Vol. S/N: 1548-09D5
  6,285,144 / 3,257,284 KB free
   814,321 / 1,571,286 Allocation Units Available
   625,744 / 655,360 extended memory free

15 January 2006    DOS screen display,  8:30 a.m.
  "Windows cannot determine what configuration your computer is in."
  "Select one of the following:"
  "1. Original Configuration
  2. NexConfiguration_dupl
  3. None of the above"
  "Enter your choice: _ "
  "A file has been entered on c: drive that has changed the
  autoexec.bat. Its stats are AUTOEXEC.BAT"
  "Windows startup disk Vol S/N 331A-9400, 1,457,664 bytes total disk
There is no date of creation from CHKDSK on the a: drive.
  "1,457,664 bytes total disk space
  " 223,232 bytes in 3 hidden files
  " 985,088 bytes in 21 user files
  " 138,240 bytes in bad sectors
  " 111,104 bytes available on disk." **Plaintiff creates new repair diskette.**

15 January 2006     DOS screen display
  "VFAT Device Initialization Failed."
  "A device or resource required by VFAT is not present or is
  not available. VFAT cannot continue loading. System halted.
  [ Blue screen window ]

  "The Windows98 startup disk could not create a temporary drive
  for the diagnostic tools, this may be because this computer
  has less than the minimum required extended memory."
  "General failure reading [under] drive A.
  Abort, Retry, Ignore, Fail?"  "Fail on INT24 -- COMMAND.COM
   Path not found -- :\EXTRACT.EXE , :\README.TXT
  "Bad command or file name."

  "The diagnostic tools were successfully loaded into drive ."
  "File not found. To get help, type HELP and Press ENTER."

  "D:\> [ the virtual drive, a RAM disc ]
  "D:\> Autoexec.bat      57   01-14-06        4:09 PM
       CLDMA.LOL  53,785   01-10-06       10:53 PM
       CONFIG.SYS     72   01-10-06        9:17 PM

  MS DOS chkdsk:  sys_max_900 created 08-26-05 Vol. S/N 1548-09D5

From 13 JAN 2006  System File Checker, Win98 program execution

| REPORT | |
|---|---|
| Folders Examined: | 370 |
| Files Examined: | 2079 |
| Files added to verification data file: | 790 |
| Files updated in verification data file: | 27 |
| Files removed from verification data file: | 0 |
| Files restored: | 0 |
| File changes ignored: | 2 |
| Files added to the table: | 19 |

Disk in position for active c: drive is 6,142 Mbytes
  there are also 8 Mbytes marked "free" in next disk space outside of primary partition.
  Changes recorded in the SFC report are mostly from the variety of differences of the
  versions of MS Internet Explorer and drivers in use per version changeover and in the
  changeover from the Win98SE in place, to basic Windows98 operating system platform.
Display of Logical DOS Drive information obtained 05 Feb 2006:
  Primary DOS, 6.142 GB drive, "System: UNKNOWN, 100% usage."
In Win98 it reads
  "Invalid Media Type" reading Drive C, as though partition
  table has been altered, or removed.

10. Like mine workers that have the Achilles tendon cut, historically to

reduce the opportunities of thieving the precious mineral products,

Plaintiff's own activities of jogging and exercise are similarly reduced by

behavior approbations on his security: the plaintiff can run, but anything

left behind in the room and the lockers are subject to scrutiny (inspection) while in exercise.

The residence where plaintiff lives is, in a manner of speaking, a common carrier, as any employer would be considered, as they actively maintain openings and positions for the standard rental markets, as well as special populations (and the funding accompanying them).

In applying for work, and in consideration of professional employments, refusals to consider applications are commonplace (if accepted, this may be pre-arranged acceptance with actual conditions that the monitoring of the residence must be continued on the work sites, as well as other adjustment modifications in the work environment surrounding any of the female constituency of any work site, though this is not construed as totality; nevertheless, the Plaintiff has had experience enough that it generally could be said, a portion of the environment strictly comes across an non-naive).

11.     On a Sunday morning, March 19, 2006, the bus driver of the T-metro #2293 on the No. one route refused to accept reduced fare offering for common transport.  Plaintiff offered five cents, or twenty-five cents, but the driver refused to look at it.  Even programs on ridership for Sundays allow one free rider accompanying those riders with passes, or the Charlie ticket.  The T-Bus passes allow the common carrier to accept rider fares for any rider, plus a free Sunday charge, *ad libetum*, to most any destination in Boston metro, even if they have to stand for the want of seats.

Now, that the Plaintiff's income has become a targeted excess, is it the role of the CHA-member housing to keep it that way, and in

exchange for housing, and rights of use of facilities, Plaintiff can be offered instead services, as in human services beginning with the Cambridge MultiService Center, 19 Brookline Street (December 11, 2002)? The targets of service no longer need cash as a basis for living, once the ceiling has been set to below a given minimum. Plaintiff argues that it is this ceiling limit on assets is a basis for services to take over any of the Plaintiff's prospective economic entitlement.

