## United States District Court
### District of Massachusetts

| | |
|---|---|
| Jeffrey Taylor,<br>*Plaintiff*<br><br>- verses -<br><br>Central House, YMCA,<br>Residence, and CHA-member,<br>*Defendant*<br><br>S-C Management Corp.,<br>*Defendant*<br><br>Central House, Officer<br>*Defendant*<br><br>J. / J. Doe, Entity Unknown(s),<br>*Defendant(s)* | Post CA—04-11802 EFH<br><br>**AFFIDAVIT** — Reference<br><br>19 OCTOBER 2006 |

Commonwealth of Massachusetts
County of Middlesex

Documentation. Reference material in October 2006.

   There are three sections in AFFIDAVIT.
     Section A contains statements which modify or add to prior documentation.  The adjustments address details in consideration.
     Section B comprises newer material relating to housing relationships and the Cambridge Housing Agency-member contract for residence.
     The attachment carries a conversation with a family relation.  It may contain new material affecting the quality of housing available to the Plaintiff currently, and that which has been available in the past.

   I, Jeffrey Taylor, state and depose, under the pain and penalties of perjury 19 October 2006, that the attached content material is true and accurate.  Due to the criminal nature of the relation of the party in the ''Entity Unknown(s)'' a single copy of complaint material is available.

[ Signature ]

Yahoo! Mail - j_taylori@yahoo.com

Page 1 of 2

**YAHOO! MAIL**

Print - Close Window

**Date:** Sat, 30 Sep 2006 16:52:26 -0700 (PDT)
**From:** "Bruce Taylor" <bwtaylorphoto@yahoo.com>
**Subject:** Re: VOICE MAIL NOTICE SEPTEMBER 24
**To:** "jeff taylor" <j_taylori@yahoo.com>

Hi Jeff,

Remember, I have not lived in Braddock since 1972. I would not know where you have stored your things...

Nothing has been sold at the house yet. That will take place in November. The lawyer wants us to get our personal things out by the 1st of November. I was up at Braddock two weeks ago and got what I needed to get (mostly family photographs). There are still a lot of photographs there for you and David to go through. From Nov. 1st, the house will be cleaned out and sold Dec/Jan.

On the gift card. I have no idea what you are talking about. Something about communicaticating with the world and day to day discussions with me???? > enable me to have daily connection with the world because the city has come to the netlans on the roof. many parts of the city are functioning now.>

Do you have plans to go to Braddock? The house is locked and you need to pick up a key from Dad. He is in room number 136 at Country Meadows. Address of Country Meadows is very easy to find. Go I-70 East from Frederick and take the airport exit (one exit past the fairgrounds) which is Quinn Orchard Road. Go 1/2 mile from I-70 to 5955 (its easy to miss)on the left. Dads phone number is: 301-663-6438.

Will talk later. If you need to call me, please call me anytime after 12:00 noon. I am here most of the time.

Later, Bruce
================================================
--- jeff taylor <j_taylori@yahoo.com> wrote:

> thank you for the notice on september 24 regarding the plastic
> rifle, and
> minolta.
>
> you have found a telescopic attachment for the remington. where is
> the
> woodstock that used a stove bolt for the lever? the last time at
> the
> residence there that driefle has not been there. had that been
> sold?
>
> the camera does not belong to me. my coins and stamps have to be
> brought
> out, so eventually they can be recovered for current care.
>
> have you still considered sending a gift card? with a wireless PCI
> i

http://us.f607.mail.yahoo.com/ym/ShowLetter?box=Inbox&MsgId=4166_8868701_1577_...  10/2/2006

Yahoo! Mail - j_taylori@yahoo.com                                        Page 2 of 2

```
> should be able to join you on daya to day discussions.  a gift card
> would
> enable me to have daily connection with the world because the city
> has come
> to the netlans on the roof.  many parts of the city are functioning
> now.
>
> if you can contribute for visiting there it is appreciative.
>
> jeff
>
```

---

Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

http://us.f607.mail.yahoo.com/ym/ShowLetter?box=Inbox&MsgId=4166_8868701_1577_...   10/2/2006

# Part A

October 19, 2006.

The date of acquiring electronic pedometer: April 06, 2006. The device is clipped to the belt to calculate overland distance. The possession predates by more than a year of the false reports of a cell phone Plaintiff has had to answer from the housing agency, or their reporters, calling for records of use.

