UNITED STATES DISTRICT COURT

District of Massachusetts

|  |  |  |
|---|---|---|
| Jeffrey Taylor, *Pro Se* | ) | |
| *Plaintiff* | ) | CA—04-11802 **EFH** |
| | ) | |
| —*verses* — | ) | |
| | ) | |
| Cambridge Housing Authority | ) | |
| *Defendant(s),* | ) | |
| | ) | |
| S-C Management Corporation, | ) | **AFFIDAVIT** |
| *Defendant,* | ) | |
| | ) | **January 25, 2007** |
| Cambridge Family YMCA | ) | |
| Affordable Housing, LP | ) | |
| *Defendant* | ) | |
| | ) | |
| J. Doe / J. Doe, *Defendant(s)* | ) | |
| | ) | |

Commonwealth of Massachusetts
County of Middlesex

Respecting Housing and Community Development Act of 1992, Documents filing for January 2007, which reflect activity on habaes and broader community habitation. Defendants above hold position as residency providers violating rights of solely plaintiff, who depends upon agency subsidy. Plaintiff has contractual rights, established with above agency, and functions, but plaintiff has not been enabled to access full facility use and even access to his own property, in the sense of full community participation and the enjoyment of usage.

1. Environment.  Three times over the Spring 2006 there has been a gentleman seen on the street in the proximity of Massachusetts Avenue two

blocks centered on City Hall, all on the same side of the street. A rain coat sometimes is the outward appearance, but generally the exterior appearance is well dressed and nearly formal. There is a tone in his demeanor strongly suggesting familiarity, and he is prompted on calling out to PLAINTIFF in passing on the sidewalk. "If I see you again," this person unknown says, "I'll call the police." Granted Cambridge is a high density residence and business district, and there are strange birds on the pedestrian throughways, and encounters are rarely seen with auditory effects (voices, singers practicing the fine arts, etc., are really not uncommon). "I'll have you arrested," this person has said at other times, "if I see you again." There was the same refrain upon his exiting the coffee shop one evening, early, and then this man ducked into the neighboring business to avoid Plaintiff's following him. Plaintiff's guess is that the un-named person lives nearby and has identified Plaintiff as an affront and threat to his personal security. But Plaintiff is not so sure how this may be picked up by others in the same scene who may overhear or witness how this troublesome stranger has addressed Plaintiff.

Perhaps this is problematic and a social concern
to this same individual who has also been directly
involved in a circle of others who have addressed
an identical outlook to the disposition of the
Plaintiff (i.e., relative to the plaintiff, other
people have libeled the Plaintiff in this person's
presence, or meeting place, that he may have
witnessed; Plaintiff is residing at such and such,
known also to contain, etc.).  If Mr. J. Doe's
dress is pressed shirts and tie, and tan raincoat
indicate position, the accommodations for such
displays do not match why he appears unemployed
and upon a better purpose to life.  When his
police are detected taking Plaintiff's personal
papers, and diary material, and business papers,
then this person's threats are to be understood as
crossing a decent boundary, no different than
looting in Plaintiff's own residence.  When Mr.
Doe's protective sphere calls more on a unprovoked
attack on the physical presence of the Plaintiff,
then more concern shall be raised.  At the same
coffee house, on an afternoon hour 26 May 2006,
another person has approached the Plaintiff
(standing and engaged with a newspaper, waiting
for a table), and then sharply backed off, "OH!
... I ... thought you were somebody else."

Plaintiff is not to assume the paranoid stance that this is one and the same social problem already mentioned in the same paragraph, although temporarily encountered, as a character misidentification. It is as inaccurate to say that they are personally acquainted with plaintiff. It is not the same to say, however, that another person may have directly lead either of them to want to interact, or believe in a little knowledge of Plaintiff's existence.

