been established to the use of the exclusivity of the Internet Rooms with the Cambridge PUBLIC LIBRARY system.

It is apparent that a third floor resident of the Cambridge YMCA has been given rights of access to the account use at station three on this afternoon. The library staff has recruited this person's assistance for the purpose of abusing the patron, perhaps? The Plaintiff, whom has been issued a secondary library account, and whom has now been under attack has arrived to the point of the charge of unauthorized usages of the public services at the library? At the library, the Internet Room occupancy has been close to full on the half-a-dozen computers, or so. There are disabled computers, up to four an five stations in the past week, which means that the accommodations are diminished to the regular crowds. The computers now are assigned with the Cybrarian® queuing system, where prospective users are logging in on software for first come, first serve, for either hour (1-12 workstations), or the twenty-minute machines (a, b and c workstations). The queue was empty at the time of arrival. But as the Plaintiff wished for space to open at an hour machine, two entries had been made in the

queue, at the time Plaintiff was ready.

The queue contained the name, first up, "brian", and another. The plaintiff observed the heavy bolding of the screen name which designates the computer, and the time at which the computer would default to the next users after a given grace time. The number three station is where the login for first user was intended. The screen on the Station #3 computer contained the green menu box with the name "brian" clearly bolded above the log-in menu box. There were other stations open, as the chairs were unoccupied. To the accounting system, as they were open, some displayed the name for the intended user. To others neither a queue name box with a light brown border, nor a log-in box was filled with user information.

When the log-in menu box is up, without a QUEUE name assignment, the computer is meant to be available. A user logs on, without others in tow. However, the conditions at the time the screen display indicated "open for use," there was a queue. The queue contained at least two entries.

"Go to the third computer," the Internet Room Librarian said, "it is open to use." It was not open to use to general users, who have not logged into the queue at the Cybrarian station. The

Plaintiff pointed out the open "to use" state of
the computer (e.g., No. 7 workstation) where the
screen display had no border green menu box.  But
the Plaintiff also said to the Internet Room
Librarian that he would not log into the Number 7,
or the Number 8 station for the reason that a
queue existed, AND that the name has not come to
the screen where those computers were empty.

"You can go log onto number three," he said,
"it's open."  The screen display, the Plaintiff
pointed out a second time, indicates that only
"brian" may log onto that computer.  "Go log in,
the computer is open" to use.  He was insisting.
This does not tally with what the queue is
indicating.

The librarian intended for the Plaintiff to
use the computer station three, where the queue
had designated user "brian."

In a few minutes, when more people had come to
the Internet room, and a family with a number of
children had loaded the twenty minute machines,
the plaintiff moved to get a place, and went to
the Cybrarian log-in in the hall.  These are two
computers dedicated for patrons intending to the
use the computers for Internet at the twenty
minute and hour machines.  The computer designated

for "Handicap Use" only (number 6), for the
visually impaired especially, was empty and
plaintiff sat for a moment at the station.  Before
opening up the browser, the librarian came to say
to stop, because it was only intended for use by
handicap, and returned the sign back in the front
of the monitor on the keyboard.

Plaintiff went to the Cybrarian® logon
computer for the hour machines.  Plaintiff
inserted the name "click" into the user field, and
then entered the account number.  To the
plaintiff's surprise, when the plaintiff's account
with the library had been entered into the hour
queue, the response had been "You are already
logged onto the system, please go directly to the
computer Internet03."  This was repeated.  The
Plaintiff went inside and checked station three.
The name "brian" stood.  As soon as Plaintiff had
a view at three and there was no one seated at the
computer IN-03, the Plaintiff entered a name for
the queue.  Again, the message upon submitting
queue request returns, "You are already logged
onto the system, please go directly to the
computer Internet03."  The menu box was green and
there was the same name "brian" in the green
background indicator.

Now, the question arises, if the alternate account has not been logged out, and the time on the twenty minute side has been expired, there remains to be explained that Plaintiff's account has been in use with another Patron.

It is surmised, with the help of an IT person, on the inside of the Cambridge main branch that Plaintiff's account has been put into use.

This has resolved, as the plaintiff has waited a while. The person who did come to the station at the Internet Room Computer03 was a resident of the Cambridge YMCA, where the Plaintiff resides, but from another floor. This person has been given access to the Plaintiff's use of the account for the computer. The system administration has assigned the computer to the third floor resident's use. It would only be a matter of copying the field where the account number has been entered. Anyone with access to the Cybrarian software environment would be capable.