The human services sector has priority over the individual resident himself. Rather than PLAINTIFF going to the thrifty store and purchasing a ten-dollar used computer so that PLAINTIFF could learn a few office programs, it is instead a mission to bring Plaintiff to learn on computers and training on nothing but that of the human services agencies. Over the past three years, Plaintiff has received from county agency sources at least three and more invitations to use courses, and applications softwares, on computers at agency run facilities. Plaintiff has reminders/pointers from persons set up, in the past, from a former defendant entity, that services can be obtained, "for those experiencing difficulty with their" [rental fees]. The attached notice from an employee of the Shelter, Inc., is dated March 02, 2003. And that computers and printing of the plaintiff have come into unusual problems in the year past, it means that those services should be receiving primary consideration for utility.

The computers at the address of 119 Windsor Street (health department clinics) are actually at the facility operated by the local Housing Authority (where in the recent past Plaintiff has applied for a few position openings which have been contracting for help and personnel). The attachments in this affidavit from the county agencies

dated March 2006, and December 2005 are recent ones. The attachment in this affidavit of March 31, 2006 are from a former employee who has had office spaces accorded to her at the Central House / YMCA residence housing, and is dated March 02, 2001, a date that was soon before the Plaintiff launched upon significant work with the KNF&T temporary employment (April 2001 to September 2001).

12. Attachment on order in Affidavit of March 31, 2006 is a no trespass notice issued to Plaintiff upon work cessation with the KNF&T Employment agency, 133 Federal Street, Boston. This personnel action has transpired at the agency in juxtaposition with the continuing dispensing of payroll dollars directly deposited into Plaintiff's checking account. The checks themselves apparently were being authorized on a recurring basis; but Plaintiff has discontinued faxing time sheets, once off the employment site, and in fact, Plaintiff at the time of the last time sheet submittal on September 11, 2001, made the written notice that the employer has notified the plaintiff that work would no longer be needed from the plaintiff on site (Plaintiff faxed this notice to KNF&T with the last time sheet, 617.574.8222). The no trespass is meant to abridge any training available on the computers at the KNF&T site. The program materials are for testing, and for training at KNF&T home office. That a pay and severance period overrunning with unauthorized checks is a signal that any housing agency may act upon is the basis of any investigation such an authority can use for charging irregularity. Plaintiff addresses income variance at the time, and questions whether the change in relations with the prime employer is legitimate (photocopies of check voucher statements were left with the housing

agency. Plaintiff alludes to the check overrun as a fault that should be disregarded due to plain errata).

13.   On February 17, 2006 plaintiff addressed the Cambridge Housing Authority to questions of interim re-certification with a personal visit. The business was of an "interim recert" performed at three or four month intervals by J. Cassama.

That defendant(s) has relied upon plaintiff to believe that the re-certification process is accurate and not to the detriment of the plaintiff's finances, and that only thirty percent of actual regular income would be assessed for rental contract, is evident that another gambit has come into the existing relationship with housing agency policy. This is that once the financial footing foundation plaintiff has established had fallen to the low points, it was maintained there by actions of defendant party, and was maintained with the intent to turn over a charge of plaintiff to service establishments appended to the party of the defendant. There is a release consent, dated December 11, 2002, in which financing of the residence can be discussed, made out to the Cambridge MultiService Center.

In favor of employing these appended services, defendant(s) relied upon the diminishing financial foundation to redirect plaintiff to those services: human services which are comprised of in house employees in some cases. In the span of this ruination of income dollar platform, these services have taken over. The defendant party has allowed for the employment of these persons over the terms governing the contract administration, and have given a precedence for these community based programs to succeed in providing community

services were they normally would dispense for those in need, such as for others with dependency, especially the alcoholics and drug dependent populations, else wise in attendance at the residence of the Central house, but not limited to the example with the YMCA, housing assistance. These have taken over at the expense of Plaintiff's time that should be devoted to other things.

Plaintiff made an application with a county agency for work application assistance. Plaintiff has registered in 2003 and followed up on interviewing several times but has not been notified, to the best of plaintiff's knowledge, of acceptance, or whether there is more to getting an interview. By enrolling in classes with the county agency, a method of being closer may be employed with their computing equipment. As in the past, solicitations from the North Charles Institute employment program for recovering addicts have been directed to a volunteer site, and temporary work site in 1998. [See attachments.] These facilities are closely aligned with more assessment services easily on hand.

14.     When plaintiff came on a bicycle from Maryland, there was not enough room to carry Merriam Webster's 11th edition of the English dictionary. Sure, plaintiff has used one, set on a table where "free-bees" can be "found" by those needing them at the YMCA and YMCA common room. Plaintiff has relied upon spelling and sense definitions from the dictionary put there to provide for client. Plaintiff also has a plan that does not require input or interaction from basement service providers: to draw ten or fifteen dollars from an account and to buy one, from his own resource earnings and savings.

When it comes time for rental assistance, it is the defendant's plan

of action to employ a member of their team (community), so that
defendant's team member can be employed (an economically privileged
position) on plans that are devised by defendant's party.  Employment
of such persons at such costs most likely would exceed, and exceed by
far, the expenses plaintiff would have in outlay for the maintenance and
use of an Internet service provider on plaintiff's own account and
equipment (for example), which would also include telephone business
expenses.