Third week in August 2006, Second floor necessary room.
    In the shower stall Plaintiff has had use, Please note changes in the record. The bathroom has had a mark removed. It was a quarter-inch circular ink or dark brown stain resident on the square tiles on the northern wall, for several months. After mid-August 2006, the dark colorizing has been moved. Since the shower tiles at head-height in the first stall have been clean, it has been a prominent – or let's say an outstanding feature for some months. It has roughly been positioned at a named location which marks a 160 cm site from the floor cited on an earlier complaint/reports to the management offices. The colored mark is too close to the problem cited earlier about Plaintiff's report of cleaning necessary on the shower tiles not to be unrelated to a claim by

Plaintiff and out of the ordinary circumstances involving the Plaintiff.

The middle-sink the plaintiff has been in error. In prior statement of reference, and notice to the management offices, the middle sink of the second floor bathroom has not been fractured and then replaced as it has been thought. Rather, it has been observed incorrectly. The original sink mentioned in memo has been taken out for repair. A temporary replacement had been installed, then taken out at the time the hole-repair had been cured. So the fracture and hole cited in the identical location in two sinks was not correct. Single basin, single reparation. Its fracture was epoxied and patched. And in order to accomplish this, the sink had to have been dry (hard patch) to cure.

On the morning of October 11, 2006, a contract plumber has begun in an operation to replace two sinks on the second floor necessary room.

On September 06, 2006, roughly 10:00 PM, plaintiff has knocked on the door of 217 to tell him "You have left the water running." It is one of the occasions in which the Plaintiff has been in the necessary room and have come into conflict with the neighboring renter, while Plaintiff was in bathroom, #217 Charles had come in to utilize the facility, while at the same time leave a sink running just before leaving. The spigot was fully opened, and subsequently left for the

plaintiff to turn off. Neighbor left the bathroom without saying a word and went to the room. At a time when the plaintiff had finished at the necessary room, and was on the way to take the trash left in the hallway at #216, Plaintiff knocked at the door to #217. The report was that 'you tell me who you are,' first before the door is opened is how Charles welcomed a visitor. As Plaintiff audibly gave words in the hallway about simply leaving water running, there was mumbling, and mostly grumbling over what had troubled him (nondescript, more complaints and references to the questionable nature). The door was not opened.

October 05, 2006. Requesting input at the S-C Management Offices, for residence problems, it has been decided that complaints from Plaintiff's side are required. "He can't stand you," Ed says, and then Ed is joined in by Antonette simultaneously, "He hates you." They are also the general sink for complaint activities, countless activities of anyone, anytime, they ever have had a problem with "Plaintiff's Behavior." It would appear that a crusade has been on, and that Plaintiff is the only one not making friends in the Offices. Plaintiff delivers several pages, three in the first round in talks. And also about making hang-points in the Plaintiff's room. That is, Plaintiff has requested materials, and tools to help string up hangers several places. Note here, Plaintiff's confiding that the rodent incursion has

come through the front to the apartment, and that since April 2006 no droppings have been discovered in the window side of the apartment. At the entrance door, the clearance of the bottom of the door to the floor is more than a half-an-inch along the length of the door's bottom edge, thus allowing small mammals (and as well as dust and other particulate matter to enter along the surface of the floor, unless there is a negative pressure exerted from the interior of the building, relative to the outside air). Under the windows there has been modifications to the rodent entry-ways along the heating pipes and conduits at the runner board. Plaintiff has also requested Ed Braga's, chief maintenance, expertise in the reason that Building Codes have incorporated the "hands-off" policies regarding the secondary usage of overhead pipes for clothing hangar, or rack. And this is clear he said, that not every one is as conscientious "as you are, because they're afraid that they'll knock off the [sprinkler heads], or interfere with the sprinklers." Plaintiff does not have the resources to go to the store to make those things happen, but Plaintiff brought a screw-eye to the office to sample. Since there are not any wall partition supports, like a frame, or studs, a solution is not so readily amenable.