It is entirely different to say, as well, that it is not out of the reason that either of them may have witnessed others, or have read in sources not familiar to the Plaintiff, mistreatment directed to the Plaintiff and their own problems interfere with their reasoning power. In the case of the former stranger, perhaps his own problems, whether social in nature, or not, have given him a predilection on misidentifying Plaintiff, as well as any other person whom "they" may soever choose. Personal problems in either of the two instances of a stranger accosting the Plaintiff are suggested that mis-characterizing the Plaintiff has lead them to behave in un-civil ways. Purposely, both have directly interacted with the Plaintiff, with the awareness of doing so to

produce a response in Plaintiff (the second person is a little less culpable however than raving about arrest and grave matters of certain characterizations). When their security force has burglarized the Plaintiff or the computers plaintiff employs, then Plaintiff has a problem to remedy trespass of plaintiff's quarters and of computer crimes. (Notation: The change in the Windows screen saver program following the power supply crash indicates that no longer is the main menu viewable when the Windows special key is pressed, and after January 2006 that pressing the Windows Key does not display document names, and program use, nor anything else before the screen saver password is entered to open the lock of window for the desktop). The gentleman has also launched a nasty verbal attack prior to the encounter weeks later on the east Antrim Street sidewalk upon the walk back from Jury Service in Malden, Massachusetts December 12, 2006. Rather than "arrest you" he uttered a civil "thank you" upon Plaintiff's pausing to allow his passing through the sidewalk narrow by the huge tree.

To back up, let us examine another point in interacting with this person — to the encounter at his presence at the Cambridge Housing Authority

front desk, and another encounter in front of the Holmes building on the morning of November 19, 2006. Unknown person, upon entering Central Square from Magazine Street side to cross over to the outbound Red-Line entrance at Starbucks Coffee, has thrown a spate of invective to the Plaintiff. It is the kind of personal attack which produces cursive language, and Plaintiff's question, "Sir, Do I know you from somewhere?" gets more verbal abuse, you "son-of-a-bitch" as though the very large format camera the person is carrying with him is the kind which produces visual enticement into varieties of sordid publishing. The vocabulary this person has used is not a large one one at all; nonetheless, on this day it has doubly expanded, so the amount of word variety previously in use is crimped at about a range of 20.

On the morning of November 18, 2006, Plaintiff has on the occasion of volunteering with Jerry Feldman's group at the Install Fest for the Boston Linux User Group (until it is determined later in the morning that the number of volunteers has far exceeded the assistance-seeking patrons), learned that the presence of another John Doe has caused the disappearance of a Philips floppy, a 1.44MB

diskette (bought in fall 2006 from the Micro Center). The Install Fest is for help, interest, and assistance for Linux operating system installation. The Plaintiff has reason to believe that the portable computer disc was confiscated while on a bathroom trip. The backpack has been left behind in the presence of the three sponsors of the morning's activity, in visual sight, and under their visual control on a chair not three meters away at the facing table. At a time before the Plaintiff has discontinued attendance, early, there was a call from one of the three, who were helping one Linux Newbie, if anyone has a floppy to spare for a process with them to perform. The Philips diskette contains data plaintiff has used, and is from the latest purchase in a box of ten. Plaintiff volunteered to offer a diskette, but backed off when it had been uttered by one of the four that there were only laptops in the room on the Sloan School building. Of course, no disc is of use to a laptop unless one could spare a flash disk, also known as a pen drive. Their other help has arrived with their LinkSys routers, and Plaintiff departs.

Being exposed to perpetrators who achieve the

goal of stealing, means a grave burden on those who have taken the extreme measures to keep the back-pack, and the presence of the plaintiff under surveillance. The surveillance amounts to an example of turning the backpack of the plaintiff into the object of a continual search, and sometimes seizure. And unlike a punishment designed to the offenders who have been judged guilty of trespass into the carry-alls of anyone, and recycled into the retribution for the offenses so judged, it could not be more inappropriate. Even those who lodge false claims, or initiate claims on the flimsy evidence and tenuous voices of the unaccountable, there is the ulterior motive of vaguely assigning a guilt where perhaps there really is none. It is the Plaintiff's claim that such a tactic has been in use.