It is unlikely that the third floor resident is acting on his own behalf with Plaintiff's account identification. Although, it is yet to be determined whether the breach COULD Be from the serial of raids targeting the backpack which the plaintiff very, very rarely leaves unattended.

It is yet to be determined that the
information necessary for the IT Access is not
derived strictly from within the software and
system of the computer room, for the use of the
staff with the purpose to surprise the Plaintiff's
visit.  An a priori reasoning that having two
accounts with the library the Patron has been
using is an unauthorized act.  The library may
also be acting to find that the source of the
account has not been a legitimate one.

Are plaintiff's personal electronic mail
accounts are being pilfered?

Is the degree to which Plaintiff's privacy has
been compromised due to discovery actions of the
library?  The assumption is that with screen
freezes, and computer lock-outs, while the Patron
is in use of the email that losses are actively
transpiring.  And as the plaintiff does not recall
a single instance of a computer seizure at any
time other than when a email account has not been
opened and in use, it is assumed that the
electronic mail that is being scrutinized.  In the
long history of abuse which the plaintiff has
suffered at the INTERNET computer rooms at the
library of public uses, both in Boston and in
Cambridge, plaintiff does not hold a high opinion

of the library services.

Why under the  name of "brian"?  Coded for
another scandal under a pseudonym it could mean
other personal information for the Plaintiff.  The
speculation is not forwarded at this time.  The
person who has stepped into the seat at
COMPUTER03, the Plaintiff does not vouch for his
presence at the library in recent memory.  Unlike
two perhaps three others, the YMCA is not a very
well represented group at the library.

The artist, the person who is avid drawer and
sketchbook artist, appears friendly at most of the
times, resides on the third floor.  It is hard to
believe that PLAINTIFF's personal information
would be driving his agenda, as it has apparently
infected a core of people in the third floor
nucleus of problem.  Someone there is driving from
personal information abstracted from the Plaintiff
(and now library use is included).  There is a
finite residua of problems residing on the wing of
the residence one floor up, and there happens to
be the strong element of the downstairs security
desk, and the information nexus at the front desk
(the front desk is teeming with the unofficial
'water cooler' rumors environment, driven in large
part by what goes on at off-hours, when the YMCA

closes the business end of its services, when the
security assumes the front desk). Plaintiff has
been named "bad" by many of the riff-raff, and a
scandal appears to be persistent.

Recall for one, testimony, in which "No. 217"
Charles has approached the Plaintiff's face at the
morning mirror, not even at the YMCA, to drop
innuendo about being in violation of federal
charges, "done somethin wrong" and "something is
wrong with him". And it "now" Plaintiff "owes"
dues to #217 Charles and all of his friends and
family because someone told him of an offense.

But now what drives the third floor southeast
wing of the YMCA to be such a scandalous bunch of
busybodies? Someone, or somewhere, there has been
a huge input of personal information relating to
the Plaintiff and his personal connections for
this to transpire? Many of the violators,
relative to the Plaintiff, from the third floor
have even moved on, with no change in their
agenda. They have gone away with poorly
configured pictures of the reputation, that is,
how they are acquainted with the Plaintiff, and
who it is that has published to them.

### Reference statement for Plaintiff's use of

**Internet Room, January 19, 2007.** Cambridge Public
Library, Internet room.  Station 7, approximately
10:30.  In regular account, the activity of
another user is suspected as the computer has
frozen, and has been seized with electronic mail
account opened, Microsoft Word, with data about
why Hotmail.com use is not available to open
attachments, a second window with Craig's List
open on jobs in the community, and another window
with job references from Craig's list, a window
opened for the computer drive to bring files for
Plaintiff's use onto the desktop.  These files
were being applied to the jobs and positions
plaintiff had gleaned for the morning, after a
session with personal agenda had been accomplished
in the ¾ hour just prior to the seizure of the
computer.  Although the Dell workstation has
Pentium class four cpu, and Windows Xp
Professional, the windows became inactive to some
function the computer has been instructed to
process.  Six, perhaps seven windows, really is no
challenge for such an equipped desk top
workstation.  Use of the Internet in earlier
phases of work on the morning of the 19th has
proven problematic, as Plaintiff has tried to
demonstrate a long standing problem with

Hotmail.com and the availability of electronic mail with attachments. In fact, Plaintiff wished to enter a complaint with the facility, as it appears to Plaintiff that HIS account with Hotmail does not, and has not for a long time, been enabled to retrieve attachments to view in the browser window.