Without the limitations of time constraints and supervision by the
[community], plaintiff could have earned an advanced degree.  Plaintiff
could have established, in unlimited Internet usage in the span time
spent living unemployed and without money in the Cambridge YMCA, a
working relationship in the real world, un-filtered by the said community.
Plaintiff could also have had in place, with an Internet connection, a
more secure foothold in the biotech business Plaintiff has attempted to
raise in the span of time of living in Massachusetts.  At the present time,
March 2006, Plaintiff is learning at second hand sources of the state of
the industry at launch sites where Plaintiff's business would be settled
into the business niche of Cambridge, which has grown by a multitude
of factors in the same span of time Plaintiff lay dormant.  By learning at
a second-hand information source, it is as though the Plaintiff is really
not involved, as though plaintiff is not a participant.

Instead, what we have in this case is a plan that prevents Plaintiff
from attaining enough autonomy sufficient to even hold a simple work
plan together more than five months.  The ceiling of growth is dollars in
the bank, and Plaintiff does not even have a savings account.  Plaintiff
claims the motive in such a holding establishment is to further the

economy of the services that cater to the human services which surround the establishment of the housing ECONOMY. That PLAINTIFF has had medical problems, attributable solely to the environment, and others idiopathic to the medicine that purports to service those who are ill, these iatrogenic legacies are in large part subservient to the housing containing the person and body of the Plaintiff.

15.    Attachment: Social organization related to the residence in which Plaintiff resides. An electronic mail communication to a group from Plaintiff, who meets a call from the church organization. It is the same organization that lists Gary Dougherty as a member and subscriber. An underwritten agenda of one of these groups purports to help church members who have shortcomings and limitations. Plaintiff attends the church for music and community relation, as well as contacts for potential business leads to further the economic determination for the PLAINTIFF. The communication asks questions. The communication prompts the participants. The communication does not get answered, and a response it has generated serves not what the message wants to generate.

16.    Attachment: Plaintiff's receipt of letter of intent to settle demands of rental by the defendant party. The legal action cited is for claiming of rents owed to defendant for the control of the property in use by Plaintiff at 820 Massachusetts Avenue, Cambridge, MA  02139. The attorney group is of a Braintree, Massachusetts address. The complaint has intended to be filed and processed on August 15, 2005. Within the

month, a balance of seventy-five dollars was paid to Marcus, Enrico, Emmer & Brooks, P.C., 45 Braintree Hill Office Park, Suite 107, Braintree, MA 02184, to settle the complaint. The financial assistance originating with the Cambridge Economic Opportunity Committee, a local resource center, comes to resolve rents; it is also where Plaintiff obtains pantry goods, fresh and packaged. The small claims action is the resort of the residence provider. It will assess plaintiff in a manner similar to any debtor, and demand dollars plaintiff does not have because the housing agency said in the certification that Plaintiff has a change in income (or that, as Santos, the CHA administrative assistant has related, "if you can" pull cash up for twenties and other amounts, "you can get rent, and do it for rent money." Plaintiff has replied that dollars do not come when plaintiff wants, and may not under the conditions of residence be able to produce X amount of dollars on the times that demands are due).

[17.    March 24, 2006.        P.M. Late in the day:  Plaintiff was on the second floor at the time that Kevin Braga was with someone performing services in the "Utility" room next to the exit at the end of the corridor, short-L. Plaintiff said, "I do not have the rent that you are seeking." "The housing authority," he glibly said, "takes care of setting the rates." Plaintiff said sorry to intrude, while he was hosting another's working, but the common room, the TV room, the sink is a bit clogged, if Ed is around, "do you think he might have time to open it?" At the evening when Plaintiff did a round of dishes, the sink was full of water. And it is Friday. If the sink is not cleared, the drainage will not work the entire

weekend.  He must have been so busy that other tasks are more important.]

18.    Part of the message plaintiff receives from defendants is similar to the warning received from accusers, "you were seen vandalizing a tray," which has not been answered in the response plaintiff generated. Plaintiff has been named as vandal, like school records — there are names and name calling, but there is no apology, or removing of accusations that do not come around to testing their substance.  If the administrative assistant with the housing agency can say that my credit reports are subject to their scrutiny, like any employment history, the school records of Plaintiff are likely subject to call to their offices as well.  A year ago, a demand was made for information about Plaintiff, and the contributions made to the Social Security Administration. Plaintiff has been made subject to many irrational inquiries of the housing agency.  There is an entry of an inquiry in the Plaintiff's credit report, one for the May 02, 2005, and it has been generated for a west coast communications company, T-Mobile.

I, Jeffrey L. Taylor, state and depose for the purposes of the record the preceding content and under the penalties of purjury attest the truth and the accuracy, and for true copy of any material attached, of the provisions herein 31st March 2006.  We are permitted a single copy to work with, until circumstances dictate otherwise.

[ signature ]

Jeff Taylor
[ printed ]