    Twice plaintiff displays to Ed and Antonette a gesture which illustrates what the Plaintiff calls somnambulism of #215 John L. in the afternoon talks at the management offices, and that is of a person with

both hands digging on her desk, and talking to the other person, "he is digging through your pocketbook, and saying to [Ed] 'what are you talking about,' [my hands] I don't know what they're doing over there 'I am talking with you Ed'." There was a response from Antonette that one of them, or two other residents, has had the temerity to register a complaint with [Central House] or to file a false report that, as misbehavior, the Plaintiff has pulled a curtain on who ever it was when he was in a shower stall. John L., the Plaintiff said to them, is a somnambulist: "he can not distinguish between my door, and another, even though I have kept a giant rubber exerciser on the handle to cushion the closing of the door, but John L. attempts to open the door, and to continue to misplace his door." Plaintiff does not register the observation, that it is as though John L. has lived in this location, and knows only through a force of relict habit that a door at Plaintiff's location is one and the same as a former residence. Plaintiff has verbally told John not to do this, and to stop it, long before even installing the Theraband® on the door handle.

# Part B

October 19, 2006.

    Three spottings along the highway at the Mystic River Generating Plant occurred on the same day that a guard at the Department of transitional assistance turned away paperwork due that same day.  Going north, the first one occurred on the sidewalk of the deck of the drawbridge upon passing the channel, and into the city-proper of Everett.  Secondly by another uniformed guard, again on the western side of the highway along the sidewalk, just before the entrance at the generating plant and his crossing over.  The third was on the return walk, probably two to three blocks before the Generating Plant's property boundary, again on the west sidewalk (the Everett roadways are very unfriendly to pedestrian traffic).  The guard had crossed the road toward the fast food nearest to a bus stop.  Each, as they passed, had an eye for Plaintiff and sort of made it a point to be noticed or to notice Plaintiff.  At the destination, the guard who refused entry to the offices/elevator was with a receptionist.  There must be something important enough for these movements of low-level employees to have transpired, and such an event has also been accompanied with the movement of two other types of people.  The day these events correspond is August 21, 2006 where Plaintiff has taken a 15-mile foot journey to Revere Beach.  These people who have been staged appear to be with purpose,

possibly to get involved, and suggest a similar motivation to Plaintiff, as pretexting is of a psychological and categorization making.

On an evening of August 2006 Plaintiff has gone through several steps of necessary action to remove biting bugs from apartment, as they have been introduced in some manner, or Plaintiff has brought the tick-beggars along.  Also, August 02, approximately three hours after bringing clean linen direct from the shelf and making a complete change in bedclothes (base lining, bottom and top sheet with a cover blanket (another sheet), all tucked in at the foot of the bed, and another pillow case) plaintiff has opened it up to go to bed for the night.  Here, Plaintiff has discovered a single biting bug roughly a meter from the top of the sheet margin at the head of the bed.  It's amazing why a bug could go into new territory, under fresh sheets to be found at that distance from any opening available to the centerline of the bed, while at the same time the cover blanket layer did not show any penetration (the layer of use by bug would not be a predetermined one, or a selected layer to enter).  On the matter of finding bugs and disgusting things, in October someone else's nail-clipping has shown up in the room on the floor on the side at the hinges. October 08, a grub such as one might find on a cob of corn, has been left in the front of the computers on the floor (this is the screen display of the hard disk which has not been recovered, the one with Win98, and MS Office 2000 Suite, turning on the computer leaves DOS message and

stops: "Windows is starting up.../GRUB_"). The grub worm would not be able to travel 12 inches in a day's time, but it is in the middle of the floor not attached to any food.

October 05, 2006
Neighbors on the adjoining living at the YMCA get notices, through the S-C Management Company offices at the Cambridge YMCA, as plaintiff displays response to their ways of interacting.

1. John M., of #212, 820 Mass Ave., Cambridge, MA 02139.  In the first half of the year, John M. has said to another resident, "[he] was considering reporting" another resident for stalking him, as the resident was harassing him; I.E., that Plaintiff was annoying John M. to the degree of harassment outside of the normal habit, and habit-range of John M.  [one time plaintiff has gone to the fourth floor dedicated shower room and identified where John M. has regularly been taking the shower — a shower room once reserved to Plaintiff's own activities, before being actively prohibited by management at the YMCA, Cf. MICV04-1828B].
2. John C., of #215, 820 Mass Ave., Cambridge, MA 02139.  It has been expected that from the past interactions Plaintiff has incurred with John C. that in answering to the door Plaintiff would be asked for a can opener, as it is assumed that John C. has not acquired a can opener.  Other times