The plaintiff has not been aware of specific incidents of the accusation of pilfering from someone's carry-all, or say, a pocket-book. There was an occasion in the year 1991, and the plaintiff has been questioned about a missing floppy diskette on the Job with University of Maryland School of Medicine. And this was a time long before Plaintiff was involved with personal computing. It was associated with a new employee

on staff, and that the new colleague was in a
period of adjustment at the laboratories of
science.  The person really believed Plaintiff had
the possession of his disc ("you haven't seen my
floppy, have you?") in order to approach Plaintiff
for his disk.  Unlike the Plaintiff seeking lost
glassware in laboratories outside of the stock in
the Plaintiff's lab, and querying where the
dishwasher may have installed a hundred items of
glassware, the disc was more of the personal
attribute to the new employee.  Although the
employee sought to question Plaintiff, the act of
the diskette being mislaid has had to occur at the
other end of the building where the office
environment would have contained his things, and
not on laboratory/office space containing no
computing station where the Plaintiff had been
based.  Unlike the chemicals, and the beakers,
which disappearance from the cabinets had troubled
the Plaintiff, and caused performance slow-downs,
the diskette missing was not even considered at
the time to be among the same class of activities
and class of violations.  It was one of those
things Plaintiff had associated with personal
carriers, like a back pack, or of a collection of
things in a woman's purse, and not of a cabinet or

desk.   The Plaintiff did not lose any work over
that issue, as the co-worker has sort of
volunteered and suggested inputting the chemical
inventory onto a database.   The inventory was a
project management of the Plaintiff's.   The
inventory project was one where comments had been
established about using others to help and
recruiting new tools to work with (a voice
recorder to perhaps allow working with objects
while at the same time committing item
descriptions to records).

Currently, where there have been accusations,
and unfounded rumors, that the plaintiff has been
subject, Plaintiff surmises of the potential of
the application of punishments where there should
be no effect/application.   It is like a measure to
modify the behavior of the Plaintiff where it is
plainly uncalled for.   If the community does not
want the Plaintiff to have a "widget", then the
stores in that community have removed widgets from
the shelf.   Plaintiff also claims that having the
contents of the backpack (Plaintiff considers it
an "oversize wallet") searched, is a relic of the
housing situation Plaintiff has largely been
forced into, initiated by an imposed illness,
1998, for starters as example.   The shelter system

is a containment system, on some surface aspects, however, this containment fall back is the short-ended version of receiving punishment in the real forms of incarceration, and even penal remedies for serious offenders, NOT victims of domestic violence, and political discretions reserved for the gnat of the antagonistic, and the nuisance of outlaw dissenters.  The relic of "search your stuff" is also parcel for security of the hospital, and the medical personnel.  Plaintiff has been in contact with emergency medical staff, and in duress, at the emergency room under the pain of insult and injury of petty infections.

For example, the visits Plaintiff experiences have typically been instituted on the Weekends. It starts as a cold, and then sometimes fever and hacking, and a throat infection, which threatens, for the most part to involve the nasal works.  At one occasion in 2003, there AT NEW England Medical Center's emergency room, the URGENT visit to the center is in absence of primary care which is normally only available 9-4 weekdays with the general practitioners.  Richard Foster, M.D., and later Plaintiff has come into contact with Dr. Barbara Edwards there on the weekend for throat infection, where there was no other immediate help

available for a sore throat.  Upwards of an hour
of the Plaintiff's time has passed, and once on
the inside of the ER center, before a physician
has become available, it was decided to check the
time, where a clock could be found.  The nurse has
come to patient, and said no wandering, get back
inside of the curtains.  It was less than another
15 minutes and the Plaintiff has been transferred
to another room for B. Edwards, M.D., signer of a
release and report, to come with three and four
hundred pounds of security personnel to guard the
Plaintiff for questioning.  Although she provided
the name, the Plaintiff had asked again, but would
not be able to reproduce it, until viewing the
medical records in later years at the time of
transferring Primary Care to another center.

Those guards, the beefeaters detail, or
personnel that check the ER security, made a
visible point that donning leather gloves and
standing by for the word of the medical staff,
they were not going to take a chance of Plaintiff
running out on them at the display of fear.  And
this is the point where Plaintiff has decided that
other medical help would justify leaving any
services with the emergency medical staff with the
New England Medical Center.