At the point of demonstrating to the second Librarian, named Susan, where the screen points to the browser troubles, another instant of Internet diplomacy has transpired, where a work-slowdown does not even permit the notice of unavailability to appear, instead hangs on the prompt to Get File, or to download the attachment. As the plaintiff explained the problem, "it was as though another had knowledge of [Plaintiff] wanting to access his own records AT THE TIME of demonstrating a problem, and was actively preventing the use of the records to appear through a denial of service attack." Plaintiff explained to the librarian what denial-of-service attack means under this circumstance as similar to a shopper who attempts to exit the store, and wants to check out with merchandise, but is put-upon by a hoard or twenty or thirty people converging at the register at the same moment. It

also maybe with the intent to delay the shopper at the exit.  She said, what an appropriate analogy it was, as she experiences a similar access with her own account at times.

Plaintiff asserts that an access violation has occurred, and the symptom here is another person stopping the screens, and perhaps performing a content review of particulars into the business of the Plaintiff.  Furthermore, such a review is more invasive as Plaintiff's email communications are perhaps as well being scrutinized for relevancy to legal proceedings which the plaintiff is involved, or has been involved.

6.  The 10:00 AM meeting of the **employment interview**, November 08, 2006, with the computer store personnel staff is such as one would not find in the complaint to the housing authority as a regular venue for such material.  However, there does appear to be the aspect of work, and what type of community involvements the Plaintiff has incurred as it relates to responsibilities the housing agency may be handling, such as determining conditions in community privileges.

Community supervision is also a term which denotes a offender status, either for thieves, or

other petty type of class offenses.   It is
somewhat implied that someone J. Doe, attached
inside to the residence has first hand knowledge
of the classified activities of their residents.
Having a patrol car (which on this occasion, had
the Number "218" painted on a department of
Cambridge Police vehicle side) appear on the store
premises before the Plaintiff left is something of
a signal of this state. The presence is a
indicator of foreknowledge.   Has the officer been
summoned?

Another flag on the employment interview is
that paper work left with the personnel offices
has not been recovered at the time of the
interview, nor in a follow up check in a few days.
The application seems to be the first portion of
documents in which it is possible to set an offer
for employment, yet Mr. E. Weeks has not
referenced the kind of paperwork entered by the
Plaintiff.

An exhibit, a light green sample "APPLICATION FOR
EMPLOYMENT" has been attached with this affidavit.
The original has been submitted to the personnel
offices there, but unfortunately copies of the
transmittal letter were not possible since the
application has not been outside of the Micro

Center.  The electronic mail sent to Mr. Weeks
from the Plaintiff's Yahoo.com account is annexed
to the affidavit.  Plaintiff has asked at a few
days hence, whether the recovery of the original
document has surfaced in the office.  There has
been an offer of interest, while at the same time
a white-paper has been completed at the time of
the interview, most likely documenting an offer of
the evening operational aide position there, and
not with the customer service employment which the
application has designated, when rendered at the
office in October 2006.

Furthermore, Upon the interview's conclusion,
Ed Weeks queried if Plaintiff were going to come
work for the Micro Center, Plaintiff would be
hired essentially at minimum wage, and would
Plaintiff be OK with that.  He offered a position
on the evening shift, and as a operator for the
call line, supervising somewhat as well, other
positions which worked in the evening, closing at
ten at night.

The job requested on the application was
certainly in customer service, but from the job
description provided in the interview, Plaintiff
came away with questions as to where, and with
whom, the job would actually take place.

Plaintiff made no assumption which relied on intuition about doing cash register work, nor with providing sales support from the floor, or at a station so designated to work. These facts were not available, but not unrelated to phone work, like an operator's job stationed at the phone, one in customer service would have to have prices available, and be able to refer to facts and specifications on the products themselves. At the close, he sounded interested, and suggested one named, "arsenio" would be in touch, or phone me at the voice mail for the next step in hiring. The name did not come across, though it was said twice, and due to the accent, Plaintiff has not discerned other designations to which the name could be approximated to, such as an Italian or other Latinate derivative. No call of interest from the designated hiring manager has been registered in the voice mail of Plaintiff. The personnel manager has not followed up on interest as well. The plaintiff has forwarded to inquiries.

7. Every person who obeys a perpetrator's order to organize to appropriate plaintiff's personal property acts to damage human contact and

to damage every human relationship and working
relationships in the process.


I, Jeffrey L. Taylor, state and depose for the purposes of
this record the preceeding content, and under the pain and
penalties of purjury attest the truth and the accuracy,
and for true copy of any material attached, of the proviso
this 25th day of January 2007.

_____

[ signature ]

# Event transcription Wednesday, Jan 10, '07

<u>Cambridge Public Library</u>, Internet Room
Time:  5:41 p.m., earliest event recordation.
Time:  5:51 p.m., last access with Internet Explorer (not permissible).