John C. would come to the door to ask for the time of day. One occasion early in 2006 when Plaintiff was in the bathroom and having BM in the small toilet stall, and John C. had just come to the necessary room to micturate, essentially at the "next" stall, on the other side of the right partition to Plaintiff. Out of curiosity, Plaintiff called-out to John C. to ask the time of day. Before John C. was finishing, Plaintiff said, "John, can you tell me what time it is?" John Carlson said in response, "It is eight-thirty." After a moment Plaintiff finished up and checked the pedometer for the time and it reported 8:30 (plaintiff usually has left the wrist watch at the room on bathroom trips). It was exactly 8:35 AM.

3. John M, of #212, 820 Mass Ave., Cambridge, MA 02139. For the longest time, up to the spring/summer 2006 John M. has shook his wearables in the bathroom and the hallways, additionally he has used a high-pitched vacuum in his room to clean. Less than 40 feet from Plaintiff's room the amount of noise minutes long, two and more times, in a day has been a presence in the second floor. In 2006, the waste barrels in the hall have regularly been coated with white-powdery flake. In recent months the stairwell flooring and steps are coated with the talc-like powder.

4. On October 05, 2006. After 12:30 PM, John M. has been engaged in conversation with a neighbor, a habitual substance user, outside of the doorway to

Plaintiff's room, not 10 feet away. Probably in less than five minutes the two broke their discussion partially and barter for a hand-held item. In less than a minute, John C. has opened the unlocked door to Plaintiff's room, and has entered crossing the threshold. John C. acknowledged and has exclaimed "Ohhhhhhh! Sorry." John C. has "discovered" that a mistake has transpired and has backed out closing the behind him. Plaintiff has been inside to come for lunch, and was reading daily news.

5. On October 05, 2006. On the event of bartering cigarettes with another resident from the very end of the hallway, John C. had finished and entered the doorway adjacent to his own. Since Plaintiff has returned to room temporarily, a half an hour prior, Plaintiff was surprised and disturbed by another crashing into the room without a knock. Although there was a brief verbal apology, and quick exit once past the threshold to the room of the Plaintiff, John C. considers the event Past. It's an acknowledgment, but not one that passes muster with the degree of the offense by John C. Nothing has happened. When Plaintiff has come to the door and opened it to the two of them engaged again in barter and further discussion. They are both on the opposite side of the hallway center, and a meter to the left of the axis to the doorways across the hall. Both are facing toward the Plaintiff's door when it is opened. Plaintiff has observed no greeting, but continual

discussion. Because John M. is wearing flip-flops (or ones with single band) and his legs are bare, and the light flooding out from Plaintiff's room to the hallway illuminates and displays the sore spots on the shins and elsewhere on the legs. John M. has rashes and apparently is under some dermatologic assault from irritation. They both are framed as to be oriented in the direction of plaintiff's residence, but do not appear too interested in inviting the Plaintiff into the discussion. There is no eye contact. The Plaintiff gawks back at their posture, but Plaintiff observes with the door further open to throw light upon their dispositions. [in an editorial position, at a separate time of composing, it should be noted that the ceiling light directly above their location has been blinking, and erratically flashing, starting the evening upon this latest of episodes of their prevarications. The phosphorescent bulb has been malfunctioning, up to Tuesday in the afternoon, 10th October.]

6. On the night of October 04, 2006, John C. was at the outside of Plaintiff's door wrapping several times in two series. There was another in the hallway. John C. engaged in small conversation with this person. As it was sometime after 10:00 PM, plaintiff was engaged in reading in bed and was not willing to respond. While John C. was knocking at Plaintiff's door he was at the same time calling out "Jerry? Jerry, Jerry?" audibly.

Plaintiff should hear this, as in the next minute it was possible to hear a knock on a doorway down the hall.