The searching of the bags and carry-all has the carry-over of employers wanting to know why they should hire a knapsack carrying employee. Plaintiff has kept membership for years with the former athletic club at Kendall Square, one also where the locker has been breached, physically. But employers picking up on these quibbles are beginning to overlook the athletic training of Plaintiff, and the reason why physical fitness has any importance.

Plaintiff's community disposition has been one that being such a target in the view of the perpetrator — the organizing influence has meant as well manipulating the Plaintiff's environments, and subjecting human participants in the environments to the view that Plaintiff's has to be manipulated in order that the goals of DEFENDANTs' party to succeed in rifling through plaintiff's satchel and spaces accorded for living.   It appears to Plaintiff that most of such persons manipulated in the environment being subject to these stream of influence are damaged, in that the goal to succeed that a monitor be effective for the surveillance of plaintiff's personal or business works.   Every person who security comes into contact with the goal of

surveillance has joined the increase of numbers of people tending toward suspicion of the Plaintiff. As the medical records of the Plaintiff contain the index flags on reports, similar to paranoia evaluations dispensed from the hand of Barbara Edwards, M.D., those who are within the reach of any security breach of those records, it is unlikely that Plaintiff is going to have work where there is not a tendency toward suspicion directed at the Plaintiff (another philosophy of containment). Types of personnel experienced with transfer of information include specialists such as in case management, or records managers.

Having records impounded is another layer of the manipulation of the environment, where possessions are out of reach, and as likely out of the control of Plaintiff's access.

To illustrate more of this, suppose that in any previous thirty days Plaintiff left the satchel in the room on a one-minute bathroom visit (an entrance not a hundred feet from the quarters in room #216) on several occasions only. That is, testing the environment for extreme vulnerability by leaving the backpack in the locked room, INSTEAD OF CARRYING the backpack on Bathroom visitation. Of course these were not announced —

the events are discovered.  Where does the
backpack get raided?  In those two or three
occasions, in the span of a month, there has to be
a lot of effort into gaining access at those
points of trespass specifically at those moments a
guard has dropped.  One a locked door, then the
anticipation of finding a targeted item for
confiscation.  Granted, the sort of malingerers
which will pick-pocket, are part of the
environment (and could be employed, for the price
of a flask of liquor);  there may also be large
amounts of un-occupied time available.  But in
motivating someone, a collusion has to occur
between two.  It is a legacy of the work with the
university.  It presupposes a damage to the
intended victim, which says that theft of material
in the hands of another are secondary to this
person's privacy, so therefore invalidates a part
of the person, or the possessions.

    It is a time of conflict, and it is also time
to call-off the dogs.

    Time and twenty-five dollars resources to
finance.  Plaintiff returns to residence with DVD-
ROM drive, where in the short span of several
hours the room is trespassed and targeted
destruction of new purchase is a mission

accomplished. How is the sneak-thief neighbor
informed that a DVD-ROM Drive would be lying out
in the room, along with he software CD-ROM? How
does the sneak-thief neighbor keep tabs on
community activity, enough to know when a neighbor
purchases new material.

The neighbor was not at the store. The
residence could not possibly know that a DVD-ROM
was carried inside the backpack into the building
interior, without a prior knowledge of its
acquisition. The sneak-thief neighbor would not
know that the new merchandise purchase would be on
display (not without foreknowledge or trespass)
while Plaintiff made trip to the necessary room.
The sneak-thief neighbor would not be in position
to enter the Plaintiff's room on "the next
opportunity," without being highly aware of the
movements, not only of the "subject", but in order
to defend against being caught in trespass, would
have to elude the presence and knowledge of
several other neighbors who might also be acting
in random movements egressing in and out of their
rooms. And the second floor has nearly twenty
residents. The presence of outside visitors is
too rare an occurrence.

The saboteur next door, also needed a key.

To restate the problem again:  PLAINTIFF is strongly convinced that SOME of the computer problems, and difficulties accessing those hard discs are related to others who have access to the Plaintiff's living spaces.  The computers, which are not hard-wired to other computers otherwise, apparently have been in use by regular and repeated intrusion of those who have physically entered the Plaintiff's room.  It is this group of people who are damaging and deleting some contents, and files, in the computer spaces of the Plaintiff.  If there would be no effort to monitor what the plaintiff thinks or writes, these intercession behaviors would not be present.