Normal use of machine eleven of Internet Room has been interrupted, and call upon librarian to re-instate the computer, and to restore queue position for customer use not effected.  Total functional time on computer use is perhaps five minutes.

Electronic mail general failure, and failure at the local machine of Internet Explorer.

Menu box:
[ "Error  X"    [ box "OK" ]

      "Please contact Computers by Design, Inc.  Error Number:  10557 from Module MachineInfo" ]  End of message on pop up menu/display box.

The Internet Explorer screen shot is the last page the email account with *j_taylori@yahoo*.com is registering.  It has frozen on a screen-page viewing the email sent to library user.  <u>Forward and Backward buttons</u> produce the Internet Explorer screen for [5:46 p.m., EST] blank medium: "The connection to the Yahoo server can not be (obtained) at this time. ... ... "  It is not possible to dial another URL, or other directive.  Only a single page of email account is viewable, others non-navigable.

At 5:51 after rebooting the computer, an Error menu box has appeared again, with Yahoo Messenger.  Internet Explorer does not function, in patron account.  [ "ERROR X" red circle ] "Please contact Computers by Design, Inc.  Error Number:  10552 from Module MonitorAPPS." also with a box for "OK" button.  MS Windows Xp pro, OS.

The use of computer no. **Eleven** with the Internet Room, CPL, has been restored by user logging out, and permitting the next user in the queue to come onto the station.

The Internet librarian has not restored the computer user to a suitable place in the queue until after five other users were processed into the facility use.  Inconvenience: a loss of time for about a half-an-hour.  Additionally, when patron has attained Internet Explorer use to get to the Yahoo.com email account, on No. **4** computer, he has learned that his account has not been logged out.  The alternate account number is still in use, therefore, the regular account has been entered to establish normal business, or business as usual, with the Yahoo.com electronic mail.  The queue gone.

If the alternate account is still in use, however, does the freeze indicate breech of email, for the use of an anonymous user/monitor to read the email account particulars?

1/19/2007 10:16:25 AM

error access to Hotmail.com attachments

step one.

File Doenload: security warning. Do you want to save this file?

Button, save, button, cancel. Name: { x.doc, y.pdf, etc} Type: zz From: 65.55.137.124

Step two.

Microsoft Internet Explorer

X Internet Explorer cannot download . . . . {file. . . from 65.55.137.124.}

Internet Explorer was not able to open this Internet site. The requested site is either unavailable or cannot be found. Please try again later.
Button: OK.

The file download progress window is motioning about moving a file.

"Getting file information: {file} from 65.55.137.124
estimated time left to download to: transfer rate:

PO Box 391701, Cambridge, Massachusetts 02139-1701
Voice Mail: 617.918.7873
Electronic Mail: < j_taylori@yahoo.com >

January 17, 2007

John Cassama
Leasing and Occupancy
Cambridge Housing Authority
675 Massachusetts Avenue
Cambridge, Massachusetts   02139

Claire Edouard
Leasing and Occupancy
Cambridge Housing Authority
675 Massachusetts Avenue
Cambridge, Massachusetts   02139

Dear John and Claire,

I have intentionally copied this over to the address
of Claire Edouard.  This is simply because I have
her's, and she has opened enrollment.

        Thank you for the time for me to pour through the
data on file with your office.

        The information contained in the folder and is
relevant, and should be available for application
input to file for any Section 8 voucher openings.   The
matter of the statements on that application have not
been cleared for inclusion.

                        Very truly,


                        Jeff Taylor

BY EMAIL ONLY
        Claire Edouard
        John Cassama



j_taylori@hotmail.com                                        Printed: Wednesday, November 22, 2006 10:55 AM

**From :**   jeff taylor <j_taylori@yahoo.com>
**Sent :**   Tuesday, November 21, 2006 10:35 AM
**To :**     cedouard@cambridge-housing.org
**CC :**     Jeff <j_taylori@hotmail.com>, Jeff <j_taylori@yahoo.com>
**Subject :** GREETINGS

📎 Attachment : file_1121.pdf (0.08 MB)

please see BELOW

the annexed docs will arrive under another cover.

jeff

jeff taylor
po box 391701
cambridge, ma 02139

v-mail:  617.918.7873

Sponsored Link

Online degrees - find the right program to advance your career.
www.nextag.com



THE MERVYN D. DEMILLE
RESIDENCE AT THE
CAMBRIDGE FAMILY YMCA

820 Massachusetts Avenue
Central Square
Cambridge, MA 02139-3296
Property Management: 617 876-4626
Fax: 617 876-4619



January 3, 2006

Mr. Jeff Taylor
Unit 216

Dear Mr. Taylor,

I am in receipt of your last three letters and I just wanted to address your concerns.