7. In the wee hours on the morning of October 08, 2006 plaintiff was awakened by a crashing sound of a heavy soft object impacting the floor. It is mostly surmised it was from the interior of the room adjacent to the Plaintiff's. The person living on the other side of #215's must have also been aware of such a sizeable collision jarring the floor. As Plaintiff's electronic watch has gone blank (it stopped October 5, 3:40 pm), it was not possible to put a time on the event. There was hardly any further activity in the form of noise at the interior of the room next door, and no discernable inquiry going about John C. and at the presence of his door. For a Sunday morning, it was not a significant morning for late coming and going. It is assumed John C. was up early in the day, after daylight, because there were several series of times the door was opened, as a single person coming and going. The following day hours, it was three o'clock in the afternoon and John C. has had an exit from his room. In less than a two minute span, the hallway was a sight with perhaps five residents checking at their entrance because the electricity and lights were turned out in their rooms. Plaintiff did not observe John C., but the report of others chasing down a culprit has established it was he who has likely shut things down. John M. at the return to

      his room later has said he called 911 for John C. because it appeared to him that John C. has been assaulted with a damaged face and eye socket. It was following this time that the ceiling light at the hall nearest to Plaintiff has blinked, and burnt out.

Wednesday, September 27, 2006 on a computer session at the Internet room Cambridge Public Library, Plaintiff tries to view attachment in another email account, and cannot access beyond the menu/screen for opening attachments, Internet Explorer "was not able to open this Internet site [65.54.229.250], the requested site [attachment for viewing downloading or saving files] is either unavailable or cannot be found. Please try again later." The warning is consistently viewed from the Internet room computers at the library.

    On October 04, 2006 the Plaintiff's microwave oven has malfunctioned. It has stopped working electronically. No lights, nor timer, nor clock. The electronic display is blank.

    On Friday, October 06, 2006 at the Internet computer room, Cambridge Public Library, Plaintiff logs onto a computer. Error No. 10557 displays at computer 9. The Internet browsing, and the Printing functions are stopped, but computer stills appears to function. There was a log-on problem and work made cannot be saved, it cannot be printed, because the printing and signal function has been interrupted. It displays a menu, "please pick up your print outs at the computer," but no prints have actually been generated. Plaintiff

has lost a document, and contents that could not be saved or transmitted.  The library cue program, Cybrarian, has malfunctioned.

Over the weekend of October 15, 2006, the circuit for the bathroom lights over the showers has been broken.  No lights work.  Power, and connection is resumed, or has been restored, on the 16th, when the management company is informed by Plaintiff in the afternoon.  The necessary room has a two-circuit switch at the entry way.  The broken light bulbs, the missing ones are an additional problem over the replacement of the ones simply burning out.  The light switches, however, present another layer of problems.  A circuit breaker on the wall sockets has a reset position and test button, which can be used some times to reset the circuit, the one over the shower stalls.  On this occasion, the reset is not a solution.

Annexed page notation:

On September 24, 2006, roughly 12:55 p.m., the elder brother (Atlanta, GA) telephones a voice mail message to Plaintiff (Cambridge, MA).  Electronic mail transmitted to Plaintiff in response to email notice sent to him includes a disavowal of knowledge as to the presence of a small woodstock .22 caliber rifle he has himself brought to the house (Braddock Heights, MD) in the 1960s.  The telescope Plaintiff owned was once used with plastic rifle (.22 caliber, Nylon 12, Remington) was sold at a yard sale, before, and before Plaintiff turned in automobile plates (YSF808, Md.) in fall 1994, approximately.  The automobile which was locked in July

1997 has been breached in the years it has remained in the driveway by persons who needed to have access to the belongings inside the passenger compartment and the trunk. Breaching meant that a local locksmith services were called upon to gain entry, and possibly to have a set of keys made for the 1985 Ford six-cylinder. Over the first part of the 2006 year, the car has been towed as salvage. Like the car was once claimed by the older brother to be valuable, other claims as to the value of the firearm were left on the voice mail message, to the effect that a trip to Maryland could be financed by the sale of the Remington rifle.

   The voice mail message of the elder brother sort of serves as a general announcement (or general alarm) to the current residential community. Although the voice mail message box had contained messages to the Plaintiff after the 24th of September 2006. Some messages were older than 12 days. The first business day of the week following, all messages in the Plaintiff voice mail service were deleted and not available to the Plaintiff. Some of the writings of Plaintiff will soon fall to the similar fate of the automobile, pending action of the Plaintiff.

   The impoundment of the working life, and writings or material things, of the Plaintiff may perhaps be due to the ownership of the single small arms piece, or, due to the unrest of claims among the community members about any use or misuse of the firearm (not fired since late 1970s). Like autos, the inspections process is involved in the trespass of personal spaces.