Illustration set two.  At a temporary placement on work assignment with a Boston Temp Agency, Plaintiff was taken to another area of the building to work on an unexpected photocopy task of preparing large medical files for official transfer.  The person to manipulate the Plaintiff was not even among the staff centered in Plaintiff's workstation, or cell locus.  Instead, it came from the security staff of the business and administrative office.  Plaintiff was taken to the files area to be away from his shoulder brief case, where it was later rifled and fax copies

taken for the nursing company's use.  The issue
was that the Plaintiff had discovered the breach
and communicated the losses of interest in working
on medical transcriptions and billing coding.  The
temp agency has been notified, according to the
rules of work and policies of employment agreement
signed at the time of contractual engagement.

2.  **Attachment**.  Referenced in prior AFFIDAVIT
January 12, is communication conveying a letter of
thanks for the CHA department of occupancy and
leasing, for the mobile section eight with Claire
Edouard.  The attachment in the November 21, 2006
e-mail from the Yahoo.com account did not work.
During uploading, or creation and transferral into
the e-mail a process has limited the functionality
of the PDF "file_1121.pdf" and access to view or
to save the PDF has been abrogated.  It is assumed
that the copy the housing agency has received does
not function either, the same as the copy
transacted into the inbox folder at the
Plaintiff's account.  Therefore, relying on a text
message which was remade into a WORD, DOC.doc type
Microsoft text document, the letter was
reconstructed.  The letter also was re-transmitted
without the cost of a stamp, or letter envelope to

the recipients.

3.   **Attachment**.   Letter of JLT to the leasing
and occupancy staff at the Cambridge Housing
Authority, January 17, 2007.  The Plaintiff has
made a cursory review of the folders and their
content and state that folder contents should
allow the process of the Section Eight voucher.
Without another application, Plaintiff's non-
selection of the CHA tendering of a completed
voucher on moving into independent living has
solidified.  The block on access to business
records hamper Plaintiff's access to appropriate
housing choices.

4.   **Attachment**.   Letter of Antonette LaRosa
dated for January 03, 2006 [sic], Original
document which has been delivered to the
Plaintiff's door, 01-03-07.

Notation, and appended:  The plaintiff affirms
that after mid-2006, it is the first occurrence in
which residence has had the toilet plumbing fixed
in the large stall on the second floor, where a
growing pool of water on the floor is not
resultant from the lever flush-action.

5.  **Computer Lab Incidents, the Cambridge Public Library**.  Attached are some data on work stoppages with the local Internet Room, Cambridge Public Library.  Attachment:  "1/19/2007 10:16:25 AM" presents a detail of the computer use at the precise time, which has been PRIOR to the DESKTOP seizure.  Plaintiff has saved some desktop menu box informational messages, from processes that indicate the browser is not working, Internet Explorer, for Plaintiff's machine at Hotmail.com site.  At the time of release of the computer desktop, the CYBRARIAN software had been lost, and the desktop returned to a normal screen outside of the software queuing mechanism.  It was some five, or ten minutes after talking with another librarian about Hotmail.com access, and denial of service attacks.  Attachment:  "Event transcription Wednesday, Jan 10, '07" portrays an incident at Internet Room machine Eleven work stoppage, only minutes after the Plaintiff has accessed the e-mail account on Internet Explorer. On this particular machine, Internet browsing had been curtailed, and no connection permitted again. The Yahoo.com account was not logged out, in normal procedural protocol.  Access blockade.

The use by a link, at the YMCA, from the YMCA,

or a combination, of another resident for intercession with the Library network facility for public use, in some ways violates the privacy of Plaintiff. The account has been given for Internet use, by one of the Library systems Branch Librarians, who has the authority to issue patron accounts. The intent of the account was to thwart public use of the ID, where Plaintiff's use of computers brought destruction of Plaintiff's files utilized on the computers, and illicit access to the accounts in use for electronic mail. It has sort of been deduced that the system administration of the networked channels at the libraries have been a source of problems, perhaps simply being identified as logged onto the system for an hour a day would be enough for disappearance of files, destruction of files or content, and corruption of use of Internet for emailing (stopping the browser, closing it out, clogging the computer or the connections points with denial-of-service attacks). One long-standing problem is simple access to attachments with Hotmail accounts from the Internet Room computers. Attachments do not open, sent from other email accounts of Plaintiff.