The light bulbs in the showers are stolen frequently, that is why it may seem to you that it has been quite a while since there has been no lights out. Ed replaces them regularly.

We do have the urinals and toilets cleared out on a regular basis and if something happens to be blocking them either Ed will remove it or we call a plumber.

The shower wand keeps getting vandalized and we do replace that also on a regular basis.

I do still need to make a copy of your key. We do not have one on file and if you ever lose your keys would not be able to make you another one and the cost to replace the core is $20.00, which you would incur. So I would appreciate it if you could come into the office and let us make a copy of your room key.

If I can be of any further assistance, please let me know.

Sincerely,

Antonette LaRosa
Assistant Property Manager

 **Hotmail®**

tayor29@hotmail.com                                              Printed: Tuesday, December 26, 2006 6:18 PM

**From :**   jeff taylor <j_taylori@yahoo.com>

**Sent :**   Thursday, November 9, 2006 3:34 PM

**To :**    eweeks@microcenter.com

**CC :**    Jeff <j_taylori@yahoo.com>

**Subject :**   INTERVIEW

dear ed weeks,

thank you for time wednesday to discuss the potential for employment at the
microcenter.

sincerely,

jeff taylor
po box 391701
cambridge, ma 02139

v-mail:  617.918.7873

Cheap talk?
Check out Yahoo! Messenger's low PC-to-Phone call rates.
http://voice.yahoo.com

# APPLICATION FOR EMPLOYMENT

We consider applicants for all positions without regard to race, color, religion, sex, national origin, age, marital or veteran status, the presence of a non-job-related medical condition or disability, or any other legally protected status.

FOR OFFICE USE ONLY

| Possible work loc. | Possible positions |
|---|---|
| | |

Position(s) applied for _____    Rate of pay expected $_____ ___per_____

Available for working:  ☐ Full-Time   ☐ Part-Time (less than 30 hrs. per week)   If Part-Time specify days and hours _____

☐ Temporary   ☐ Seasonal

Days and hours available to work?   Mon.  Tues.  Wed.  Thurs.  Fri.  Sat.  Sun. _____

Were you previously employed by us? _____   If yes, when? _____

Do you have any relatives employed by this organization?  ☐ YES ☐ NO   If yes, Name:_____

Have you previously applied for a position with this Company?  ☐ YES ☐ NO   If yes, when?_____

If your application is considered favorably, on what date will you be available for work? _____

Referral Source:  ☐ Advertisement - What publication?_____
☐ Friend   Name: _____    ☐ Relative   Name:_____
☐ Employment Agency    ☐ Walk-in    ☐ Other_____

## PERSONAL

Name _____   Social Security No. _____
  Last    First    Middle    Home

Present Address _____   Phone No. _____
  No.    Street    City    State    Zip

State age if under 18 _____   Phone No. where you may be contacted _____

If hired, can you provide the required documents to prove that you are authorized to work in the United States?  ☐ Yes  ☐ No

Can you travel if job requires it?  ☐ Yes  ☐ No

Are you available for relocation?  ☐ Yes  ☐ No

Is there any information we would need about your name or use of another name for us to be able to verify the data on this application?   If yes, Please Specify: _____  ☐ Yes  ☐ No

Are you capable of performing the essential functions of this position with or without reasonable accommodations?  ☐ Yes  ☐ No

Have you been convicted of a felony within the last 7 years? If "yes", explain_____ (You will not be denied employment solely based on answer.) Applicants whose arrest or conviction records have been sealed by the State may answer "no"  ☐ Yes  ☐ No

Do you have any contractual obligations or non-compete agreements with current or past employers?   If yes, indicate company/terms_____  ☐ Yes  ☐ No

| Education | High School | College/University | Tech. or Business School |
|---|---|---|---|
| Name of School and Location | | | |
| Circle Highest Year Completed | 9  10  11  12 | 1  2  3  4  5  6  + | 1  2  3  4 |
| Type of Diploma/Degree | ☐ College-Prep ☐ Business ☐ Vocational ☐ Technical | | |
| Describe Studies— Major, Minor, Etc. | | | |
| Extra-Curricular Activities, Honors, Awards, etc. | | | |
| Grade Point Average | | | |

January 25, 2007      AFFIDAVIT -- ANNEXATION      Post CA–04-11802

1006