By having a once anonymous account, it has

been for a time a relief for the present problems of the system freezes, or of the browser stopping, or sometimes just being switched off, as the current examples explain.  These types of problems are sort of guessed that influences and pressures are created to interrupt Plaintiff's work at public terminals.  There are other places where this is not a factor in computer use, or of the point of access to plaintiff's electronic mail. The problem is not described as one strictly as corrupted software, and malwares.  Analysts at the Computer Associates International have identified malware on a floppy diskette, 1.44MB, sent to them from an attack on a Windows 2000 system at the Child Care Resource Center in the 2002 to 2003 years.  The computer there corrupted the Plaintiff's diskettes, destroyed files, and disturbed sensitive work days in the making.  The computer also crashed, and at other times, opened email accounts were disrupted at the time of working on those same workstations.  Software designed to disrupt files can be left on machines for users specifically identified by one number or another.  By and large the name of a disk or a file is a chief means to bring an attack on it, or its associations with other programs and types of

software.

The administration function of the Cambridge
Pubic Library has identified the Plaintiff's
ancillary account as a illicit user's account.
The stoppage and seizures of email account screens
are a way to remind Plaintiff of their detections
of "unauthorized" access perhaps to their system,
most likely by those in the queue watching as the
Plaintiff logs onto the system with user names
such as 'kwik', 'quack' and 'click'.  Never brian.

The information which is lost to the
connections at the Cambridge Public Library,
through the Internet Room use has been detected,
sought and purloined for use later at the
Residence at the YMCA (perhaps not).

**Reference statement for Plaintiff's use of
Internet Room, January 10, 2007.**  On the occasion
of the back-up, stoppage, and denial-of-service
(i.e., commandeering) of the Internet Room
resources on the 10 day of January 2007,
DEFENDANT's and party of the DEFENDANT have
captured data, and information about a personal
contact in the State of Maryland, where records
are held, either out of plaintiff's use, or in the
custody of another user's.

January 10, 2007:  Marking an aggravated phase of
patronage and use of the public library.
Incursions into the spaces accorded to guests at
public spaces and facilities use at the library
for general use of the public.  These events do
not appear to be so random, as they have been
considered in the past, either with the spaces at
the Central Square branch, or at other locations
for the public library.  The Rotary Technology
Center has been a center of slightly subversive
activity with respect to the plaintiff's use of
computing there (similar to those at the CCRC).
Intrusions were sensed as files had actually
disappeared from the desktop which Plaintiff had
been working with.  At other times the content was
noticed to disappear from the file, leaving
nothing behind.  Granted, Open source computing
did produce computer files in various formats, and
perhaps unrecognized to the Microsoft operating
systems in use at the library, however insecure
the OS software may be.  But to attack a file, or
to destroy and corrupt the contents is something a
anti-virus would mount an attack over.  Sometimes
problems arose, and at other times, and other
computers, the disastrous activity was unapparent.

Cambridge Public Library events 5:41 p.m. First viewing of remote events of Maryland from a email communication from the desk of Chuck Hawley. Computer seizures, and freeze, account log use by those in the computing base there. Main branch of library.

**Reference statement for Plaintiff's use of Internet Room, January 17, 2007.** 2:00 p.m., as Plaintiff came to the Cambridge Public Library at the Longfellow School temporary location, the worker who would be in care of the Internet Room has just come to the entrance of the building at the time prior to two pm, and less than a hundred feet behind the Plaintiff. Stationed there was a person who manned the Internet Room and was in charge on the 10 January. He was to be relieved apparently for a 2:00 changeover on a shift, so the new arrival would be in place. The Plaintiff has experienced a violation of access on this afternoon's work at the library. The access violation has been accomplished with the assistance of the Internet Room Librarian, or perhaps both of them. The violation exists on the account in use with the library. It also involves the alternate account with the library, which has